NITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
TROIKA MISSION GROUP, INC., TROIKA        :
MISSION HOLDINGS, INC., MISSIONCULTURE    :
LLC, and MISSION MEDIA USA, INC.,         :     Index No.: 19-cv-00145-ER
                                          :
              Plaintiffs,                 :
                                          :
    -against-                             :
                                          :
NICOLA STEPHENSON, JAMES STEPHENSON,      :
and ALLMAC LLC,                           :
                                          :
              Defendants.                 :
------------------------------------------------------------------X

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR CONTEMPT AND <u>MOTION TO BROADEN INJUNCTIVE RELIEF</u>

WITHERS BERGMAN LLP
Dean R. Nicyper
Emma Lindsay
Chaya F. Weinberg-Brodt
Joseph Gallo
430 Park Avenue
New York, New York 10022
Telephone: (212) 848-9800
*Attorneys for Plaintiffs*

## Table of Contents

|  | Page(s) |
|---|---|

Table of Authorities ...................................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................... 1

STATEMENT OF FACTS ............................................................................................................ 2

    A. The Stephensons Were Fired from the TMG and MM Companies, But Continued to Interfere with the Companies' Business, Resulting in This Court Issuing a Temporary Restraining Order Against the Stephensons ....................................................... 2

    B. The Stephensons Knowingly Violated this Court's Order by Attempting to Withdraw Almost $150,000 from MissionCulture LLC's Bank Account ............................ 3

ARGUMENT .................................................................................................................................. 7

    POINT I    DEFENDANT JAMES STEPHENSON SHOULD BE HELD IN CONTEMPT FOR VIOLATING THE TEMPORARY RESTRAINING ORDER .................................................................................. 7

        A. The Applicable Standard ............................................................................. 7

        B. The January 7 TRO Clearly and Unambiguously Bars the Stephensons from Accessing and Stealing Money from Plaintiffs' Bank Accounts ................................................................................. 8

        C. Proof of Non-Compliance with the Court's Order Is Clear and Convincing ................................................................................................... 9

        D. JS Has Not Diligently or Reasonably Attempted to Comply with the January 7 TRO ............................................................................. 10

        E. Plaintiffs Should Be Awarded Sanctions, Including Attorneys' Fees and Costs ............................................................................................ 11

    POINT II    TO HELP TO PREVENT FUTURE MISCONDUCT BY THE STEPHENSONS, THE TRO AND PROPOSED PRELIMINARY INJUNCTION SHOULD BE BROADENED ............................................... 13

        A. Plaintiffs' Request Relief Is a Direct Response to JS' Theft of Company Funds ........................................................................................ 13

        B. Plaintiffs' Request to Broaden the Injunctive Relief Plainly Meets the Relevant Legal Standards ........................................................ 14

CONCLUSION ............................................................................................................................ 17

# Table of Authorities

**Page(s)**

**Cases**

*Aviv v. Brainard*,
  2018 U.S. Dist. LEXIS 176169 (S.D.N.Y. Oct. 11, 2018) ................................................. 8, 10

*Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd*,
  598 F.3d 30 (2d Cir. 2010) ................................................................................................. 14

*In re Doria/Memon Disc Stores Wage & Hour Litig.*,
  2016 U.S. Dist. LEXIS 7225 (S.D.N.Y. Jan. 19, 2016) ........................................... 7, 10, 11

*Kelly v. Evolution Markets, Inc.*,
  626 F. Supp. 2d 364 (S.D.N.Y. 2009) ................................................................................ 14

*New York State NOW v. Terry*,
  886 F.2d 1339 (2d Cir. 1989) ............................................................................................... 8

*Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*,
  369 F.3d 645 (2d Cir. 2004) ...................................................................................... 7, 9, 12

*Register.com, Inc. v. Verio, Inc.*,
  356 F.3d 393 (2d Cir. 2004) ............................................................................................... 15

*SEC v. CKB168 Holdings, Ltd.*,
  2016 U.S. Dist. LEXIS 136925 (E.D.N.Y. Sep. 28, 2016) ................................................. 12

*SEC v. Northshore Asset Mgmt., LLC*,
  2006 U.S. Dist. LEXIS 39255 (S.D.N.Y. Jun. 14, 2006) .............................................. 11, 13

**Statutes**

Federal Rule of Civil Procedure 65(d) ........................................................................................ 8

Local Civil Rule § 83.6 ............................................................................................................... 7

18 U.S.C. § 401 ........................................................................................................................... 7

Plaintiffs Troika Mission Group, Inc., Troika-Mission Holdings, Inc., MissionCulture LLC, and Mission Media USA Inc. respectfully submit this Memorandum of Law in support of their Motion for Contempt Against Defendant James Stephenson and to Broaden the Existing Temporary Restraining Order and Preliminary Injunction, brought by Order to Show Cause.

