UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
TROIKA MISSION GROUP, INC., TROIKA
MISSION HOLDINGS, INC., MISSIONCULTURE
LLC, and MISSION MEDIA USA, INC.,        Index No.: 19-cv-00145-ER

        Plaintiffs,

  -against-

NICOLA STEPHENSON, JAMES STEPHENSON,
and ALLMAC LLC,

        Defendants.
------------------------------------------------------------------X

# PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR SECOND MOTION FOR CONTEMPT AND TO BROADEN INJUNCTIVE RELIEF

WITHERS BERGMAN LLP
Dean R. Nicyper
Emma Lindsay
Chaya F. Weinberg-Brodt
Joseph Gallo
430 Park Avenue
New York, New York 10022
Telephone: (212) 848-9800
*Attorneys for Plaintiffs*

# Table of Contents

Page(s)

Table of Authorities ................................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS .......................................................................................................... 2

ARGUMENT ................................................................................................................................ 6

    POINT I    DEFENDANT NICOLA STEPHENSON SHOULD BE
HELD IN CONTEMPT FOR VIOLATING THE
TEMPORARY RESTRAINING ORDER .................................................................. 6

        A.    The Applicable Standard ..................................................................................... 6

        B.    The January 7 TRO Clearly and Unambiguously Bars the
Stephensons from Holding Themselves Out on Behalf of
MM to MM's Clients and Employees .............................................................. 6

        C.    Proof of Non-Compliance with the Court's Order Is Clear
and Convincing ................................................................................................... 8

        D.    NS Has Not Diligently or Reasonably Attempted to
Comply with the January 7 TRO ...................................................................... 9

        E.    Plaintiffs Should Be Awarded Sanctions, Including
Attorneys' Fees and Costs ............................................................................... 10

    POINT II    TO HELP TO PREVENT FUTURE MISCONDUCT BY
THE STEPHENSONS, THE PROPOSED PRELIMINARY
INJUNCTION SHOULD BE BROADENED AND LIMITED
EXPIDITED DISCOVERY SHOULD BE GRANTED ....................................... 12

        A.    Plaintiffs' Requested Relief Is a Direct Response to
NS' Improper, Post-Termination Communications
with MM's Employees and Clients ................................................................. 12

        B.    Plaintiffs' Request to Broaden the Injunctive Relief
Plainly Meets the Relevant Legal Standards .................................................. 14

CONCLUSION ........................................................................................................................... 17

# Table of Authorities

Page(s)

**Cases**

*Aviv v. Brainard,*
   2018 U.S. Dist. LEXIS 176169 (S.D.N.Y. Oct. 11, 2018) .................................................... 7, 9

*Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd,*
   598 F.3d 30 (2d Cir. 2010) ........................................................................................................ 14

*In re Doria/Memon Disc Stores Wage & Hour Litig.,*
   2016 U.S. Dist. LEXIS 7225 (S.D.N.Y. Jan. 19, 2016) ............................................... 6, 9, 10, 11

*Kelly v. Evolution Markets, Inc.,*
   626 F. Supp. 2d 364 (S.D.N.Y. 2009) ...................................................................................... 14

*New York State NOW v. Terry,*
   886 F.2d 1339 (2d Cir. 1989) ..................................................................................................... 7

*Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.,*
   369 F.3d 645 (2d Cir. 2004) ............................................................................................. 6, 8, 10

*Register.com, Inc. v. Verio, Inc.,*
   356 F.3d 393 (2d Cir. 2004) ..................................................................................................... 15

*SEC v. CKB168 Holdings, Ltd.,*
   2016 U.S. Dist. LEXIS 136925 (E.D.N.Y. Sep. 28, 2016) ....................................................... 10

*SEC v. Northshore Asset Mgmt., LLC,*
   2006 U.S. Dist. LEXIS 39255 (S.D.N.Y. Jun. 14, 2006) ......................................................... 10

**Statutes**

18 U.S.C. § 401 .............................................................................................................................. 6

Fed R. Civ. P. 65(d) ................................................................................................................... 6, 7

Local Civil Rule § 83.6 .................................................................................................................. 6

Plaintiffs Troika Mission Group, Inc., Troika-Mission Holdings, Inc., MissionCulture LLC, and Mission Media USA Inc. respectfully submit this Memorandum of Law in support of their Motion for Contempt Against Defendant Nicola Stephenson and to Broaden the Existing Preliminary Injunction with respect to both of the Stephenson Defendants, brought by Order to Show Cause.

