**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

TROIKA MEDIA GROUP, INC., TROIKA
MISSION HOLDINGS, INC.,
MISSIONCULTURE LLC, AND MISSION
MEDIA USA, INC.,

        Plaintiffs,

          -against-

NICOLA STEPHENSON, JAMES
STEPHENSON, and ALLMAC LLC,

        Defendants.

Index No. 19-cv-00145 (ER)

**DEFENDANTS NICOLA AND JAMES STEPHENSON'S**
**MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR CONTEMPT**

David D. Holahan
Richard W. Trotter
TANNENBAUM HELPERN SYRACUSE
& HIRSCHTRITT LLP
900 Third Avenue
New York, New York 10022
Phone No. (212) 508-6700
Holahan@thsh.com
Trotter@thsh.com and

*Attorneys for Defendants Nicola Stephenson*
*and James Stephenson*

## **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ..........................................................................................................4

      The Mission Company AMEX Cards were used To
      Pay Mission Company Business Expenses..........................................................4

      Multiple Other Mission Employees had Access
      to the Mission Company AMEX Account............................................................4

      The Charges Reflected on the Mission AMEX
      Statements show that they were Clearly Business Expenses................................5

      Plaintiffs Terminate the Stephensons and Ignore Attempts
      to Resolve the Mission AMEX Account Issue ...................................................6

      AMEX Suspends the Mission AMEX Account and Initiates
      Collection Actions against the Stephensons
      and the Mission Companies.................................................................................6

      The TRO did not Prohibit the Payment of the
      Mission AMEX Account Balance .......................................................................7

      The Stephensons Consent to Plaintiffs'
      Proposed Expansion of the TRO.........................................................................8

ARGUMENT .................................................................................................................8

I.     THE STRINGENT STANDARD GOVERNING
       CONTEMPT SANCTIONS....................................................................................8

II.    PLAINTIFFS HAVE FAILED TO CARRY THEIR HEAVY BURDEN........................9

      A.      James Stephenson did not Violate an Unambiguous Provision
             of the TRO .................................................................................................9

      B.      Plaintiffs' Silence is Not Clear and Convincing Evidence of
             Non-Compliance......................................................................................12

III.    SANCTIONS ARE UNNECESSARY, DISPROPORTIONATE
        AND UNJUST ................................................................................................................13

IV.    PLAINTIFFS' SECOND MOTION FOR CONTEMPT AND SANCTIONS IS A
        FRIVOLOUS AND BLATANT ATTEMPT TO HARASS THE STEPHENSONS . . .15

CONCLUSION ..........................................................................................................................18

# TABLE OF AUTHORITIES

## Cases                                                                Page(s)

*Am. Civil Liberties Union v. Dep't of Def.*
  827 F. Supp. 2d 217 (S.D.N.Y. 2011) ................................................................. 14

*Cardell Fin. Corp. v. Suchodolski Assocs., Inc.*
  No. 09 CIV6148VMMHD, 2012 WL 12932049, at *53 (S.D.N.Y. July 17, 2017).......... 11, 12

*Chao v. Gotham Registry, Inc.*
  *514 F.3d 280 (2d Cir. 2008)* ............................................................................ 9

*Drywall Tapers & Pointers of Greater New York, Local 1974*
  *of I.B.P.A.T. AFL-CIO v. Local 530 of Operative Plasterers & Cement*
  *Masons Int'l Assn.*
  889 F.2d 389 (2d Cir. 1989) ............................................................................ 11

*Indep. Living Aids, Inc. v. Maxi-Aids, Inc.*
  349 F. Supp. 2d 509 (E.D.N.Y. 2004) ............................................................. 9, 13

*Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*
  No. 04.CV-7369, 2006 WL 2128785 at *3 S.D.N.Y. July 28, 2006)..................................... 11

*King v. Allied Vision, Ltd.*
  65 F.3d 1051 (2d Cir. 1995) ...................................................................... 2, 9, 10

*Lipin v. Hunt*
  No. 14CV1081 (RJS), 2014 WL 12792367, at *5 (S.D.N.Y. Sept. 18, 2014)..................... 13

*Medallic Art Co. Ltd. V. Novas Mktg., Inc.*
  No. 00-CV-502, 2003 WL 22053130, at *1 (S.D.N.Y. Sept. 2, 2003).................................. 10

*Spallone v. United States*
  493 U.S. 265, 110 S. Ct. 625 (1990)............................................................. 13

*Tap Publ'ns Inc. v. Chinese Yellow Pages, Inc.*
  No. 95 Civ. 5043, 1996 WL 509718, at *1 (S.D.N.Y. 1996).................................. 9

