UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
TROIKA MISSION GROUP, INC., TROIKA           :
MISSION HOLDINGS, INC., MISSIONCULTURE       :
LLC, and MISSION MEDIA USA, INC.,            :    Index No.: 19-cv-00145-ER
                                             :
        Plaintiffs,                         :
                                             :
  -against-                                   :
                                             :
NICOLA STEPHENSON, JAMES STEPHENSON,         :
and ALLMAC LLC,                              :
                                             :
        Defendants.                         :
------------------------------------------------------------------X

### PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR CONTEMPT AND MOTION TO BROADEN INJUNCTIVE RELIEF

WITHERS BERGMAN LLP
Dean R. Nicyper
Emma Lindsay
Chaya F. Weinberg-Brodt
Joseph Gallo
430 Park Avenue
New York, New York 10022
Telephone: (212) 848-9800
*Attorneys for Plaintiffs*

**Table of Contents**

Page(s)

Table of Authorities ................................................................................................................. ii

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT ............................................................................................................................. 2

    I.   DEFENDANT JAMES STEPHENSON SHOULD BE HELD IN
        CONTEMPT FOR VIOLATING THE TEMPORARY RESTRAINING
        ORDER ........................................................................................................... 2

        A.   The January 7 TRO Prohibited JS from Using or Accessing the
            M-Culture Bank Account ....................................................................................... 2

        B.   JS Admits that He Intentionally Took Money from the M-Culture
            Bank Account after the Issuance of the January 7 TRO, Thereby
            Willfully Violating Its Injunctions ........................................................................ 4

        C.   JS' Justifications for Taking Money from the M-Culture Bank
            Account Are Both Irrelevant to Plaintiffs' Contempt Motion, and
            Factually Dubious .................................................................................................. 5

            1.   Plaintiffs Did Not Consent to JS' Theft Through Their "Silence" .............. 5

            2.   JS' Allegation That He Is Owed The Amount He Stole From the
                M-Culture Bank Account is Unsubstantiated, Dwarfed By
                Plaintiffs' Claims Regarding the Amounts JS and NS Owe to
                Plaintiffs, and Irrelevant ................................................................................ 6

            3.   Sanctions Against JS Are Warranted ........................................................... 8

    II.  DEFENDANT NICOLA STEPHENSON SHOULD BE HELD IN
        CONTEMPT FOR VIOLATING THE TEMPORARY RESTRAINING
        ORDER ............................................................................................................................ 8

CONCLUSION ........................................................................................................................... 10

# Table of Authorities

**Page(s)**

**Cases**

*In re Doria/Memon*,
   2016 U.S. Dist. LEXIS 7225 ................................................................................................8

*Drywall Tapers & Pointers of Greater New York, Local 1974 of I.B.P.A.T. AFL-
   CIO v. Local 530 of Operative Plasterers & Cement Masons Int'l Ass'n*,
   889 F.2d 389 (2d Cir. 1989)................................................................................................4

*Indep. Living Aids, Inc. v. Maxi-Aids, Inc.*,
   349 F. Supp. 2d 509 (E.D.N.Y. 2004) ................................................................................4

*Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*,
   369 F.3d 645 (2d Cir. 2004)............................................................................................6, 8

*SEC v. Northshore Asset Mgmt., LLC*,
   2006 U.S. Dist. LEXIS 39255 (S.D.N.Y. June 14, 2006)...................................................3

*T-Jat Sys. 2006 Ltd. v. Amdocs Software Sys. Ltd.*,
   2013 U.S. Dist. LEXIS 172969 (S.D.N.Y. Dec. 9, 2013) ..................................................4

Plaintiffs Troika Mission Group, Inc., Troika-Mission Holdings, Inc., MissionCulture LLC, and Mission Media USA Inc. respectfully submit this Reply Memorandum of Law in support of their Motion for Contempt Against Defendant James Stephenson ("JS") and to Broaden the Existing Temporary Restraining Order and Preliminary Injunction.

## PRELIMINARY STATEMENT

Weeks after JS was terminated from Plaintiffs' companies, JS intentionally took money from MissionCulture LLC's bank account (the "M-Culture Bank Account") **three separate times** to pay his American Express credit card (the "JS AMEX"). His doing so violated this Court's temporary restraining order issued on January 7, 2019 (the "January 7 TRO," Dkt. 3), which explicitly prohibited JS from "entering the physical or virtual premises of TMG [Troika Media Group, Inc.], or any of the MM [Mission Media] companies" and "using or accessing TMG's or MM's electronic information or systems . . . ." Each of JS' three willful violations of the January 7 TRO warrants holding him in contempt.