## PRELIMINARY STATEMENT

Despite this Court's issuance of a temporary restraining order (Docket No. 3) on January 7, 2019, NS and JS have failed to cease their tortious and destructive acts. On January 23, 2019 – this past Wednesday – Plaintiffs learned that James Stephenson attempted to withdraw $148,622.15 from a MissionCulture LLC bank account to pay his American Express credit card bill. Today, January 28, 2019, Plaintiffs learned that James Stephenson again attempted to use a MissionCulture LLC bank account to pay his American Express credit card bill on January 25, 2019 and January 27, 2019, in the amounts of $113,938.87 and $34,770.98, respectively. Not only did these actions violate the Court's temporary restraining order, but also they highlight the clear and present danger that the Stephensons pose to the companies.

It is apparent that the Stephensons still have access to at least one of Plaintiffs' bank accounts that is electronically linked to JS' credit card account. Plaintiffs are extremely concerned that this is not the only company bank account to which the Stephensons have access, and that the Stephensons have now shown that their campaign to derail the TMG and MM companies' operations has not been halted by this Court's January 7, 2019 temporary restraining order.

As a result, Plaintiffs respectfully request that the Court: (1) hold James Stephenson in contempt of the Court's January 7, 2019 temporary restraining order, and award sanctions to Plaintiffs; and (2) issue an order broadening the terms of the January 7, 2019 temporary

restraining order, and Plaintiffs' requested preliminary injunction, to more explicitly bar the Stephensons from accessing Plaintiffs' property and electronic systems, including Plaintiffs' bank accounts.

## STATEMENT OF FACTS

A. The Stephensons Were Fired from the TMG and MM Companies, But Continued to Interfere with the Companies' Business, Resulting in This Court Issuing a Temporary Restraining Order Against the Stephensons

The circumstances giving rise to this lawsuit have been described at length in the Complaint and in Plaintiffs' previous court filings on January 7, 2019. The relevant facts from those filings are summarized herein for the Court's convenience.

Plaintiff TMG purchased the Mission Media ("MM") companies from Defendants NS and JS on June 29, 2018. (Declaration of Christopher Broderick in Support of Plaintiffs' Motion for Contempt and Motion to Broaden Injunctive Relief, dated January 28, 2019 (the "Broderick Declaration"), ¶ 3.) One of those purchased MM companies was MissionCulture LLC ("M-Culture"), a Delaware LLC. (*Id.*) After the sale, NS and JS were allowed to continue in management positions with the MM companies. (*Id.* ¶ 4.) For the reasons described in the Complaint, NS and JS were terminated, for cause, from their respective positions in the MM companies, including M-Culture, on January 4, 2019. (*Id.* ¶ 4.) As described in the Complaint, despite being terminated, NS and JS continued to interfere with the business of the MM companies, including their interference with the MM companies' email accounts and electronic information without authorization. (*Id.* ¶ 5.)

On January 7, 2019, in response to NS' and JS' continued interference with Plaintiffs' business, Plaintiffs filed the Complaint in this action, and filed papers seeking a temporary restraining order and preliminary injunction against NS and JS. (*Id.* ¶ 6.) On January 7, 2019, this Court granted Plaintiffs' request for a temporary restraining order against NS and JS (Dkt. 3,

2

the "January 7 TRO"). Among other relief, the January 7 TRO provided that: "(1) the Stephenson Defendants, who are no longer employees of the MM companies, are enjoined from entering the physical or virtual premises of TMG, or any of the MM companies; (2) the Stephenson Defendants, who are no longer employees of the MM companies, are enjoined from using or accessing TMG's or MM's electronic information or systems, including any MM or TMG emails accounts in their own names, or in the names of any other person or entity..." (*Id.* p. 2.) The January 7 TRO remains in place and, absent any action by the Court, will continue to remain in place until the preliminary injunction hearing, which is currently scheduled for February 11, 2019.