## PRELIMINARY STATEMENT

Defendants Nicola Stephenson ("NS") and James Stephenson ("JS") have now violated the temporary restraining order this Court issued on January 7, 2019 (Dkt. 3) (the "January 7 TRO") many times. They continue their illegal, tortious and destructive acts in blatant disrespect of the rule of law and utter disregard of this Court's January 7 TRO. JS's theft of company funds in violation of the January 7 TRO gave rise to the Plaintiffs' motion for contempt against JS, filed on January 28, 2019 (Dkt. 15). Plaintiffs have learned that NS also has repeatedly violated the January 7 TRO. Since the issuance of the January 7 TRO and in direct violation of its terms, NS has: (1) communicated directly with Mission Media ("MM") clients; (2) held herself out to non-parties as still representing MM, despite having been terminated from employment with MM; (3) communicated with at least one current MM employee that Plaintiffs know of regarding their communications with an MM client; and (4) communicated with Troika Media Group's ("TMG's") and MM's clients and employees by using a news reporter with whom they were friendly to print a false, scathing article for clients and employees to see. Having become aware of these incidents of the Stephenson Defendants' continuing contemptuous conduct (which Plaintiffs suspect is only the tip of the iceberg), Plaintiffs are now forced to protect their business by supplementing their previous motion against JS with this motion against NS.

The Stephenson Defendants have engaged in a massive scorched earth campaign to

destroy the TMG and MM companies. They fraudulently placed the UK companies in administration requiring enormous efforts to remove those companies from that administration. They repeatedly communicated with employees and clients and planted scathing articles in the press. Their conduct and utter disregard of this Court's orders threatens not only the viability of the companies, but also the livelihood of their 180 employees and their families. The Stephenson Defendants' misconduct cannot be countenanced.

Plaintiffs respectfully request that the Court: (1) hold Nicola Stephenson in contempt of the Court's January 7 TRO, and award sanctions to Plaintiffs; and (2) issue an order broadening the terms of Plaintiffs' requested preliminary injunction to further bar the Stephensons from disrupting Plaintiffs' business, and to require Defendants to produce specific material post-termination communications so that Plaintiffs and the Court can fully understand, and thereby fully address, the harm done by the Stephensons.

## STATEMENT OF FACTS

The circumstances giving rise to this lawsuit have been described at length in the Complaint and in Plaintiffs' previous court filings on January 7 and January 28, 2019. In the interest of brevity, those facts are not repeated here.

Among other relief, this Court's January 7 TRO provided that: "… (3) the Stephenson Defendants are enjoined from further communications with MM's or TMG's employees or clients in a manner inconsistent with the Stephenson Defendants' obligations under the EPA [Equity Purchase Agreement], GPA [Goodwill Purchase Agreement], and their respective Employment Agreements; (4) the Stephenson Defendants are enjoined from further communicating with AllMac, MM's employees, or MM's or TMG's clients in a manner that disrupts or interferes with Plaintiffs' business…." (Dkt. 3 pp. 2-3.)

By reviewing an MM email account previously used by NS, TMG has discovered an email chain, dated January 23, 2019, between NS and MM client Serena Rees Studio. (Declaration of Christopher Broderick in Support of Plaintiffs' Second Motion for Contempt and to Broaden Injunctive Relief, dated February 5, 2019 (the "Broderick Declaration"), ¶ 4; Exhibit 1.) Serena Rees Studio and its brand "Les Girls, Les Boys" was a client of MM while NS worked at MM, and continues to be a client of MM now. (Broderick Decl. ¶ 4; Exhibit 2.) By taking those actions, NS violated Sections 3 and 4 of the January 7 TRO.