*T-Jat Sys. 2006 Ltd. V. Amdocs Software Sys. Ltd.*
  No. 13 CIV 5356 HB, 2013 WL 6409476, at *3 (S.D.N.Y. Dec., 9, 2013)........................... 11

*United States v. Local 1804-1 Longshoreman's Ass'n.*
  44 F.3d 1091 (2d Cir. 1995) ......................................................................... 9

iii

*Upjohn Co. v Medtron Labs., Inc.*
  894 F. Supp. 126 (S.D.N.Y. 1995) ............................................................................................ 8

Defendants Nicola Stephenson and James Stephenson (the "Stephensons") submit this Memorandum of Law in Opposition to the Motion for Contempt by Plaintiffs Troika Media Group, Inc. ("Troika"), Troika Mission Holdings, Inc. ("Troika Holdings"), MissionCulture LLC ("Mission Culture") and Mission Media USA, Inc. ("Mission USA", together with Mission Culture and non-party Mission Media Ltd., the "Mission Companies" and, together with Troika, Troika Holdings and Mission Culture, the "Plaintiffs").

## PRELIMINARY STATEMENT

On January 4, 2019, Plaintiffs terminated the Stephensons' employment without cause in a bad faith effort to deprive them of more than $20 million in consideration the Stephensons are owed in exchange for the sale of the Mission Companies – which the Stephensons spent the better part of the last 15 years building – to Troika.  Apparently recognizing the groundless basis for their termination of the Stephensons, Plaintiffs have since deployed a scorched-earth litigation strategy in a misguided effort to bludgeon the Stephensons into submission and deter them from challenging their wrongful termination and enforcing their myriad of related contractual and legal rights.

Having ignored the Stephensons' repeated attempts to unwind their various economic and other connections with the Mission Companies since their baseless termination, Plaintiffs now attempt to weaponize their intransigence by asking this Court to impose civil contempt sanctions despite the fact James Stephensons' did not violate any clear or unambiguous term of the January 7 TRO (ECF No. 3, the "TRO").  Indeed, by seeking to expand the TRO to bar the Stephensons from paying credit card accounts in the name of the Mission Companies, Plaintiffs undermine their entire request for sanctions by unwittingly admitting that the TRO does not prohibit such conduct.  As a matter of well-settled law, and given the absence of a violation of a "clear and

1

unambiguous" order of the Court, Plaintiffs' request for sanctions must be denied.  *See King v. Allied Vision, Ltd*., 65 F.3d 1051, 1058 (2d Cir. 1995).

In an overzealous and transparent attempt to portray James Stephenson as the villain, Plaintiffs have also willfully distorted the facts and evidence belying their motion.  That is, as long before their sale of the Mission Companies to Troika, the Stephensons – like many small business owners – used American Express ("AMEX") cards issued in the names of both their businesses and the Stephensons personally to operate the Mission Companies.  Over the years, various other Mission Company employees have also had (and continue to have) access to corporate AMEX cards linked to this same credit account, which they routinely used to pay Mission Company expenses.  And while the Stephensons have not used these corporate AMEX cards to pay for personal expenses, under the terms of the card-holder agreement, AMEX has the right to hold both the Stephensons and the Mission Companies jointly liable for all card-related liabilities and fees.  Plaintiffs know this well, which is why they cynically – and apparently for no other reason than to advance their scorched earth litigation strategy – now refuse to pay the AMEX business expenses despite the Stephensons' repeated requests that they do so.

In an effort to avoid the mutually-assured destruction of both the Stephensons and the Mission Companies' credit rating, the Stephensons (through counsel) sent a letter to the Plaintiffs on January 8, 2019 asking them to abide by their obligation to pay the $180,000 balance of the Mission Company AMEX cards.  Plaintiffs ignored the Stephensons' letter and never responded.  On January 25, the Stephensons again informed Plaintiffs of the urgent need for the Mission Companies to pay the AMEX balance, and Plaintiffs again failed to respond in any way.  As a result, AMEX suspended the Mission Company AMEX account and notified the Stephensons that it had been placed into collections.

2

Having received no response or guidance from Plaintiffs, and in direct response to the threat of impending collection actions by AMEX, James Stephenson did as he had done many times before and logged into the AMEX website on his personal laptop and attempted to pay the Mission Companies' outstanding balance.   James Stephenson, however, never entered the "physical or virtual premises" of Plaintiffs, or accessed their "electronic information or systems" – the conduct that was explicitly prohibited by the TRO.   Rather, the payment was initiated through AMEX's own third-party website, and the payment was subsequently reversed by Plaintiffs before it could be completed.   In the wake of Plaintiffs' motion to expand the TRO to prevent the Stephensons from paying the Mission Company credit card bills, the Stephensons have taken no further action with respect to the Mission Company AMEX account – which, to the best of their knowledge – remains in delinquent and continues to damage both the Mission Companies' and the Stephensons' credit ratings.