The letter JS' lawyer sent to Plaintiffs' counsel on January 8, 2019, which demanded that TMG pay JS' credit card bill, demonstrated that JS was fully aware that he was not authorized to take money from the M-Culture Bank Account. Yet he did so on January 23, 2019, and again on January 25, 2019. Upon learning that he did so, Plaintiffs' counsel sent an email to Defendants' counsel on January 26, 2019 giving them notice (if they had not already been aware) that JS had taken $148,622.15 from the M-Culture Bank Account on January 23. Yet, the next day, on January 27, 2019, JS took another $34,770.98 from the M-Culture Bank Account.

JS' knowingly and intentionally "accessing [the] electronic information [and] systems" and "entering the . . . virtual premises" of the M-Culture Bank Account on three separate occasions constituted conduct in blatant disregard of this Court's January 7 TRO. He and

Defendant Nicola Stephenson ("NS") have repeatedly flouted the strict provisions of the January 7 TRO as part of their malicious campaign to destroy the TMG and MM companies. The Stephensons' criminal and contemptuous conduct must end. Plaintiffs' respectfully request that the Court hold JS in contempt for violating the January 7 TRO to ameliorate Plaintiffs' damages and to coerce JS and NS to comply with their legal obligations going forward.

## ARGUMENT

**I.   DEFENDANT JAMES STEPHENSON SHOULD BE HELD IN CONTEMPT FOR VIOLATING THE TEMPORARY RESTRAINING ORDER**

    A.   The January 7 TRO Prohibited JS from Using or Accessing the M-Culture Bank Account

The January 7 TRO provides that: "(1) the Stephenson Defendants, who are no longer employees of the MM companies, are enjoined from entering the physical or virtual premises of TMG, or any of the MM companies; (2) the Stephenson Defendants, who are no longer employees of the MM companies, are enjoined from using or accessing TMG's or MM's electronic information or systems, including any MM or TMG emails accounts in their own names, or in the names of any other person or entity…" (Dkt. 3 p.2.) The January 7 TRO has been in effect since January 7, and remains in effect today.

JS declares: "I am aware of the Temporary Restraining Order that was granted by the Court on January 7, 2019 [the January 7 TRO]." (Declaration of James Stephenson in Opposition to Plaintiffs' Motion for Contempt, dated February 5, 2019 ("JS Decl."), Dkt. 25, ¶ 19.) JS also declares: "My understanding is that the [January 7 TRO] prevents Nicola and me from entering Plaintiffs' physical and virtual premises and from using their information to gain access to our former company email accounts." (*Id.*) JS does not state that he understood the terms of the January 7 TRO to permit him to take money from the M-Culture Bank Account. (*See generally* JS Decl.)

2

JS knew that the January 7 TRO precluded him from entering M-Culture's Bank Account to pay his AMEX bill. His counsel sent a letter on January 8, 2019 demanding that the MM companies pay that bill. (*See* Declaration of David. D Holahan in Opposition to Plaintiffs' Motion for Contempt ("Holahan Decl."), Dkt. 26, ¶¶ 5-6.) If JS thought that he could pay the bill from M-Culture Bank Account, he would not have had his counsel demand that the MM companies do so. Yet, JS used on-line access via a link between his AMEX account and the MM companies' banking facilities to enter the premises of M-Culture's Bank Account on three occasions to take money from that account. (January 28 Broderick Declaration, ¶¶ 12-19.)

The January 7 TRO's injunctions regarding Plaintiffs' property are broadly worded to include all of Plaintiffs' "virtual premises" and "electronic information or systems." (Dkt. 3 p.2.) Although the January 7 TRO also referred to Plaintiffs' email systems – and indeed, it was NS' breaking into and using Plaintiffs' email systems that necessitated the January 7 TRO – the injunctions against JS and NS were not limited to Plaintiffs' email system. JS is precluded from entering any of Plaintiffs' "virtual premises" and from accessing any of Plaintiffs' "electronic information or systems." The M-Culture Bank Account is such a "virtual premises" and "electronic system." It is not credible for JS to suggest that he understood the January 7 TRO to permit him to steal Plaintiffs' electronically stored property (their money) from their virtual premises (the M-Culture Bank Account). *See SEC v. Northshore Asset Mgmt., LLC*, 2006 U.S. Dist. LEXIS 39255, *4-6 (S.D.N.Y. June 14, 2006) (TRO enjoining withdrawal or transfer of "assets" included contents of safe deposit box, even though safe deposit boxes were not explicitly included in the order, and further noting that "both defendants employed sophisticated counsel at all times, thus, were it so that they did not understand what was prohibited by the TRO, they could have – and should have – contacted their respective counsel.")