B. The Stephensons Knowingly Violated this Court's Order by Attempting to Withdraw Almost $150,000 from MissionCulture LLC's Bank Account

On or about January 8, 2019, Plaintiff TMG received a copy of a letter, dated January 8, 2019, from David D. Holahan, an attorney representing NS and JS (the "Holahan Letter") (*see* Declaration of Dean R. Nicyper in Support of Plaintiffs' Motion for Contempt and Motion to Broaden Injunctive Relief, dated January 28, 2019 ("Nicyper Decl."), Ex. 1). The Holahan Letter stated: "... the corporate American Express cards have historically been in the name of the Stephensons. We understand the current balance is presently approximately $180,000. We hereby demand that TMG cause such balances to be paid in full immediately." (Nicyper Decl. Ex. 1, p. 2.) The Holahan Letter did not include any context, specifics, the itemized credit card invoice(s), or any other supporting documents regarding its payment demand. (Broderick Decl. ¶ 11.) Accordingly, TMG had no way to ascertain why NS and JS believed that they were entitled to payment in any amount, let alone the $180,000 demanded in the Holahan Letter. (*Id.*) TMG, therefore, did not make any payment related to the Holahan Letter's demand. (*Id.*)

On January 23, 2019, at approximately 7:55 AM EST, an MM email account previously

3

used by JS received an email from American Express (the "American Express Email") (Broderick Decl. Ex. 1). The American Express Email documented a payment of $148,622.15 made to an American Express credit card held and controlled by Defendant JS. (*Id.*) On January 23, 2019, at approximately 4:15 PM, M-Culture's Finance Manager informed Troika's Chief Operating Officer, Christopher Broderick, that M-Culture's Bank of America bank account (the "M-Culture Bank Account") had been debited in the amount of $148,622.15 earlier that day. (Broderick Decl. ¶ 13.) In the account activity report of the M-Culture Bank Account (the "Account Activity Report") (Broderick Decl. Ex. 2), the description of that $148,622.15 debit was "AMERICAN EXPRESS DES:ACH PMT." M-Culture's Finance Manager also informed Mr. Broderick that she had called American Express and American Express informed her that JS had logged into his American Express credit card account on January 23, 2019 and paid his American Express credit card bill online that day, which, as the Account Activity Report shows, he did by selecting the M-Culture Bank Account as the source of payment. (Broderick Decl. ¶ 14.)

Plaintiffs did not authorize JS to pay his American Express credit card debt using the M-Culture Bank Account. (*Id.* ¶ 15.) Indeed, to Plaintiffs' understanding, the TRO enjoined JS (and NS) from accessing any of Plaintiffs' electronic systems, including their bank accounts. (*Id.*) Over the course of multiple communications and several hours during the evening of January 23, 2019, Plaintiffs informed Bank of America that JS' debit of the M-Culture Bank Account was unauthorized, and worked with Bank of America to stop the debit. (*Id.* ¶ 16.) On January 24, 2019, at approximately 10:34 AM, Plaintiffs received confirmation from Bank of America that the "stop payment" action regarding JS' unauthorized debit had been successful, and that the $148,622.15 that JS attempted to use to pay his American Express credit card bill

4

had been returned to the M-Culture Bank Account. (*Id.*)

On January 28, 2019, Plaintiffs reviewed a second account activity report of the M-Culture Bank Account. (*Id.* ¶ 17, Ex. 3.) The Second Account Activity Report contained two additional January 28, 2019 debits from the M-Culture Bank Account, each with the same description as JS' first attempt to pay his credit card bill: "AMERICAN EXPRESS DES:ACH PMT." These two additional debits were for $113,938.87 and $34,770.98, respectively. (*Id.*) These debits totaled, $148,709.85, which is almost exactly the same amount that JS had tried to transfer out of the M-Culture Bank Account to pay his credit card bill on January 23, 2019. (*Id.* ¶ 17.)