TMG has also discovered a series of emails, dated between January 25 and January 28, 2019, among NS and several non-parties containing the subject lines of "Chat with Mission PR x INN/ECC" and "Elbow Cay x Mission." (*Id.* ¶ 5; Exhibit 3.) The Mission Subject Emails refer to conversations and meetings between NS and these non-parties, and they explicitly continue to refer to Mission in the subject line even though NS was terminated from the MM companies on January 4, 2019. (*Id.* ¶ 5; Exhibit 3.) In the Mission Subject Emails, NS is holding herself out as still representing, and being associated with, MM. (*Id.* ¶ 5.) These emails also demonstrate that she is violating the Equity Purchase Agreement ("EPA") which explicitly precludes her from competing with the MM and TMG companies (EPA § 7.05; *see also* Employment Agreement § 8 (both of which were included in Exhibit 1 attached to the January 6, 2019 Declaration of Chris Broderick (Dkt. 7.2, pp. 9-10; 72-73)). By taking these actions, therefore, NS has violated sections 3 and 4 of the January 7 TRO.

In reviewing the MM email account previously used by NS, TMG has further discovered a series of emails, dated between January 4 and January 14, 2019, between NS and a current MM employee, Jono Wylie. (*Id.* ¶ 6; Exhibit 4.) On January 5, Jono Wylie wrote concerning communications with an existing MM client: "When you get some headspace let me know

3

how/what you'd like me to communicate to Simon as I know that client relationship is somewhat of an anomaly!" (*Id.* ¶ 6; Exhibit 4, p. 1.) On January 14, Jono Wylie wrote: "Hope you're well - Simon is back in the office today so let me know if there's a party line on what we're communicating with clients." (*Id.* ¶ 6; Exhibit 4, p. 1.) In response, on January 14, one week after this Court issued the January 7 TRO and in direct violation of its terms, NS wrote: "No news -- we are currently negotiating the next steps - I will let you know when we are releasing anything officially or if there are any issues." (*Id.* ¶ 6; Exhibit 4, p. 1.) In the Jono Wylie Emails, NS is giving instructions to an MM employee on how to communicate with an MM client, despite the fact that NS was terminated from the MM companies on January 4, 2019. In several respects, therefore, NS' emails with Jono Wylie directly violate the restrictions in the January 7 TRO. (*Id.* ¶ 6.)

In reviewing the MM email account previously used by NS, TMG has also discovered a series of emails, dated variously during 2017 and 2018, between NS and Oliver Shah, who is a news reporter for The Sunday Times in the United Kingdom. (*Id.* ¶ 8; Exhibit 6.) In one of those emails, Nicola wrote to Mr. Shah: "Had an email from Adam Luck this morning on a piece about Richard. Would this not usually come from - will you write it?" (*Id.* ¶ 8; Exhibit 6, p. 1.) These emails establish the close, long-term relationship between NS and this news reporter. They are significant because on February 3, 2019, The Sunday Times in the United Kingdom published an article, written by Mr. Shah, concerning the dispute between TMG and the Stephensons. (*Id.* ¶ 7; Exhibit 5.) The Sunday Times Article was a scathing, one-sided attack on TMG. (*Id.* ¶ 7.) The Sunday Times Article also contained a comment from an MM client (*id.* ¶ 7; Exhibit 5, p. 7), and a description of one of TMG's shareholders (*id.* ¶ 7; Exhibit 5, p. 4). Neither MM's client list nor TMG's shareholder registry is publicly available, and TMG and

4

MM did not provide Mr. Shah with any client or shareholder information. (*Id.* ¶ 7.) The information therefore could only have come directly or indirectly from NS.