And while Plaintiffs' motion to expand the TRO could have been avoided if Plaintiffs' had matched the Stephensons' good-faith effort to resolve the issue, the Stephensons nevertheless are willing to consent to Plaintiffs' request to expand the TRO.   However, Plaintiffs' request for sanctions is disingenuous and unnecessary given that: (1) James Stephensons' conduct did not violate any of the clear and unambiguous terms of the TRO or harm Plaintiffs in any cognizable way; (2) Plaintiffs willfully ignored the Stephensons' repeated attempts to resolve the AMEX issue; and (3) the Mission Companies and the Stephensons have **<u>both</u>** been harmed as a result of Plaintiffs' unreasonable intransigence.   In short, Plaintiffs' request for sanctions is nothing more than a litigation tactic intended to intimidate the Stephensons, and should be denied.

3

## BACKGROUND

**The Mission Company AMEX Cards were used**
**To Pay Mission Company Business Expenses**

Since founding the Mission Companies in 2003, the Stephensons have utilized AMEX corporate credit cards jointly issued to Mission Company-entities and them personally to pay the Mission Companies' operating expenses.  (J. Stephenson Decl.[1] ¶¶ 4-5.)  The card at issue is a "Business Platinum Card," and lists both Mission USA and James Stephenson (the former CFO of the Mission Companies) as cardholders – a fact which Plaintiffs fail to acknowledge in their motion papers.  (*Id.* Exs. 1-5.)  Long before they sold the Mission Companies to Troika, the Stephensons and their employees used business credit cards to pay for Mission Company operating expenses – and the Stephensons assumed joint liability for all amounts owed thereunder.  (*Id.* ¶ 6.)

**Multiple Other Mission Employees had**
**Access to the Mission Company AMEX Account**

In addition, multiple other Mission Company employees were provided with their own corporate AMEX cards linked to the same AMEX account ending 1-87008 (the "Mission AMEX Account"), which they too used to pay expenses arising from the operation of the Mission Companies' business.  (J. Stephenson Decl. ¶¶ 4-5.)  For example, Katie Rappaport (Head of Client Services), James Allan (Director of Strategy and Planning), and Nicole Brown (Senior Financial Accountant) **all had AMEX cards linked to the Mission AMEX Account**, and – to the best of the Stephensons' knowledge – are all still employed by the Mission Companies.  (*Id.* ¶ 8.)   In fact, the most recent account statements issued by AMEX in connection with the Mission AMEX Account identify these other card holders, and shows which charges were

---

[1] Declaration of James Stephenson, dated February 5, 2019.

incurred by which individual.  (*Id.* Exs. 1-5.)   These statements also demonstrate that the vast majority of the business charges incurred on the Mission AMEX Account were incurred by these other individuals – and not by James Stephenson.  (*Id.*)

**The Charges Reflected on the Mission AMEX Account**
**Statements show that they were Clearly Business Expenses**

The most recent Mission AMEX Account statements – which reflect the outstanding balance and are readily accessible to Plaintiffs – show that the charges incurred by these individuals were clearly business expenses.  (J. Stephenson Decl. Exs. 1-5.)

For example, the September 2018 statement shows that the Mission AMEX Account was used to purchase airline tickets for Mission employees Jonathan Wylie, Sara Madison Serviente and Perry Alexander Cook, as well as for actor (and son of the famous Clint Eastwood) Scott Eastwood – who was working on an advertising campaign for one of Mission's  clients.  (*Id.* Ex. 1.)   The September statement also reflects nearly $50,000 dollars in Facebook advertising purchases made on behalf of the Mission Companies and their clients.  (*Id.*)   Similarly, the October 2018 statement shows thousands of dollars in additional charges by Facebook and Google for additional advertising services, as well as travel expenses incurred by Mission Company employees other than James Stephenson.  (*Id.* Ex. 2.)   In addition, the November 2018 statement shows charges for plane tickets purchased for Mission Company employees Melisa Emine Itez and Noel Catacutan, and thousands of dollars in additional Facebook advertising charges.  (*Id.* Ex. 3.)

Plaintiffs had access to these same statements at all times, and copies were otherwise provided to their counsel by counsel for the Stephensons in a continuing effort to resolve this

critical issue. (Holahan Decl.[2] Ex. 5.) Had Plaintiffs simply reviewed the account statements for the Mission AMEX Account, they would have quickly confirmed that the Mission AMEX Account was a corporate account used by multiple Mission Company employees to pay business expenses, and not James Stephensons' "personal" credit card account – just as the Stephensons had repeatedly told them. (*Id.* Exs. 1-5.)