The cases on which JS relies to impugn the clarity of the injunctions in the January 7 TRO are inapposite.  For example, JS relies on *Drywall Tapers & Pointers of Greater New York, Local 1974 of I.B.P.A.T. AFL-CIO v. Local 530 of Operative Plasterers & Cement Masons Int'l Ass'n*, 889 F.2d 389 (2d Cir. 1989), for the proposition that the JS did not violate a "clear and unambiguous" provision of the January 7 TRO.  (Def. Opp. Br. p.11.)  However, JS' citation is to the dissent.  In fact, the majority of the Second Circuit upheld the lower court's contempt holding and damages award.  *Drywall Tapers*, 889 F.2d at 398.

In *Indep. Living Aids, Inc. v. Maxi-Aids, Inc.*, 349 F. Supp. 2d 509 (E.D.N.Y. 2004), on which JS also relies, the Court issued an Order finding Plaintiffs had a common-law trademark in "Independent Living Aids," and enjoining defendants from using that phrase.  The Second Circuit, in upholding the Order (outside the context of contempt), held that the trademark was case specific.  *See id.* at 513, 518.  Relying on the Second Circuit's holding, the court found that defendants were not in contempt for using the phrase "independent living aids."  *Id.*  Likewise, *T-Jat Sys. 2006 Ltd. v. Amdocs Software Sys. Ltd.*, 2013 U.S. Dist. LEXIS 172969, **13-14 (S.D.N.Y. Dec. 9, 2013) held that where a court grants a motion to compel arbitration, the moving party is not in contempt of that order by filing a related action in another forum.  These cases therefore have no bearing on JS' violation of this Court's injunctions.  JS' reliance on cases that are so legally and factually different from this dispute is telling.

B.     JS Admits that He Intentionally Took Money from the M-Culture Bank Account after the Issuance of the January 7 TRO, Thereby Willfully Violating Its Injunctions

In his declaration, JS admits: "…I logged into the American Express website on my personal laptop, using my own login name and password, and attempted to pay the Corporate AMEX [*i.e.* the JS AMEX] Account's outstanding balance through the bank account that has always been linked to the card." (JS Decl. ¶ 16.)  JS studiously avoids stating, but does not deny,

4

that the bank account "linked" to the JS AMEX was the M-Culture Bank Account.  (*See* January 28 Broderick Decl. ¶¶ 12-19.)

Knowing that the M-Culture Bank Account constitutes virtual premises and that accessing it on-line was using an electronic information system belonging to Plaintiffs, JS also avoids saying, but does not deny, that he had to deliberately click the appropriate buttons so that his AMEX account accessed the M-Culture Bank Account to extract money.  He had to affirmatively choose which account he would use to pay the JS AMEX, and he chose the M-Culture Bank Account.  (*Id.*; January 28 Broderick Decl. ¶ 14.)  The January 7 TRO does not permit JS to enter any of Plaintiffs' "virtual premises" or to use or access any of Plaintiffs' "electronic information or systems," whether from his AMEX Account or otherwise.  His conduct was an intentional and deliberate violation of the January 7 TRO.

JS also avoids stating, but does not deny, that he tried to pay the JS AMEX bill with money from the M-Culture Bank Account on **three separate occasions**: January 23, January 25, and January 27.  (*See id.*)  Indeed, the January 27 unauthorized transfer was **after** Plaintiffs' counsel had emailed JS' counsel to inform them of the January 23 unauthorized transfer.  (January 28 Broderick Decl. ¶ 20.)  JS' violation of the January 7 TRO therefore was indisputably willful.