Upon reviewing the MM email account previously used by JS, Plaintiffs learned that JS had received two additional emails from American Express on January 25, 2019 and January 27, 2019, respectively. (*Id.* ¶ 18, Ex. 4 and 5.) The January 25 American Express Email documented a payment of $113,938.87 made to JS' American Express credit card (*Id.* ¶ 18, Ex. 4), and the January 27 American Express Email documented a payment of $34,770.98 made to JS' American Express credit card. (*Id.* ¶ 18, Ex. 5.)

These documents confirm that on January 25, JS took $113,938.87 from the M-Culture Bank Account to pay his American Express credit card bill, and that on January 27, JS took an additional $34,770.98 from the M-Culture Bank Account to pay his American Express credit card bill.

Upon learning of JS' additional unauthorized attempts to pay his credit card with funds from the M-Culture Bank Account, Plaintiffs again called Bank of America to confirm that the debits would not be paid to American Express. (*Id.* ¶ 19.) Bank of American confirmed that because of Plaintiffs' previous communications with Bank of America, JS' $113,938.87 and

5

$34,770.98 attempted debits would not be paid to American Express, and the money would be returned the M-Culture Bank Account. (*Id.*)

Upon reviewing the MM email account previously used by JS, Plaintiffs also learned that on January 25, 2019, JS enrolled in "AutoPay" for his American Express credit card. (*Id.* ¶ 21, Ex. 6.) In addition, Plaintiffs also learned that today, on January 28, 2019, JS changed the email address associated with the American Express card from the previous MM email account to a personal email account (*see* the "American Express Email Change" annexed hereto as Exhibit 7). (*Id.* ¶ 21, Ex. 7.) Therefore, Plaintiffs will no longer see email notices regarding JS' payment of his American Express credit card from the M-Culture Bank Account.

On January 26, 2019, Plaintiffs' counsel Dean Nicyper sent an email to David D. Holahan, Esq., counsel for James and Nicola Stephenson, stating: "We have learned from our clients that James Stephenson took $148,622.15 from Mission Culture's bank account a couple of days ago to pay his AMEX credit card bill. Please confirm that no one at your firm had prior knowledge of this." (Nicyper Decl. ¶ 6.) That email concerned Mr. Stephenson's taking money from the M-Culture Bank Account on January 23, 2019. (*Id.*) That means that JS' last transfer of funds out of the M-Culture Bank Account took place after Plaintiffs' counsel had notified JS' lawyers of JS' January 23, 2019 transfer. (*Id.* ¶ 7.)

Plaintiffs' employees are engaging in ongoing efforts to further secure TMG and MM's electronic information and systems in the hopes of preventing JS (and NS) from undertaking any other attempts to remove money or information from electronic systems belonging to TMG and MM. (Broderick Decl. ¶ 22.) It is difficult, however, for Plaintiffs' employees to anticipate what means and processes the Stephensons might use to do so or what other activities they might engage in to interfere with the TMG and MM companies' business or to access, use, or dispose

6

of the TMG and/or MM companies' assets. (*Id.*)

Plaintiffs were forced to undertake significant efforts to address JS' taking of funds from the M-Culture Bank Account, which interfered significantly with Plaintiffs' executives and employees' ongoing business responsibilities. (*Id.* ¶ 23.) In addition, Plaintiffs were forced to incur significant expense, including attorneys' fees, in connection with this application regarding JS' actions. (*Id.*)

## ARGUMENT

## POINT I

### DEFENDANT JAMES STEPHENSON SHOULD BE HELD IN CONTEMPT FOR VIOLATING THE TEMPORARY RESTRAINING ORDER

A.   The Applicable Standard

This Court has the well-established authority to hold a party in contempt for the violation of one of its orders. *See* 18 U.S.C. § 401; Local Civil Rule § 83.6. The standard for determining whether to impose a finding of civil contempt against a party who has breached the restrictions and obligations of a court order is also well-settled. A party seeking a civil contempt order must establish: "1) that the order the contemnor failed to comply with is clear and unambiguous, 2) that the proof of noncompliance is clear and convincing, and 3) that the contemnor has not diligently attempted to comply in a reasonable manner." *In re Doria/Memon Disc Stores Wage & Hour Litig.*, 2016 U.S. Dist. LEXIS 7225, at *15 (S.D.N.Y. Jan. 19, 2016) (citation and quotation omitted); *see also*, *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004) (same standard) (citation and quotation omitted).