In addition, The Sunday Times Article also stated: "Taking background advice from Simon Bentley, the senior independent director of retail giant Sports Direct, and working with Mike Stubbs of law firm Mishcon de Reya, **the Stephensons put Mission's UK division into administration to try to take control**." (*Id.* ¶ 9; Exhibit 5, p. 7.) Obviously, only the Stephensons could have told reporter Shah that their intent and purpose in placing Mission's UK division into administration was "to take control." By planting this article in The Sunday Times, NS blatantly did indirectly precisely what the January 7 TRO precluded her from doing – *i.e.*, communicating with TMG's and MM's employees and clients. Moreover, the article was specifically designed to embarrass TMG's and MM's investors and shareholders and is an indirect communication with them too, as part of the Stephensons' extensive campaign to destroy the TMG and MM companies.

NS's repeated efforts to disrupt and destroy TMG's and MM's business are causing significant and sustained damage to TMG and MM. (*Id.* ¶ 10.)

In reviewing the MM email account previously used by NS, TMG has also discovered recent emails showing that the Stephensons are selling their residence in the United States. (*Id.* ¶ 11.) TMG also discovered an email showing that the Stephensons are taking their children out of school in the United States. (*Id.* ¶ 11.) Based on these emails and the actions the Stephensons have taken to damage TMG and the MM companies, Plaintiffs have serious concerns that NS and JS, who are both foreign nationals, are preparing to leave this Court's jurisdiction and remove their assets from this Court's jurisdiction. (*Id.* ¶ 11.)

## ARGUMENT

## POINT I

### DEFENDANT NICOLA STEPHENSON SHOULD BE HELD IN CONTEMPT FOR VIOLATING THE TEMPORARY RESTRAINING ORDER

A.  The Applicable Standard

This Court has the well-established authority to hold a party in contempt for the violation of one of its orders. *See* 18 U.S.C. § 401; Local Civil Rule § 83.6. The standard for determining whether to impose a finding of civil contempt against a party who has breached the restrictions and obligations of a court order is also well-settled. A party seeking a civil contempt order must establish: "1) that the order the contemnor failed to comply with is clear and unambiguous, 2) that the proof of noncompliance is clear and convincing, and 3) that the contemnor has not diligently attempted to comply in a reasonable manner." *In re Doria/Memon Disc Stores Wage & Hour Litig.*, 2016 U.S. Dist. LEXIS 7225, at *15 (S.D.N.Y. Jan. 19, 2016) (citation and quotation omitted); *see also, Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004) (same standard) (citation and quotation omitted).

Here, it is undeniable that all of the elements for contempt have been met and that Nicola Stephenson's actions, as set forth above, were blatant, willful, and in flagrant disregard of the January 7 TRO, beginning just days after its issuance and continuing through as recently as this past weekend. The Stephensons' continued interference with the company that **they sold and no longer own** – and for which they have been handsomely paid – cannot and should not be countenanced.

B.  The January 7 TRO Clearly and Unambiguously Bars the Stephensons from Holding Themselves Out on Behalf of MM to MM's Clients and Employees

Federal Rule of Civil Procedure 65(d) requires that an injunctive order must "state its

terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required." Fed R. Civ. P. 65(d). Accordingly, in determining whether to issue a finding of contempt, courts look to whether the order is reasonably clear to an ordinary person, and specifically, whether the terms are "definite enough to apprise those within its scope of the conduct that is being proscribed." *New York State NOW v. Terry*, 886 F.2d 1339, 1352 (2d Cir. 1989) (citation and quotation omitted); *see Aviv v. Brainard*, 2018 U.S. Dist. LEXIS 176169, * 7 (S.D.N.Y. Oct. 11, 2018) ("A clear and unambiguous order is one that leaves no uncertainty in the minds of those to whom it is addressed, who must be able to ascertain from the four corners of the order precisely what acts are forbidden.") (citations and internal quotations omitted).