**Plaintiffs Terminate the Stephensons and Ignore**
**Attempts to Resolve the Mission AMEX Account Issue**

On January 4, 2019, Plaintiffs terminated the Stephensons without cause in a wrongful attempt to avoid their otherwise binding contractual obligations to pay them more than $20 million in back-end payouts arising from the sale of the Mission Companies, and millions more in additional executive compensation and benefits. (J. Stephenson Decl. ¶¶ 2-3.) On January 8, 2019, the Stephensons (through counsel) sent a letter to Plaintiffs informing them of the urgent need for the Mission Companies to pay the outstanding $180,000 balance of the Mission AMEX Accounts. (Holahan Decl. Ex. 3.) Plaintiffs failed to respond to the Stephensons' letter. (*Id.* Ex. 4.) On January 25, 2019, the Stephensons again (through counsel) contacted Plaintiffs in an attempt to "resolve this issue as soon as possible" in light of the fact that the failure to pay the outstanding balance would "inflict significant damage upon the companies . . . and the Stephensons." (*Id.*) Again, Plaintiffs failed to respond. (*Id.* ¶ 8.)

**AMEX Suspends the Mission AMEX Account and Initiates**
**Collection Actions against the Stephensons and the Mission Companies**

In late-January of 2019, James Stephenson received an electronic notification that the Mission AMEX Account was delinquent and had been placed into collections. (J. Stephenson Decl. ¶ 13.) James Stephenson also received a notification that his personal AMEX (which was

---

[2] Declaration of David D. Holahan, dated February 5, 2019.

linked to a separate, personal account and was completely unrelated to the Mission AMEX Account) had also been suspended. (*Id*.)  It was only then that James Stephenson realized that Plaintiffs – who had failed to respond to the Stephensons' repeated requests to address the AMEX issue – had failed to pay the outstanding balance. (*Id*.)  With the understanding that AMEX would pursue collections actions against both the Mission Companies and the Stephensons personally, and that such actions would be extremely harmful to all parties involved, James Stephenson attempted to pay the outstanding balance of the Mission AMEX Account through the AMEX website by logging in on his personal laptop and using his own login name and password. (*Id.* ¶ 16.)  At no point did James Stephenson enter the virtual or physical premises of any of the Mission Companies, or utilize any of their electronic information or systems in his attempt to process the payment. (*Id.* ¶ 19.)

Plaintiffs subsequently reversed the Stephensons' attempt to pay the outstanding balance of the Mission AMEX Account and – to the best of the Stephensons' knowledge – that balance remains unpaid. (*Id.* ¶ 17.)

**The TRO did not Prohibit the Payment of the**
**Mission AMEX Account Balance**

On January 7, 2019, Plaintiffs moved for a temporary restraining order based primarily upon their allegations that that the Stephensons' retained access to their Mission Company email accounts, and allegations that the Stephensons were engaged in post-termination communications with Mission Company clients and employees. (*See generally* Holahan Decl. Ex. 1 at 9-13.)  The same day, this Court granted the TRO proposed by Plaintiffs, which enjoined the Stephensons from: (1) "entering the physical or virtual premises of TMG, or any of the MM companies;" (2) "using or accessing TMG's or MM's electronic information or systems, including any MM or TMG email[] accounts in their own names, or in the names of any other

7

person or entity;" and (3) "communications with MM's or TMG's employees or clients" in a manner that would interfere with Plaintiffs' business. (Holahan Decl. Ex. 2.)

James Stephenson is fully aware of, and has abided by, these prohibitions.  (J. Stephenson Decl. ¶ 19.)  Indeed, he did not violate any of the injunctions set forth in the TRO because he has not accessed, or even attempted to access, the physical or virtual premises of the Mission Companies, and he did not utilize any of the Mission Company electronic information or systems in the processing of the payment through the AMEX website.  (*Id.*)

**The Stephensons Consent to Plaintiffs'**
**<u>Proposed Expansion of the TRO</u>**

Notwithstanding the fact that the TRO did not prohibit the payment of the Mission AMEX Account balance through the AMEX website, the Stephensons are willing to consent to Plaintiffs' proposed extension of the TRO.  (J. Stephenson Decl. ¶ 20.)  However, AMEX has initiated collection actions against both the Mission Companies and the Stephensons personally, to the great detriment of all parties involved – which is why the Stephensons went to such great lengths to amicably resolve this issue despite Plaintiffs' continuing failure to engage in any type of reasonable dialogue on the issue following their improper termination of the Stephensons' employment.  (*Id.* ¶¶ 16-17.)