C.     JS' Justifications for Taking Money from the M-Culture Bank Account
        <u>Are Both Irrelevant to Plaintiffs' Contempt Motion, and Factually Dubious</u>

    1.     Plaintiffs Did Not Consent to JS' Theft Through Their "Silence"

In his brief, JS argues: "Plaintiffs never responded to these overtures by the Stephensons, and yet now claim that James Stephenson should have somehow concluded from Plaintiffs' silence that they objected to the payment of the Mission AMEX account balance, and that any attempt to do so would be punished by a motion for contempt."  (Def. Opp. Br. p.12.)  This

5

makes no sense.  JS knew he was no longer employed by the MM companies, and knew he had no authority to take money from the M-Culture Bank Account.  He did not need a statement from MM to tell him this.  In fact, the termination letter that the TMG and MM companies sent to JS on January 4, 2019 expressly stated: "You additionally are prohibited from using or accessing any information or property of any of the Worldwide Companies, including but not limited to . . . **bank accounts**, company credit cards, equipment, etc." (*See* January 6, 2019 Declaration of Chris Broderick (the "January 6 Broderick Decl."), Ex. 7, Dkt. 7-8, p.2.)  (Emphasis added.)[1]

    2.    JS' Allegation That He Is Owed The Amount He Stole From the M-Culture Bank Account is Unsubstantiated, Dwarfed By Plaintiffs' Claims Regarding the Amounts JS and NS Owe to Plaintiffs, and Irrelevant

In his opposition, JS claims that the JS AMEX bill contained legitimate corporate expenses that, he alleges, Plaintiffs owed to him.  As an initial matter, this is irrelevant to the contempt motion as a matter of law.  *See Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004) ("Persons subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed, even if they have proper grounds to object to the order.").

Second, although JS states under oath that he used the card solely for corporate expenses and never for personal expenses, his statement is false, as demonstrated in part by JS' own evidence submitted in opposition to Plaintiffs' contempt motion.  As one of many examples, Exhibit 5 to the JS Declaration shows that JS charged personal "Uber Eats" expenses to the card on January 8, 2019, after he had been terminated from his employment with the MM companies, and after the Court had issued the January 7, 2019 injunction.  (JS Decl. Ex 5, Dkt. 25-5, p.5.)

---

[1]    In addition, the statement in the Holahan Decl. that "Plaintiffs' Counsel also did not respond to my January 25, 2019 email" is simply false. (*See* Reply Declaration of Dean R. Nicyper (the "Reply Nicyper Decl."), Exs. 2-6.)

Furthermore, as more fully set forth in the Reply Declaration of Christopher Broderick, executed on February 8, 2019 ("Broderick Reply Decl."), JS and Arsenio France, who Plaintiffs understand is the Stephensons' driver, repeatedly used the card for personal expenditures for JS, his children, and potentially NS as well. At present, Troika has located over $35,000 of such charges. (Broderick Reply Decl., ¶ 5.) Likewise, Troika has found numerous emails between JS and Mission accounting personnel addressing JS' and Mr. France's personal charges on the card. *Id.* ¶¶ 8-9, and Exs. 1-6.

Third, Plaintiffs' alleged damages for their claims against JS and NS in the Complaint – which alleged damages could exceed $25 million – dwarf the amount that JS claims to be owed by Plaintiffs in connection with the JS AMEX bill. In addition to those damages, Plaintiffs sent a letter to the Stephensons Defendants' counsel expressly demanding payment of the $274,344 the Stephensons owed to the MM companies for personal expenses they had charged to the MM companies and personal loans they had taken from the MM companies.[2] (*See* Reply Nicyper Decl., Ex. 1.) Any claim that Plaintiffs owe Defendants money therefore falls flat.

If JS, as he claims (JS Decl. ¶ 16.), was truly concerned about suffering damages in connection with the unpaid JS Amex bill – payment of which the AMEX invoice states is not even due until February 13, 2019 (JS Decl. Ex. 5, Dkt. 25-5, p.2.) – he could have: (1) used some of the $11 million Defendants received for their sale of their stock in the MM companies; or (2) sought emergency relief from the Court. Instead of doing either of these things, JS resorted to self-help tactics and took money from the M-Culture Bank Account, in violation of the January 7 TRO.

---

[2] JS and NS have not responded to Plaintiffs' demand for payment.