Here, it is undeniable that all of the elements for contempt have been met and that James Stephenson's actions, as set forth above, were blatant, willful, and in flagrant disregard of the

7

January 7 TRO, less than three weeks after its issuance. Indeed, the Stephensons' continued interference with and theft from the company that **they sold and no longer own** – and for which they have been handsomely paid – cannot and should not be countenanced.

B.  The January 7 TRO Clearly and Unambiguously Bars the Stephensons
    from Accessing and Stealing Money from Plaintiffs' Bank Accounts

Federal Rule of Civil Procedure 65(d) requires that an injunctive order must "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required." Fed R. Civ. P. 65(d). Accordingly, in determining whether to issue a finding of contempt, courts look to whether the order is reasonably clear to an ordinary person, and specifically, whether the terms are "definite enough to apprise those within its scope of the conduct that is being proscribed." *New York State NOW v. Terry*, 886 F.2d 1339, 1352 (2d Cir. 1989) (citation and quotation omitted); *see Aviv v. Brainard*, 2018 U.S. Dist. LEXIS 176169, * 7 (S.D.N.Y. Oct. 11, 2018) ("A clear and unambiguous order is one that leaves no uncertainty in the minds of those to whom it is addressed, who must be able to ascertain from the four corners of the order precisely what acts are forbidden.") (citations and internal quotations omitted).

The January 7 TRO prohibits the Stephensons from "entering the physical or virtual premises of [the Company]" and accessing the "TMG's or MM's electronic information or systems . . . ." "Virtual premises" and "electronic information or systems" clearly encompasses Plaintiffs' online bank accounts. The Holahan Letter demonstrates that JS and his counsel understood that the January 7 TRO prohibited the Stephensons' from accessing the Plaintiffs' bank accounts. If JS thought he could take funds from Plaintiffs' bank accounts to pay his credit card bill and still comply with the January 7 TRO, his lawyer certainly would not have asked for Plaintiffs to provide him with money for that very purpose. (*See* Nicyper Decl. Ex. 1, p. 2.) Further, even in the abstract, no reasonable former employee could think that he should have

8

continued, post-termination access to his former employer's bank accounts, let alone that he would be entitled to pay an outstanding credit card balance of nearly $150,000 using his former employer's account.

In addition, the prohibitions set forth by this Court in the January 7 TRO should have been especially clear to JS in the context of his recent termination for cause from the MM companies, and the Stephensons' post-termination conduct giving rise to Plaintiffs' application for the January 7 TRO. As described in the Complaint, the Stephensons have engaged in a pattern of interference with the TMG and MM companies, and that interference gave rise to the January 7 TRO in the first place. In light of the Stephensons' past interference and the subsequent January 7 TRO, it would be frivolous for JS to argue that the January 7 TRO does not clearly enjoin him from taking funds from Plaintiffs' bank account.

C.  Proof of Non-Compliance with the Court's Order Is Clear and Convincing

The Broderick Declaration and the documents attached thereto, as well as the documents attached to the Nicyper Declaration, provide clear and convincing evidence that JS has not only directly, but also willfully violated this Court's order.[1] Plaintiffs' evidence proves that:

1) On January 8, 2019, after the January 7 TRO had been issued by the Court, JS' attorney asked Plaintiffs to provide the Stephensons with TMG and/or MM company funds to pay the Stephensons' credit card bills. (Nicyper Decl. Ex. 1, p. 2.)

2) Plaintiffs did not provide the requested funds, and did not authorize the Stephensons to use company funds to pay those credit card bills. (Broderick Decl. ¶¶ 11, 15.)

---

[1]  Notably, willfulness is not a factor to be considered in an order for contempt. *Paramedics Electromedicina*, 369 F.3d at 655. However, it is nonetheless important as evidencing the brazenness of the JS' behavior here, as well as the need for coercive sanctions against JS.

9

3) On January 23, 2019, JS paid his American Express bill in the amount of $148,622.15. (*Id.* ¶ 12, Ex. 1.)

4) On January 23, 2019, $148,622.15 was debited from an M-Culture bank account. (*Id.* ¶ 13, Ex. 2.)

5) American Express informed M-Culture that JS had logged into his American Express credit card account on January 23, 2019 and paid his American Express credit card bill online that day using the M-Culture Bank Account, which had been linked to his American Express credit card account. (*Id.* ¶ 14.)