The January 7 TRO prohibits the Stephensons from "(3)...further communications with MM's and TMG's employees or clients in a manner inconsistent with the Stephenson Defendants' obligations under the EPA, GPA, and their respective Employment Agreements; [and] (4)...further communicating with . . . MM's employees, or MM's or TMG's clients in a manner that disrupts or interferes with Plaintiffs' business . . . ." (Dkt. 3, p. 2.) "Communicating with" clearly encompasses the Stephensons' use of email. "MM's employees" and "MM's or TMG's clients" are equally clear, framed in commonly-used terms that could not reasonably be misunderstood by senior business executives. As to the effect of the communications – the disruption of or interference with Plaintiffs' business – such an effect evidently occurs when the Stephensons' purport to give instructions to employees, to engage with MM's current clients, and otherwise to hold themselves out as continuing to be representatives of MM. Such an effect also indisputably occurs when, upon information and belief, NS chooses to use a reporter of her long-standing acquaintance as a vehicle for her wider communications with MM's employees, and MM's and TMG's clients, as well as shareholders, investors, and the public at large, through

7

The Sunday Times in London. Greater disruption to and inference with Plaintiffs' business could hardly be imagined.

In addition, the prohibitions set forth by this Court in the January 7 TRO should have been especially clear to NS in the context of her recent termination for cause from the MM companies, and the Stephensons' post-termination conduct giving rise to Plaintiffs' application for the January 7 TRO. As described in the Complaint, the Stephensons have engaged in a pattern of interference with the TMG and MM companies, and that interference gave rise to the January 7 TRO in the first place. In light of the Stephensons' past interference and the subsequent January 7 TRO, it would be frivolous for NS to argue that the January 7 TRO does not clearly enjoin her from seeking to communicate with MM's employees and clients by email and through the news media, in order to interfere with Plaintiffs' business.

C.    Proof of Non-Compliance with the Court's Order Is Clear and Convincing

The Broderick Declaration and the documents attached thereto provide clear and convincing evidence that NS has not only directly, but also willfully violated this Court's order.[1] The evidence proves that:

1) In emails dated January 23, 2019 NS communicated with a current MM client. (Broderick Decl. ¶ 4; Exhibit 1.)

2) On January 25 through 28, 2019, in email communications to non-parties, NS held herself out as still representing, or being associated with, MM. (Broderick Decl. ¶ 5; Exhibit 3.)

---

[1] Notably, willfulness is not a factor to be considered in an order for contempt. *Paramedics Electromedicina*, 369 F.3d at 655. However, it is nonetheless important as evidencing the brazenness of the NS' behavior here, as well as the need for sanctions against NS.

8

3) On January 14, 2019, NS communicated by email with a current MM employee regarding a current MM client. (Broderick Decl. ¶ 6; Exhibit 4.)

4) Upon information and belief, NS communicated with a reporter of her long-standing acquaintance as a vehicle for her wider communications with MM's employees, and MM's and TMG's clients, leading to an article published in The Sunday Times on February 3, 2019. (Broderick Decl. ¶¶ 7-9; Exhibit 5.)

These facts, established by documents and witness testimony, constitute clear and convincing evidence of NS' violation of the January 7 TRO. *See e.g. In re Doria/Memon*, 2016 U.S. Dist. LEXIS 7225 at **18-19 (holding defendants in contempt on the basis of witness testimony, affidavits, and supporting evidence); *Aviv*, 2018 U.S. Dist. LEXIS 176169 at **8-9 (holding non-party in contempt on the basis of witness testimony).

D.  NS Has Not Diligently or Reasonably Attempted to Comply with the January 7 TRO

In light of her conduct, NS can make no credible argument that she diligently or reasonably attempted to comply with the January 7 TRO, which clearly prohibits the Stephensons from communicating with MM's employees or clients in a manner that disrupts or interferes with Plaintiffs' business. Contemporaneously with the issuance of the January 7 TRO, and after having been terminated from employment with MM, NS purported to instruct MM employee Jono Wylie in his conduct of MM's business. (Broderick Decl. ¶ 6.) Just over two weeks after the issuance of the January 7 TRO, NS interacted with MM client Serena Rees Studio and purported to set up meetings on behalf of MM with others. (Broderick Decl. ¶¶ 4, 5.) And then just this past weekend, NS flouted this Court's order not to communicate to Plaintiffs' detriment with MM's employees, clients and others, by availing herself of her friend reporter Oliver Shah and the court of public opinion. (Broderick Decl. ¶¶ 7-9.) It is beyond dispute that

NS has made no effort to comply with the January 7 TRO, and instead has taken knowing, intentional, affirmative steps to violate it.