<u>**ARGUMENT**</u>

## I.   THE STRINGENT STANDARD GOVERNING CONTEMPT SANCTIONS

An order of civil contempt of court is a severe sanction that should be used sparingly. *Upjohn Co. v. Medtron Labs., Inc.*, 894 F. Supp. 126, 133 (S.D.N.Y. 1995). A party seeking civil contempt and an award of sanctions must establish by clear and convincing evidence that: (1) the order the non-movant failed to comply with is clear and unambiguous; (2) the proof of noncompliance is clear and convincing; and (3) the non-movant has not diligently attempted to

comply in a reasonable manner. *King*, 65 F.3d at 1058; *Chao v. Gotham Registry, Inc*., 514 F.3d 280, 291 (2d Cir. 2008).  "Because the 'contempt power is among the most formidable weapons in the court's arsenal, and one with significant potential for harm if it is wielded imprudently . . . the district court's power to hold a party in contempt – whether civil or criminal – is significantly circumscribed.'" *Tap Publ'ns Inc. v. Chinese Yellow Pages, Inc.*, No. 95 Civ. 5043, 1996 WL 509718, at *1 (S.D.N.Y. 1996) (alteration in original) (quoting *United States v. Local 1804-1 Longshoreman's Ass'n*, 44 F.3d 1091, 1095 (2d Cir. 1995)).

## II.     PLAINTIFFS HAVE FAILED TO CARRY THEIR HEAVY BURDEN

### A.     James Stephenson did not Violate an Unambiguous Provision of the TRO

Plaintiffs' request for sanctions is undermined by its motion to expand the TRO. (Plaintiffs' Memo. at 13-17.)  If James Stephensons' conduct actually violated the "clear" and "unambiguous" language of the TRO, there would be no need for Plaintiffs to move to expand TRO.  The very fact Plaintiffs now seek to expand the TRO undermines their entire claim at James Stephenson violated it in the first place.  *See Indep. Living Aids, Inc. v. Maxi-Aids, Inc.,* 349 F. Supp. 2d 509, 519 (E.D.N.Y. 2004) (preliminary injunction enjoining Defendant from using the phrase "Independent Living Aids" in marketing was not clear and unambiguous as to whether the Defendant was permitted to use the same phrase in lower case letters).

Nevertheless, Plaintiffs go to incredible lengths to stretch and distort the language of the TRO in an attempt to manufacture a violation.  Of the injunctions set forth in the TRO (which Plaintiffs' counsel drafted and proposed), Plaintiffs rely upon the Court's prohibitions against the "entering the physical or virtual premises of [the Company]" and "accessing TMG's or MM's electronic information or systems, including any [of Plaintiffs'] email[] accounts in their own

names, or in the names of any other person or entity." (Plaintiffs' Mem.[3] at 8.) While "electronic information or systems" and "virtual premises" are not defined by the TRO – and while the TRO makes absolutely **<u>no reference to Mission Company bank accounts or credit cards</u>** – Plaintiffs argue that it "should have been especially clear" to James Stephenson that he was barred from paying the Mission Amex Account Balance on a third party's website.[4] (*Id.* at 9.)

But the rigorous standard for an award of sanctions leaves no room for Plaintiffs' litigation gamesmanship or the type of "should haves" and circumstantial inferences employed by Plaintiffs in support of their motion. An order will not be found clear and unambiguous unless it is "specific and definite enough to apprise those within its scope of the conduct being proscribed" such that an individual is "able to ascertain from the four corners of the order precisely what acts are forbidden." *Medallic Art Co. Ltd. v. Novas Mktg., Inc.*, No. 00-CV-502, 2003 WL 22053130, at *1 (S.D.N.Y. Sept. 2, 2003) (citation omitted); *see King*, 65 F.3d at 1060 (no contempt found where plaintiff attempted to impose obligations on defendant that were not explicitly within the order).

Plaintiffs can point to no explicit, self-explanatory prohibition in the TRO enjoining James Stephenson from: (1) logging into his own American Express account, with his own login and password, on his own personal laptop; and (2) attempting to cause American Express to attempt to satisfy payment of expenses incurred by the Mission Companies, and for which they

---

[3] ECF No. 16.