7

3.     Sanctions Against JS Are Warranted

Notwithstanding the fact that Plaintiffs managed, with great effort, to claw back the money JS took from the M-Culture Bank Account, Plaintiffs have incurred substantial damages in connection with JS' contempt of the January 7 TRO and the resulting disruption of their business, including attorneys' fees. (January 28 Broderick Decl. ¶ 23.) Sanctions are an appropriate remedy for Plaintiffs' injury in these circumstances. *See e.g. In re Doria/Memon*, 2016 U.S. Dist. LEXIS 7225 at **19-20 ("If the Court does find that the violation was willful, however, attorney's fees should be awarded unless there are persuasive grounds to deny them"). In addition, sanctions against JS are necessary to compel future compliance, in light of his and NS' repeated violations of several aspects of the TRO in their continuing campaign to destabilize Plaintiffs' business. *See Paramedics Electromedicina*, 369 F.3d at 657 ("The imposition of civil contempt sanctions may serve dual purposes: to secure future compliance with court orders and to compensate the party that has been wronged").

## II.     DEFENDANT NICOLA STEPHENSON SHOULD BE HELD IN CONTEMPT FOR VIOLATING THE TEMPORARY RESTRAINING ORDER

In their opposition brief, Defendants also respond to Plaintiffs' second contempt motion, which addresses NS' violation of the January 7 TRO. Defendants argue that NS' communications with MM's employees and clients are "innocuous." They are not. NS and JS have embarked on an extensive campaign to destroy the MM companies, including:

- After manipulating the MM companies' finances, NS and JS fraudulently put the UK MM companies into insolvency administration. Although the MM companies came out of "administration" a couple of weeks later because there had been no basis to put them into administration, taking them out of administration required Plaintiffs' to expend an enormous amount of time and expense.

8

- After their employment was terminated, NS broke into the MM companies' email systems, changed passwords, and then sent an email to all company employees, telling employees "it's business as usual and I am available to you at any time," and told employees to communicate with three employees NS had selected because she was "in constant contact" with them and "they know what to do." (January 6 Broderick Decl. Ex. 10, Dkt. 7-11, p.3.)

As the Second Contempt Motion explains, JS and NS have continued their campaign to destroy the MM companies and are doing so with blatant and complete disregard for this Court's January 7 TRO. Specifically:

- On January 14, 2019, one week after the TRO was entered, in continuation of her email to employees telling them "it's business as usual," NS communicated with current MM employee Jono Wylie about the strategy he should pursue in communicating with a specific client named Simon, telling him: "we are currently negotiating the next steps - I will let you know when we are releasing anything officially or if there are any issues." (Declaration of Christopher Broderick in Support of Plaintiffs' Second Motion for Contempt and to Broaden Injunctive Relief, dated February 5, 2019 (the "February 5 Broderick Declaration"), Ex. 4.)

- Throughout January 2019, NS repeatedly communicated with a then-current MM client – Serena Rees Studio. Although Defendants argue that those communications were innocuous, it appears that Serena Rees Studio is now no longer an MM client.

- Capitalizing on her long-standing relationship with a reporter at The Sunday Times in London, evidence indicates that NS planted a scathing story intended to defame the MM companies and to drive a wedge between the companies and some of their major

9

investors.  (February 5 Broderick Declaration Exhibits 5, 6.)

These communications by NS with MM employees, clients, shareholders, and investors are a continuation of her campaign to destroy the MM companies.  Defendants' argument that they were not undertaken in a way that disrupts or interferes with Plaintiffs' business (Dkt. 15, p.3) is belied by the communications themselves and the context in which they were made.

## CONCLUSION

For the foregoing reasons, the Court should hold Defendant James Stephenson in contempt for violating the January 7 TRO, should award sanctions, including costs and attorneys' fees, to Plaintiffs as a result of such contempt, and should broaden the injunctive relief in the January 7 TRO, and in Plaintiffs' requested preliminary injunction, to add the terms specified in this Plaintiffs' moving Memorandum of Law and proposed orders to show cause.

Dated: New York, New York
February 8, 2019

WITHERS BERGMAN LLP

By: _____ /S/ Dean Nicyper_____
Dean R. Nicyper
Emma Lindsay
Chaya F. Weinberg-Brodt
Joseph Gallo
430 Park Avenue
New York, New York 10022
(212) 848-9815
Dean.Nicyper@WithersWorldwide.com
Emma.Lindsay@WithersWorldwide.com
Chaya.Weinberg-Brodt@WithersWorldwide.com
Joseph.Gallo@WithersWorldwide.com
*Attorneys for Plaintiffs*