6) On January 25, 2019 and January 27, 2019, JS attempted to pay American Express bill in the amounts of $113,938.87 and $34,770.98, respectively. (*Id.* ¶ 18.)

7) On January 28, 2019, 113,938.87 and $34,770.98 were debited from the M-Culture Bank Account. (*Id.* ¶ 17.)

8) Plaintiffs' employees had to undertake significant efforts to reverse the debits from the M-Culture Bank Account and ensure that the $148,622.15, $113,938.87, and $34,770.98 that had been taken without authorization were all returned to the account. (*Id.* ¶¶ 16, 19.)

These facts, established by documents and witness testimony, constitute clear and convincing evidence of JS' violation of the January 7 TRO. *See e.g. In re Doria/Memon*, 2016 U.S. Dist. LEXIS 7225 at **18-19 (holding defendants in contempt on the basis of witness testimony, affidavits, and supporting evidence); *Aviv*, 2018 U.S. Dist. LEXIS 176169 at **8-9 (holding non-party in contempt on the basis of witness testimony).

D.   <u>JS Has Not Diligently or Reasonably Attempted to Comply with the January 7 TRO</u>

In light of his conduct, JS can make no credible argument that he diligently or reasonably

attempted to comply with the January 7 TRO, which clearly prohibits the Stephensons from continuing to interfere with the Plaintiffs' electronic systems and virtual premises. Just over two weeks after the January 7 TRO was issued, and nearly a month after JS' employment with the MM companies was terminated, JS converted $148,622.15, $113,938.87, and $34,770.98 of M-Culture's money through three separate attempts to pay his credit card bill from the M-Culture Bank Account. (Broderick Decl. ¶¶ 13-14; 17-18.) To do so, JS deliberately logged into his American Express account and selected the M-Culture Bank Account as the source of his credit card payment. (*Id.*) Moreover, JS paid his credit card bill with M-Culture's money despite the fact that his attorney had already requested funds from Plaintiffs for that purpose – a request in which Plaintiffs did not acquiesce. (*Id.* ¶¶ 11-12; Nicyper Decl. Ex. 1, p. 2.) Further, one of JS' attempted transfers took place **after** Plaintiffs' counsel had informed JS' counsel of his previous unauthorized transfers. (Nicyper Decl. ¶ 7.) It is beyond dispute that JS has made no effort to comply with the January 7 TRO, and instead took knowing, intentional, affirmative steps to violate it.

E.      Plaintiffs Should Be Awarded Sanctions, Including Attorneys' Fees and Costs

If this Court concludes that JS' actions a few days ago are in contempt of the January 7 TRO, this Court has broad discretion to impose sanctions upon JS, including the Plaintiffs' costs and attorneys' fees. *See e.g. In re Doria/Memon*, 2016 U.S. Dist. LEXIS 7225 at **19-20 ("If the Court does find that the violation was willful, however, attorney's fees should be awarded unless there are persuasive grounds to deny them.") (citation and internal quotation omitted); *SEC v. Northshore Asset Mgmt., LLC*, 2006 U.S. Dist. LEXIS 39255, **9-10 (S.D.N.Y. Jun. 14, 2006) (awarding sanctions, including attorneys' fees and costs, where "[s]uch sanctions are consistent with the goal of civil contempt remedies – namely, restoring the status quo,

compensating the Receivership estate for damages, and compelling future compliance.").

In exercising this discretion, factors for courts to consider include: "(1) the character and magnitude of the harm threatened by the continued contumacy; (2) the probable effectiveness of any suggested sanction in bringing about compliance; and (3) the contemnor's financial resources and the consequent seriousness of the burden of the sanction upon him." *SEC v. CKB168 Holdings, Ltd.*, 2016 U.S. Dist. LEXIS 136925, * 6 (E.D.N.Y. Sep. 28, 2016) (quotation and citation omitted). Courts consider both the compensatory and the coercive effects of potential civil contempt sanctions. *Paramedics Electromedicina*, 369 F.3d at 657 ("The imposition of civil contempt sanctions may serve dual purposes: to secure future compliance with court orders and to compensate the party that has been wronged.").