E.  Plaintiffs Should Be Awarded Sanctions, Including Attorneys' Fees and Costs

If this Court concludes that any of NS' actions over the past four weeks are in contempt of the January 7 TRO, this Court has broad discretion to impose sanctions upon NS, including the Plaintiffs' costs and attorneys' fees. *See e.g. In re Doria/Memon*, 2016 U.S. Dist. LEXIS 7225 at **19-20 ("If the Court does find that the violation was willful, however, attorney's fees should be awarded unless there are persuasive grounds to deny them.") (citation and internal quotation omitted); *SEC v. Northshore Asset Mgmt., LLC*, 2006 U.S. Dist. LEXIS 39255, **9-10 (S.D.N.Y. Jun. 14, 2006) (awarding sanctions, including attorneys' fees and costs, where "[s]uch sanctions are consistent with the goal of civil contempt remedies – namely, restoring the status quo, compensating the Receivership estate for damages, and compelling future compliance.").

In exercising this discretion, factors for courts to consider include: "(1) the character and magnitude of the harm threatened by the continued contumacy; (2) the probable effectiveness of any suggested sanction in bringing about compliance; and (3) the contemnor's financial resources and the consequent seriousness of the burden of the sanction upon him." *SEC v. CKB168 Holdings, Ltd.*, 2016 U.S. Dist. LEXIS 136925, * 6 (E.D.N.Y. Sep. 28, 2016) (quotation and citation omitted). Courts consider both the compensatory and the coercive effects of potential civil contempt sanctions. *Paramedics Electromedicina*, 369 F.3d at 657 ("The imposition of civil contempt sanctions may serve dual purposes: to secure future compliance with court orders and to compensate the party that has been wronged.").

In this case, it is clear that sanctions are not only warranted given the nature of NS' disregard of this Court's directions and the ongoing – and apparently increasing – threat that the

Stephensons pose to the TMG and MM companies, but also necessary to motivate the Stephensons to comply with the January 7 TRO. NS' series of communications with MM employees and clients, culminating in an article in the Sunday press, is only the latest in a series of actions the Stephensons have taken to interfere with Plaintiffs' business since they were fired for cause. (*See* Complaint ¶¶ 37-47.) Indeed, the Stephensons' post-termination campaign to disrupt Plaintiffs' business was the reason Plaintiffs were compelled to apply for the relief requested in the January 7 TRO. The fact that NS has communicated with MM's employees and clients again and again **after** the January 7 TRO speaks volumes about the Stephensons' intentions going forward.

The Stephensons' misconduct to date, including NS' recent communications with MM's employees and clients, has already significantly harmed Plaintiffs. (*See* Complaint ¶¶ 47, 61; Broderick Decl. ¶ 10.) Further, the Stephensons' status as former owners and senior executives of the MM companies makes them uniquely well-positioned to continue to interfere with and harm Plaintiffs' business, unless they are compelled to stop doing so. In addition, NS and JS were paid at least $11 million from the sale of the MM companies to TMG, so NS clearly has the financial resources to pay a sanction in connection with her continued misconduct.

Courts have held that this type of behavior warrants sanctions in similar circumstances. *See, e.g., In re Doria/Memon*, 2016 U.S. Dist. LEXIS 7225, *17-20 (holding defendants in contempt for violating the TRO which specifically prohibited defendants "from speaking to employees of Defendants either directly or through another person acting on their behalf").[2]

---

[2] The damages caused by NS' violation of the January 7 TRO are ongoing. At the Court's request, Plaintiffs will provide the Court with evidence of their damages, including the costs and attorneys' fees that Plaintiffs have been required to incur as a result of NS' contempt.