[4] That the TRO does not reference Plaintiffs' bank accounts, directly or indirectly, is all the more crucial given that the TRO *does* expressly reference Plaintiffs' "email and other … *accounts*" in no less than four unrelated provisions. (*See* TRO, p. 2, § (6) (enjoining AllMac from preventing Plaintiffs access to their "email and other … accounts"); p. 2, § (7) (enjoining AllMac from acquiescing to the "improper access and/or use of those … [email and other] accounts); p. 3 § (6) (enjoining AllMac from preventing Plaintiffs access to their "email and other … accounts"); p. 3 § (7) (enjoining AllMac from acquiescing to the "improper access and/or use of those [email and other] accounts").)

too are liable.  (J. Stephenson Decl. ¶ 16.)  In short, James Stephenson never "entere[ed] the physical or virtual premises" of the Mission Companies, and he did not "us[e] or access[] TMG's or MM's electronic information or systems," because any attempt to pay the Mission AMEX Account balance was made through the AMEX website, and not through any electronic portal or platform created by, or belonging to, the Mission Companies.  (Holahan Decl. Ex. 2 at 2.)

An award of sanctions cannot turn on Plaintiffs' **interpretation** of the TRO.  *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, No 04.CV-7369, 2006 WL 2128785 at *3 (S.D.N.Y. July 28, 2006) (injunction must "clear and unambiguous," and "any ambiguities in an order should be read in favor of the person charged with contempt").   Where a movant cannot show that the conduct in question was "expressly barred" by a court order, a request for sanctions must be denied. *See T-Jat Sys. 2006 Ltd. v. Amdocs Software Sys. Ltd.*, No. 13 CIV. 5356 HB, 2013 WL 6409476, at *3 (S.D.N.Y. Dec. 9, 2013).   Because Plaintiffs cannot show that James Stephenson violated a "clear and unambiguous" provision of the TRO, their request for sanctions must be denied.[5]  *See Drywall Tapers & Pointers of Greater New York, Local 1974 of I.B.P.A.T. AFL-CIO v. Local 530 of Operative Plasterers & Cement Masons Int'l Ass'n*, 889 F.2d 389, 400 (2d Cir. 1989) (finding that order was not clear and unambiguous where it was "not clear" that the alleged contemnor's actions "were contemplated by the spirit and purpose of the injunction," which were not necessarily within the scope of the order's "primary objective")

---

[5] Even if this Court were to conclude that James Stephensons' conduct was improper, impropriety alone "does not necessarily amount to a clear violation" of a court order.  *Cardell Fin. Corp.*, 2012 WL 12932049 at *53.

B.      Plaintiffs' Silence is not Clear and Convincing Evidence of Non-Compliance

Plaintiffs not only take great liberties with the text of the TRO, they also attempt to play the role of mind-reader by speculating about what James Stephenson should have inferred from their silence with respect to the Mission AMEX Account balance.

The Stephensons made repeated attempts to bring the issue of the Mission AMEX Account balance to Plaintiffs' attention, and informed them of the harm that all parties would suffer if the Mission Companies failed to make the required payment. (J. Stephenson Decl. ¶ 15; Holahan Decl. Exs. 3-4.)  Plaintiffs never responded to these overtures by the Stephensons, and yet now claim that James Stephenson should have somehow concluded from Plaintiffs' silence that they objected to the payment of the Mission AMEX account balance, and that any attempt to do so would be punished by a motion for contempt.

Plaintiffs' theory strains credulity.  If Plaintiffs objected to the Stephensons' access to the Mission AMEX Account, they could have acted to restrict such access.  Moreover, if Plaintiffs objected to the continuing payment of the Mission AMEX Account balance by James Stephenson (a routine occurrence which happened every month without any objection from Plaintiffs whatsoever) they could have said so.  Plaintiffs did no such thing, and should not be permitted to read a new injunction into the TRO after it was entered, solely for purposes of facilitating a false finding of contempt. Plaintiffs purposefully remained silent in the face of repeated, reasonable requests by the Stephensons – leaving the Stephensons in the dark, while their financial well-being (and that of the Mission Companies) hung in the balance through no fault of their own.  Under those circumstances, one can understand why James Stephenson concluded that the only way to avoid significant, lasting and unjustified damage to both the Stephensons and the Mission Companies was to pay the Mission Amex Account balance before

AMEX took any further collection actions (J. Stephenson Decl. ¶¶ 16-17) – particularly because payment was not barred by the clear and unambiguous terms of the TRO.  *Cardell Fin. Corp. v. Suchodolski Assocs., Inc*., No. 09CIV6148VMMHD, 2012 WL 12932049, at *53 (S.D.N.Y. July 17, 2012), *report and recommendation adopted sub nom. Cardell Fin. Corp. v. Suchodolksi Assocs., Inc*., 896 F. Supp. 2d 320 (S.D.N.Y. 2012) (denying motion for contempt and finding that "although it is certainly reasonable to read the language of the injunction as movants do . . . the wording of the injunction could be more narrowly construed.")