In this case, it is clear that sanctions are not only warranted given the nature of JS' disregard of this Court's directions and the ongoing – and apparently increasing – threat that the Stephensons pose to the TMG and MM companies, but also necessary to motivate the Stephensons to comply with the January 7 TRO. JS' conversion of Plaintiffs' funds from the M-Culture Bank Account is only the latest in a series of actions the Stephensons have taken to interfere with Plaintiffs' business since they were fired for cause. (*See* Complaint ¶¶ 37-47.) Indeed, the Stephensons' post-termination campaign to disrupt Plaintiffs' business was the reason Plaintiffs were compelled to apply for the relief requested in the January 7 TRO. The fact that JS accessed and removed funds from Plaintiffs' bank account, three separate times, **after** the January 7 TRO speaks volumes about the Stephensons' intentions going forward.

The Stephensons' misconduct to date, including JS' latest attempted thefts, has already significantly harmed Plaintiffs. (*See* Complaint ¶¶ 47, 61; Broderick Decl. ¶¶ 17-18.) Further, the Stephensons' status as former owners and senior executives of the MM companies makes

them uniquely well-positioned to continue to interfere with and harm Plaintiffs' business, unless they are compelled to stop doing so. In addition, NS and JS were paid at least $11 million from the sale of the MM companies to TMG, so JS clearly has the financial resources to pay a sanction in connection with his continued misconduct.

Courts have held that this type of behavior warrants sanctions in similar circumstances. *See, e.g., Northshore Asset Mgmt.*, 2006 U.S. Dist. LEXIS 39255 at **8-10 (holding defendants in contempt for accessing and removing property from a safety deposit box in violation of a temporary restraining order and preliminary injunction, and awarding sanctions to plaintiff). Accordingly, Plaintiffs respectfully request that contempt sanctions be imposed upon JS in an amount to be decided by the Court.[2]

## POINT II

### TO HELP TO PREVENT FUTURE MISCONDUCT BY THE STEPHENSONS, THE TRO AND PROPOSED PRELIMINARY INJUNCTION SHOULD BE BROADENED

A.   Plaintiffs' Requested Relief Is a Direct Response to JS' Theft of Company Funds

In addition to requesting that the Court hold JS in contempt of the January 7 TRO, Plaintiffs also seek to broaden the January 7 TRO, and Plaintiffs' requested injunctive relief in their proposed preliminary injunction, to emphasize to the Stephenson Defendants the natural and logical consequences of the termination of their employment with the MM companies and to confirm with greater specificity that they are denied access in any way, shape, or form to Plaintiffs' information, systems, and property. In particular, Plaintiffs seek a temporary restraining order and preliminary injunction:

---

[2] The damages caused by JS' violation of the January 7 TRO are ongoing. At the Court's request, Plaintiffs will provide the Court with evidence of their damages, including the costs and attorneys' fees that Plaintiffs have been required to incur as a result of JS' contempt.

- enjoining the Stephenson Defendants, who are no longer employees of the MM companies, from using, accessing, or exercising any control, authority, or possession, indirectly or directly, over any property of TMG, MM, or any of their affiliated companies;

- enjoining the Stephenson Defendants, who are no longer employees of the MM companies, from using, accessing, or withdrawing funds, indirectly or directly, from any bank accounts or other financial accounts held by, controlled by, or in the name of TMG, MM, or any of their affiliated companies; and

- enjoining the Stephenson Defendants, who are no longer employees of the MM companies, from linking the payment of the balances of credit cards held in their names, in whole or in part, or the payment of any other bills, invoices, debts, obligations, or other financial accounts, to any bank accounts or other financial accounts held by, controlled by, or in the name of TMG, MM, or any of their affiliated companies.

B.  Plaintiffs' Request to Broaden the Injunctive
    Relief Plainly Meets the Relevant Legal Standards

"The standard for granting a temporary restraining order and a preliminary injunction . . . are identical." *Kelly v. Evolution Markets, Inc.*, 626 F. Supp. 2d 364, 375 (S.D.N.Y. 2009). A TRO, like a preliminary injunction, should issue if: (1) it is necessary to prevent irreparable harm; and (2) either (a) movant is likely to prevail on the merits, or (b) movant has shown sufficiently serious questions going to the merits to make them fair ground for litigation, and a balance of the hardships tips decidedly in movant's favor. *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd*, 598 F.3d 30, 34-35 (2d Cir. 2010). Plaintiffs' papers in support of the January 7 TRO application describe the Stephensons' previous misconduct and interference with the Plaintiffs' business. The reasons and legal bases for

14

Plaintiffs' request to broaden the injunctive relief in the face of JS' latest actions are the same as the reasons and legal bases for Plaintiffs' request for the January 7 TRO. In the interest of brevity, Plaintiffs will not repeat these reasons and bases in full. However, JS' latest actions serve to underline the need for broader injunctive relief to prevent the Stephensons from interfering with Plaintiffs' business.