11

## POINT II

## TO HELP TO PREVENT FUTURE MISCONDUCT BY THE STEPHENSONS, THE PROPOSED PRELIMINARY INJUNCTION SHOULD BE BROADENED AND LIMITED <u>EXPEDITED DISCOVERY SHOULD BE GRANTED</u>

A.  Plaintiffs' Requested Relief Is a Direct Response to NS' Improper, <u>Post-Termination Communications with MM's Employees and Clients</u>

In addition to requesting that the Court hold NS in contempt of the January 7 TRO, Plaintiffs also seek to broaden their requested injunctive relief in their proposed preliminary injunction, to emphasize to the Stephenson Defendants the natural and logical consequences of the termination of their employment with the MM companies and to confirm with greater specificity that they may not communicate, directly or indirectly, with MM's employees or clients, solicit business while purporting to represent MM, or hold themselves out in any way as representatives of MM. Plaintiffs also seek information regarding the extent of the harm that NS might have wrought by way of such improper communications because Plaintiffs have no way of knowing all communications that NS has made in violation of the January 7 TRO, whether using her personal email address or otherwise. In particular, Plaintiffs seek a preliminary injunction:

- enjoining the Stephenson Defendants, who are no longer employees of, or associated with, TMG or any of the MM companies, from holding themselves out to clients or potential clients as if they were still employed by, or associated with, any of the TMG or MM companies;

- enjoining the Stephenson Defendants, who are no longer employees of, or associated with, TMG or any of the MM companies, from communicating with TMG's and MM's investors and shareholders;

- enjoining the Stephenson Defendants, who are no longer employees of, or associated with, TMG or any of the MM companies, from communicating with any third party in

such a way as to harm TMG or MM or negatively affect their business; and

- ordering the Stephenson Defendants to produce, on an expedited basis, by or before February 19, 2019:
    - All communications between Nicola Stephenson and/or James Stephenson on the one hand, and any employee of TMG, MM, or any of their affiliated companies on the other hand, dated on or after January 4, 2019;
    - All communications between Nicola Stephenson and/or James Stephenson on the one hand, and any client of TMG, MM, or any of their affiliated companies on the other hand, dated on or after January 4, 2019;
    - All communications between Nicola Stephenson and/or James Stephenson on the one hand, and any shareholder or investor of TMG, MM, or any of their affiliated companies on the other hand, dated on or after January 4, 2019;
    - All communications between Nicola Stephenson and/or James Stephenson on the one hand and Oliver Shah on the other hand, dated on or after January 4, 2019;
    - All communications between Nicola Stephenson and/or James Stephenson on the one hand, and Simon Bentley and/or Mike Stubbs on the other hand, concerning the Stephenson Defendants' plan to "put Mission's UK division into administration to try to take control," as reported in Exhibit 5 to the Broderick Declaration.

Because these are contempt motions concerning each of the Stephenson Defendant's personal conduct, it is important that NS and JS personally appear in Court at the hearing on February 11, 2019. Accordingly, Plaintiffs seek an order requiring that:

- the individual Stephenson Defendants (in addition to their counsel) are personally

13

ordered to attend the hearing on February 11, 2019.

B.     Plaintiffs' Request to Broaden the Injunctive
Relief Plainly Meets the Relevant Legal Standards

"The standard for granting a temporary restraining order and a preliminary injunction . . . are identical." *Kelly v. Evolution Markets, Inc.*, 626 F. Supp. 2d 364, 375 (S.D.N.Y. 2009). A TRO, like a preliminary injunction, should issue if: (1) it is necessary to prevent irreparable harm; and (2) either (a) movant is likely to prevail on the merits, or (b) movant has shown sufficiently serious questions going to the merits to make them fair ground for litigation, and a balance of the hardships tips decidedly in movant's favor. *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd*, 598 F.3d 30, 34-35 (2d Cir. 2010). Plaintiffs' papers in support of the January 7 TRO application describe the Stephensons' previous misconduct and interference with the Plaintiffs' business. The reasons and legal bases for Plaintiffs' request to broaden the injunctive relief in the face of NS' latest actions are the same as the reasons and legal bases for Plaintiffs' request for the January 7 TRO, and indeed the same as the reasons and legal bases for Plaintiffs' January 28, 2019 request that the January 7 TRO be broadened in response to JS' contempt. In the interest of brevity, Plaintiffs will not repeat these reasons and bases in full. However, NS' latest actions serve to underline the need for broader injunctive relief to prevent the Stephensons from interfering with Plaintiffs' business.