In short, Plaintiffs should not be permitted to use their own cynical litigation tactics and purposeful silence as a substitute for the established and stringent standard for finding a party in contempt for violating the clear and unambiguous terms of a court's order.  Accordingly, Plaintiffs' motion for sanctions should be denied.  *See Indep. Living Aids, Inc.*, 349 F. Supp. 2d at 519.

## III.    SANCTIONS ARE UNNECESSARY, DISPROPORTIONATE AND UNJUST

The purpose of civil contempt is remedial and is intended to coerce compliance with an order of the Court. *Spallone v. United States*, 493 U.S. 265, 277, 110 S. Ct. 625, 633 (1990) ("[I]n selecting contempt sanctions, a court is obliged to use the 'least possible power adequate to the end proposed.'").  Even where a party has committed a technical violation of a court order, courts routinely decline to utilize the heavy hand of civil contempt to impose onerous monetary sanctions. *See Lipin v. Hunt*, No. 14CV1081 (RJS), 2014 WL 12792367, at *5 (S.D.N.Y. Sept. 18, 2014) (declining to impose civil contempt of court given the alleged contemnor's more "recent pattern of compliance" and noting that the court "reiterates the warning contained in the Order" that upon further violation the "Plaintiff will immediately be held in civil contempt").  Even if Plaintiffs could meet the rigorous standard for civil contempt and sanctions (and, as set

13

forth above, they cannot), there are substantial mitigating factors that would countenance against an award of monetary sanctions or attorneys' fees to Plaintiffs.

First, Plaintiffs were not damaged by any attempt to pay the Mission AMEX Account balance.  Plaintiffs claim to have reversed the payment (Plaintiffs' Memo. at 10), and – even if they did not – Plaintiffs would have **benefited** from the transfer by avoiding all the negative implications of AMEX's impending collection proceedings against them.  (*See* J. Stephenson Decl. ¶ 16.)  As a result, there nothing for this Court to remediate, and – even if Plaintiffs wrongly believe that the Mission Companies have been damaged in any way – they should not be permitted to pursue their alleged "damages" by way of a frivolous contempt proceeding.

Second, the Stephensons have agreed to consent to Plaintiffs' proposed expansion of the TRO, and have no intention of attempting to pay any other amounts owed by the Mission Companies from the Mission accounts – even while facing unjustified damage to their personal credit ratings.  (*Id.* ¶ 17.)  As a result, there is no need for this Court to coerce their compliance by imposing monetary sanctions – which would "serve no beneficial purpose."  *Am. Civil Liberties Union v. Dep't of Def.*, 827 F. Supp. 2d 217, 230 (S.D.N.Y. 2011) (denying motion for contempt where "a finding of civil contempt at this point would serve no beneficial purpose.") To the contrary, an award of monetary sanctions would provide a windfall to Plaintiffs, and only further incentivize and reward their scorched earth litigation tactics.

IV.  **PLAINTIFFS' SECOND MOTION FOR CONTEMPT AND SANCTIONS IS A FRIVOLOUS AND BLATANT ATTEMPT TO HARASS THE STEPHENSONS**

Moments before the Stephensons' deadline to oppose Plaintiffs' first motion for contempt and sanctions against James Stephenson, Plaintiffs filed their **<u>second motion for contempt and sanctions</u>** in less than a week (ECF No. 20, the "Second Sanctions Motion"), in a blatant and frivolous attempt to intimidate the Stephensons and avoid the adjudication of this dispute on the merits.  Needless to say, the Stephensons deserve a full and fair opportunity to oppose Plaintiffs' Second Sanctions Motion and refute the clearly frivolous factual assertions and legal arguments set forth therein, but the outrageous nature (and timing) of Plaintiffs' Second Sanctions Motion cannot go unanswered – particularly in light of the fact that Plaintiffs have set February 11, 2019 (the same day as the hearing for their instant motion) as the return date.

First, Plaintiffs' allegations that Nicola Stephenson violated the TRO are at best frivolous and, at worst, they are outright fictional.  Plaintiffs attach three utterly innocuous emails to their motion papers (which are attached as Exhibits 6-8 to the Holahan Decl.[6]) and wrongfully portray them as an unprecedented assault on the rule of law.  Plaintiffs' histrionics notwithstanding, a cursory review of these emails shows nothing more than Nicola Stephenson using her personal email account to exchange platitudes and pleasantries with individuals that reached out directly to her, some of whom she has known personally for years.  (*See* Holahan Decl. Exs. 6-9.)  The TRO enjoined the Stephensons from communicating with Mission Company clients and employees in a manner that would "disrupt[] or interfere[] with Plaintiffs' business,"  and nowhere in any of these supposed "smoking guns" does Nicola even attempt to interfere with the Mission Companies' business.  (*Id.* Ex. 2.)