JS is a terminated former employee of the MM companies who has used his knowledge of MM's operations repeatedly to harm his former employers by actively interfering with Plaintiffs' business, electronic systems, and property. If anything, JS' most recent misconduct – taking $148,622.15, $113,938.87, and $34,770.98 from the M-Culture Bank Account without authorizations to pay his credit card bill – is even more likely to cause irreparable harm to Plaintiffs than the conduct that formed the basis of the January 7 TRO application. JS' actions not only violate criminal laws, but JS' theft of $148,622.15 also will now require Plaintiffs to carefully monitor their electronic systems for future instances of misconduct. As long as the Stephensons believe they can interfere with Plaintiffs' electronic systems, including their bank accounts, Plaintiffs cannot operate their business free from fear of further disruption. In these circumstances, injunctive relief is warranted to prevent irreparable harm. *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (affirming the district court's preliminary injunction order enjoining defendant from accessing plaintiff's computers and using data from plaintiff's database upon a finding of irreparable harm).

Likewise, JS' latest actions make it even more likely that Plaintiffs will succeed on the merits of their claims. Plaintiffs' claims against the Stephensons are based, in part, on the Stephensons' months-long pattern of bad faith, obfuscation, and unwarranted interference with TMG's and MM's business, which continued even after the Stephensons were fired for cause. It

is hard to imagine a more illustrative continuation of this pattern than JS' outright theft of company funds in defiance of a court order. JS did not even notify Plaintiffs that he had withdrawn the funds that he tried to use to pay his credit card bill. Apparently either he expected that Plaintiffs would not notice the missing money (which is concerning) or he simply did not care (even more concerning). In any event, JS' flagrant disregard of the January 7 TRO can serve only to increase the likelihood that Plaintiffs will succeed on the merits of their claims against the Stephensons.

For similar reasons, JS' theft of company funds tips the balance of hardships in this case further in favor of the Plaintiffs' request for injunctive relief. The Stephensons no longer work for the MM companies, and can have no legitimate need to access those companies' bank accounts. By contrast, Plaintiffs have a self-evident interest in protecting the security and integrity of their financial accounts from theft and other malfeasance by former employees. Even if, as the Stephensons' counsel suggests in his letter, the Stephensons' credit card debt is partly comprised of monies spent to benefit the MM companies while the Stephensons worked there, the Stephensons are simply not permitted to engage in self-help by stealing from Plaintiffs' bank accounts.

Because Plaintiffs have demonstrated a substantial likelihood of success on the merits, and because they will suffer irreparable harm in the absence of immediate injunctive relief, Plaintiffs respectfully request that this Court broaden the January 7 TRO, and Plaintiffs' requested injunctive relief in their proposed preliminary injunction, as specified herein and in the accompanying Order to Show Cause.

## CONCLUSION

For the foregoing reasons, the Court should hold Defendant James Stephenson in contempt for violating the January 7 TRO, should award sanctions, including costs and attorneys' fees, to Plaintiffs as a result of such contempt, and should broaden the injunctive relief in the January 7 TRO, and in Plaintiffs' requested preliminary injunction, to add the terms specified in this Memorandum of Law and the accompanying Order to Show Cause.

Dated: New York, New York
       January 28, 2019

                              WITHERS BERGMAN LLP

By: _____
     Dean R. Nicyper
     Emma Lindsay
     Chaya F. Weinberg-Brodt
     Joseph Gallo
     430 Park Avenue
     New York, New York 10022
     (212) 848-9815
     Dean.Nicyper@WithersWorldwide.com
     Emma.Lindsay@WithersWorldwide.com
     Chaya.Weinberg-Brodt@WithersWorldwide.com
     Joseph.Gallo@WithersWorldwide.com
     *Attorneys for Plaintiffs*