NS is a terminated former employee of the MM companies who has used her knowledge of and familiarity with of MM's employees and clients repeatedly to harm her former employers by actively interfering with Plaintiffs' business. If anything, NS' most recent misconduct – communicating directly with MM's clients and employees and, upon information and belief, stage managing the article written by her friend in The Sunday Times – is even more likely to cause irreparable harm to Plaintiffs than the conduct that formed the basis of the January 7 TRO

application. NS' actions not only give rise to additional tort claims, including defamation, but also will now require Plaintiffs to carefully monitor their electronic systems for future instances of misconduct – at least in those instances when Plaintiffs are able to tell that they have occurred (for example, because NS copied her now inactive MM email address on her communications). There are potentially many instances of communications in violation of the January 7 TRO about which Plaintiffs have no way of knowing (for example, because such communications were sent by NS from a personal email address without a copy to her old MM email address). NS should be required by the Court to disclose all such communications to Plaintiffs so that they may protect and preserve their business. As long as the Stephensons believe they can interfere with Plaintiffs' business, Plaintiffs cannot operate their business free from fear of further disruption. In these circumstances, injunctive relief is warranted to prevent irreparable harm. *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (affirming the district court's preliminary injunction order enjoining defendant from accessing plaintiff's computers and using data from plaintiff's database upon a finding of irreparable harm).

Likewise, NS' latest actions make it even more likely that Plaintiffs will succeed on the merits of their claims. Plaintiffs' claims against the Stephensons are based, in part, on the Stephensons' months-long pattern of bad faith, obfuscation, and unwarranted interference with TMG's and MM's business, which continued even after the Stephensons were fired for cause. NS' recent communications with MM's employees and clients further demonstrate the persistence of her and JS' campaign to disrupt Plaintiffs' business, her and JS' disregard of the termination of their employment, and her and JS' recalcitrance in the face of this Court's January 7 TRO – all of which can serve only to increase the likelihood that Plaintiffs will succeed on the merits of their claims against the Stephensons.

For similar reasons, NS' repeated communications with MM's employees and clients tip the balance of hardships in this case further in favor of the Plaintiffs' request for injunctive relief. The Stephensons no longer work for the MM companies, and can have no legitimate need to communicate about business matters with MM's employees, clients, investors or shareholders. By contrast, Plaintiffs have a self-evident interest in protecting and preserving their employee, client, investor, and shareholder relationships from meddling by former employees.

Because Plaintiffs have demonstrated a substantial likelihood of success on the merits, and because they will suffer irreparable harm in the absence of immediate injunctive relief, Plaintiffs respectfully request that this Court broaden Plaintiffs' requested injunctive relief in their proposed preliminary injunction and grant Plaintiffs limited expedited discovery, as specified herein and in the accompanying Order to Show Cause.

## CONCLUSION

For the foregoing reasons, the Court should hold Defendant Nicola Stephenson in contempt for violating the January 7 TRO, should award sanctions, including costs and attorneys' fees, to Plaintiffs as a result of such contempt, and should broaden the injunctive relief in Plaintiffs' requested preliminary injunction, to add the terms specified in, and to order limited expedited discovery as requested in, this Memorandum of Law and the accompanying Order to Show Cause.

Dated: New York, New York
February 5, 2019

WITHERS BERGMAN LLP

By: _____
Dean R. Nicyper
Emma Lindsay
Chaya F. Weinberg-Brodt
Joseph Gallo
430 Park Avenue
New York, New York 10022
(212) 848-9815
Dean.Nicyper@WithersWorldwide.com
Emma.Lindsay@WithersWorldwide.com
Chaya.Weinberg-Brodt@WithersWorldwide.com
Joseph.Gallo@WithersWorldwide.com
*Attorneys for Plaintiffs*