---

[6] The other emails attached by Plaintiffs to their Second Contempt Motion pre-date the TRO by months and are therefore utterly irrelevant.  (*See* ECF Nos. 22-2 and 22-6).

Plaintiffs' assertions to the contrary represent little more than the paranoid ramblings of an overly litigious family of companies that are no doubt in crisis now that their clients have likely learned that the Nicola Stephenson – the founder of the Mission Companies and the heart of their business – has departed.  For example, Plaintiffs attach a January 23, 2019 email in which an alleged client of the Mission Companies sends an unprompted email to Nicola Stephenson attaching an organizational chart and a profit and loss summary.  (*See id.* Ex. 6.) Nicola Stephenson replies by saying "[t]hank you so much Georgia."  (*Id.*)  There is simply no fair reading of the phrase "interfering with Plaintiffs' business" that would include thanking someone for an email.

Similarly, Plaintiffs attach another email in which Nicola Stephenson again responds to an unsolicited email from a non-party – that is (by Plaintiffs' own admission) not even a client of the Mission Companies – by saying "Thanks."  (*Id.* Ex. 7.)  According to Plaintiffs, the supposedly incriminating nature of this document arises entirely from an email subject line **which Nicola Stephenson did not even draft**, and which makes a reference to "Mission."  (*Id.*) Needless to say, thanking a non-client of the Mission Companies can in no way be construed as a violation of a clear and unambiguous term of the TRO – which only prohibits communicating with Mission Company **clients and employees** in a way that interferes with Plaintiffs' business. (*Id.* Ex. 2 at 2.)  Yet, Plaintiffs remarkably claim that thanking a non-client and non-employee for sending an email somehow warrants an imposition of sanctions.  Whatever the Plaintiffs' think of the meaning of the words "thank you," any argument that these emails constitute clear and convincing evidence of Nicola Stephensons' violation of an unambiguous provision of the TRO is absurd, and should be rejected out of hand.

16

Plaintiffs' other "smoking gun" is an email chain with a Mission Company employee named Jono Wylie which includes only one email from Nicola Stephenson dated after the entry of the TRO.  (*Id.* Ex 8.)  In response to an email from Wylie (one of Plaintiffs' own employees) asking for advice on how best to communicate with Mission Company clients, Nicola Stephenson responds "No news – we are currently negotiating the next steps" and makes absolutely no attempt to interfere with any client relationship, or to solicit either the client or employee in any way.  In short, Nicola Stephenson handled the inquiry in the most banal way imaginable, and did not come close to interfering with Plaintiffs' business or violating the TRO. (*See id.*)

Plaintiffs strategy is clear – they intend to drown the Stephensons in frivolous motion practice in a futile attempt to avoid adjudicating this case, and the Stephensons' numerous claims against them, on the merits.  The absurdity of the Second Sanctions Motion is laid bare by Plaintiffs' reference to a "Sunday Times Article" published in the U.K., which Plaintiffs appear to have been offended by.  (ECF No. 21 at 4.)  Setting aside for the moment the inaccuracy of Plaintiffs' allegations with respect to the origins and substance of this article, the mere fact that they are seeking sanctions based in part on the publication of a newspaper article shows that the Second Sanctions Motion is little more than a vindictive attempt at retribution against the Stephensons for Plaintiffs' well-deserved bad publicity.

Moreover – and it is remarkable that this point need even be made – the imposition of sanctions against the Stephensons for communications with a newspaper reporter, or for the content of an article published by that paper would be a clear violation of the First Amendment to the United States Constitution and a profoundly un-American attempt to stifle freedom of speech and an independent press.

17

For all these reasons, Plaintiffs' Second Sanctions Motion should be denied outright. Nevertheless, in the event the Court does not deny Plaintiffs' Second Sanctions Motion at the February 11 hearing on the instant motion, the Stephensons reserve their right to file a more fulsome opposition to the Second Sanctions Motion, and hereby reserve all rights and remedies pertaining thereto, including the right to file their own motion for sanctions as a result of Plaintiffs' frivolous and abusive motion practice.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiffs' motions for contempt and request for sanctions in its entirety, and grant such other relief as the Court deems just and proper.

Dated: February 5, 2019

TANNENBAUM HELPERN SYRACUSE
& HIRSCHTRITT LLP

By:  ___/s/ David D. Holahan_____
      David D. Holahan
      Richard W. Trotter
900 Third Avenue
New York, New York 10022
Phone No. (212) 508-6700
Holahan@thsh.com and
Trotter@thsh.com
*Attorneys for Defendants Nicola and*
*James Stephenson*

18