UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

TROIKA MEDIA GROUP, INC., TROIKA MISSION HOLDINGS, INC., MISSIONCULTURE LLC, MISSION-MEDIA HOLDINGS LIMITED, MISSION-MEDIA LTD., and MISSION MEDIA USA, INC.,

Plaintiffs,

-against-

NICOLA STEPHENSON, JAMES STEPHENSON, and ALLMAC LLC,

Defendants.

Index No. 19-cv-00145 (ER)

## DECLARATION OF JAMES RIEGER
IN SUPPORT OF DEFENDANTS NICOLA AND JAMES STEPHENSON'S
OPPOSITION TO PLAINTIFFS' MOTION TO DISQUALIFY COUNSEL

**James Rieger** respectfully submits this declaration stating as follows:

1.  I am an attorney admitted in the State of New York, and I am a partner at Tannenbaum Helpern Syracuse & Hirschtritt LLP ("THSH"), attorneys for Defendants Nicola Stephenson and James Stephenson (the "Stephensons") in this action.

2.  I respectfully submit this Declaration in Opposition to the Motion to Disqualify Counsel (ECF No. 63, the "Disqualification Motion") by Plaintiffs Troika Media Group, Inc. ("Troika" or "TMG"), Troika Mission Holdings, Inc. ("Troika Holdings"), MissionCulture LLC ("Mission Culture") and Mission Media USA, Inc. ("Mission USA", together with Mission Culture and non-party Mission Media Ltd., the "Mission Companies" and, together with Troika, Troika Holdings and Mission Culture, the "Plaintiffs").

**The Stephensons were referred to THSH by Plaintiffs' Counsel**

3. In or about May of 2018, I was contacted by James Stephenson in connection with a potential engagement concerning the Stephensons' sale of their shares in the Mission Companies to Troika.

4. The Stephensons were referred to me by counsel for Troika, Withers Bergman LLP ("Withers").

5. The Stephensons were looking for a law firm to advise them in connection with the potential sale of their equity in the Mission Companies to Troika, and to negotiate the terms of the sale on their behalf.

6. At the time of the engagement, it was my understanding that Nicola and James Stephenson were the sole owners, shareholders and directors of the Mission Companies.

7. It was therefore my understanding that the Stephensons had sole and absolute authority over the terms of any sale of their interest in the Mission Companies to Troika.

**The Stephensons Engage THSH**

8. On May 21, 2018, the Stephensons engaged THSH to represent them in the sale of their equity in the Mission Companies to Troika.

9. At the time of the engagement, I sent the Stephensons an engagement letter (the "Engagement Letter") that referred to Mission Limited, and stated that THSH would be representing Mission Limited in connection with a sale of the business to [Troika]." (Robins Affirm.[1] Ex. B.)

---

[1] Affirmation of Bruce Robbins dated June 28, 2019 (ECF No. 64).

10. It is my understanding that Plaintiffs have cited this as "proof" that THSH represented "the Company" (a term which Plaintiffs define to include all the Plaintiff entities) in connection with the Stephensons' sale of their equity in the Mission Companies.

11. Plaintiffs' argument represents a profound misunderstanding of both the Stephensons' relationship to, and absolute control over, the Mission Companies.

12. First and foremost, THSH has never represented Troika or any of its affiliates in any way, and so Plaintiffs' claim that THSH represented "the Company" is completely and utterly false.

13. While the Engagement Letter made reference to one of the Mission Companies (Mission Limited), the Stephensons were the real clients, and the real parties in interest with respect to the potential sale of their interests in the Mission Companies.

14. As the sole owners and directors of the Mission Companies, the Stephensons were the only individuals with any authority to decide whether to sell their interests in the Mission Companies and on what terms.

15. As a result, the Mission Companies had no independent discretion or authority that was separate and apart from that of Nicola and James Stephenson.

### THSH's Work in Connection with the Stephensons' Sale of the Mission Companies to Troika

16. Following THSH's engagement, I began negotiating the terms of the sale on behalf of the Stephensons with Withers in its capacity as counsel for Troika and its various affiliates.

17. I also negotiated Nicola's and James' individual executive employment agreements with Troika and Mission USA, which were signed at the same time as the Equity Purchase Agreement and other sale documents.

3

18. Withers knew that I represented and was acting on behalf of the Stephensons and, to my knowledge, neither Troika nor Withers ever requested that the Mission Companies retain independent legal counsel.

19. The proposed transaction was a two-side, buyer and seller transaction, with the Stephensons in the role as sellers, and Troika and its affiliates in the role as buyers.

20. The sale documents themselves confirm this. Attached as **Exhibit A** is a true and correct copy of the Equity Purchase Agreement between the Stephensons, TMG and Troika Holdings (the "Equity Purchase Agreement").

21. The Mission Companies were not parties to the Equity Purchase Agreement. (See Ex. A at 1.) In fact, the Equity Purchase Agreement defines the "Buyer" as Troika and Troika Holdings, and the "Sellers" as Nicola and James Stephenson. (Id.)

22. In my experience, it would be unusual for either side in such a two-party buyer-seller transaction to suggest that the entities being sold retain their own independent legal counsel.

23. Because the Stephensons were the sole owners and directors of the Mission Companies, the Mission Companies had no independent authority to dictate the terms of the sale or the nature of THSH's representation.

24. As a result, independent representation for the Mission Companies would have been superfluous and ultimately and wasteful.

25. The Mission Companies were not the sellers, they were the objects being sold.

26. I find it noteworthy that Plaintiffs have failed to introduce any sworn statements from anyone at Withers in support of their Disqualification Motion, even though Withers

represented Troika in connection with the sale, and could confirm (or attempt to refute) the fact that THSH clearly represented the Stephensons in connection with the sale.

27. If THSH really did represent "the Company" in connection with the sale – which it absolutely did not – someone at Withers should have been willing to say so.

28. The fact that they have not speaks to the misleading nature of Plaintiffs' current characterization of the sale.

### The Work Reflected in THSH's May 31 and June 28 Invoices

29. It is my understanding that Plaintiffs have cited to THSH invoices dated May 31, 2018 (Ex. C to the Robins Affirm., the "May Invoice") June 28, 2018 (Ex. D to the Robins Affirm., the "June Invoice" and, together with the May Invoice, the "Sale Invoices") as further "proof" that THSH represented "the Company" in connection with the sale.

30. Again, this reflects a gross misunderstanding of both the transaction and the relevant sale documents.

31. All of the work reflected in the Sale Invoices occurred prior to the closing of the sale of the Mission Companies to Troika, and was performed by THSH at the direction of the Stephensons.

32. All of the advice sought in connection with the sale, and pursuant to the Engagement Letter, was sought by Nicola and James Stephenson, or by their agents.

33. All of the work that THSH did in connection with the sale of the Stephensons' interests in the Mission Companies was done at the ultimate request of the Stephensons.

34. To the best of my knowledge, both Troika and Withers always knew that the sellers were the Stephensons, and that that is who they were negotiating with.

35. And while the Sale Invoices were addressed to Mission USA, the vast majority of the fees identified therein were ultimately paid by the Stephensons individually pursuant to the terms of the Equity Purchase Agreement.

36. Section 9.02 of the Equity Purchase Agreement required the Stephensons to reimburse Mission Limited and Mission-Media (Property) LLP for all "Transaction Expenses" in excess of $200,000. (Ex. A § 9.02.)

37. "Transaction Expenses" was defined to include not only attorneys' fees, but also "all fees and expenses" incurred by the Mission Companies or the Stephensons "at or prior to the Closing" of the sale.

38. In total, there were approximately $600,000 of Transaction Expenses, and the Stephensons reimbursed the Mission Companies for the vast majority of them.

39. The remaining Transaction Expenses were paid out of the proceeds of the sale after Closing.

40. In my experience, this is a common structure in these types of two-party, buyer-seller transactions in which a closely held corporation is sold by its sole owners and shareholders.

41. Withers and Troika were fully aware of the provisions governing the payment of the Transaction Expenses, and to the best of my knowledge they never expressed any objection to the way in which THSH's fees were paid pursuant to the Equity Purchase Agreement.

42. The Stephensons' sale of their interests in the Mission Companies closed on June 29, 2018. (Ex. A.)

**THSH Continued to Represent the Stephensons after the Sale**

43. THSH continued to represent the Stephensons after the sale.

44. The Stephensons each signed executive employment agreements with Mission USA and Troika at the time of the sale, and Nicola Stephenson continued to be employed by the Mission Companies following the sale. James Stephenson's employment was set to begin in January of 2019.

45. However, the Stephensons' relationship with Troika and its officers soured not long after the sale closed.

46. As a result, in October of 2018, Nicola and James each reached out to me to seek my advice on how to deal with a variety of issues arising from certain actions taken by Troika and its officers following the sale.

47. I continued to advise Nicola and James individually on how they might deal with the repercussions of Troika's actions.

48. It is my understanding that Plaintiffs have introduced certain emails from me in support of their assertion that THSH continued to represent "the Company" after the closing of the sale. This is false.

49. The emails themselves show that I was providing advice to Nicola and James in their individual capacities, and that I was not advising Mission USA, Mission Limited or any other Mission-related entity after the sale.

50. For example, Exhibit H to the Robins Affirm. shows me advising James as to how to protect and preserve his rights to the backend payouts he and Nicola were entitled to under the Equity Purchase Agreement.

51. James wanted to know if he could void his executive employment agreement, without jeopardizing the Stephensons' rights to these backend payouts. (See Robins Affirm. Ex. H.) I advised him that we should draft an agreement "terminating or voiding [his] employment

agreement" and amending the Goodwill Purchase Agreement executed in connection with the sale to ensure that the Stephensons still received their backend payouts.

52. This advice had absolutely nothing to do with the operation of the Mission Companies, and instead related directly to the preservation of the Stephensons' individual contractual rights and interests.

53. Similarly, Exhibit J to the Robins Affirm. is an email from me to the Stephensons in which I am advising them with respect to a potential loan they were thinking of making to the Mission Companies – which were experiencing a cash shortage due to the actions of Troika and its officers. (See Robins Decl. Ex. J.)

54. I told both Nicola and James that "if the loan is made, it needs to be done correctly to **protect you both**." (Id.) (emphasis added.)

55. I was concerned about the Stephensons' individual rights, and wanted to make sure that any loan they made to the Mission Companies was properly documented so as to protect their individual interests.

56. I was not providing any advice to the Mission Companies in this email. Instead, I was advising the Stephensons in their potential capacity as lenders to the Mission Companies.

57. It is my understanding that Plaintiffs' counsel has accused me personally of advising the Stephensons to file a "frivolous" lawsuit against Troika.

58. The allegation is not only completely false, it is insulting.

59. As the documents attached to Plaintiffs' Disqualification Moiton make clear, I never once instructed the Stephensons to file any kind of frivolous lawsuit against Plaintiffs or anyone else.

60. Plaintiffs' reckless assertion to the contrary has absolutely no basis in fact.

**The November 7, 2018 Invoice from THSH**

61. The only invoice sent to the Mission Companies after the June 29, 2018 sale of the Stephensons' interests to Troika was sent on November 7, 2018 (the "November Invoice") attached as Exhibit E to the Robins Affirm.).

62. The November Invoice reflects a total of $3,058 in legal fees for work performed by me on behalf of Nicola and James in October of 2018, the nature of which I have described herein.

63. The November Invoice was sent to Mission USA in error, and should have been addressed to the Stephensons personally, and sent to the Stephensons' home address.

64. Instead, it was mistakenly sent to Mission USA.

65. The November Invoice was never paid, and THSH never made any subsequent requests for payment from any of the Mission Companies for any work performed after the sale to Troika.

**Troika's In-House and Outside Counsel knew that THSH**
**Continued to Represent the Stephensons after the Sale of the Mission Companies**

66. It is my understanding that Plaintiffs are attempting to use the November Invoice as "proof" that THSH represented "the Company" after the closing of the sale to Troika on June 29, 2018.

67. It is also my understanding that Plaintiffs are now claiming to be surprised by the fact that I continued to represent the Stephensons in their individual capacity after the sale.

68. Both of these assertions are false.

69. In a November 1, 2018 email to David Guin of Withers – who was then still serving as Troika's outside counsel – I made clear that I was continuing to represent James Stephenson in his ongoing negotiations with Andrew Bressman (the Managing Director of Troika). Attached as **Exhibit B** hereto is a true and correct copy of my email to Mr. Quin.

70. I informed Mr. Guin that I would be "drafting a couple pager to memorialize" the agreement between James Stephenson and Andrew Bressman, and making reference to the Stephensons rights to "further payments of consideration, earnout, release of stock from escrow, etc." (Ex. B)

71. Mr. Guin did not express any surprise or objection to the fact that I was continuing to represent the Stephensons as of November 1, 2018.

72. On December 6, 2018, I wrote a letter to Mr. Guin and Troika's in-house counsel Mike Tenore, and in the very first sentence I state that "we are counsel to James and Nicola Stephenson (the 'Sellers')." A true and correct copy of this letter is attached as **Exhibit C** hereto.

73. In the letter, I make clear that THSH "represented the Sellers [i.e. the Stephensons] in connection with the sale of certain goodwill . . . and equity in [the Mission Companies]." (Ex. C.)

74. Neither Withers nor Troika's in-house counsel expressed **any objection** to my unambiguous statement that THSH continued to represent the Stephensons following the sale of their business to Troika.

75. On December 7, 2018, I sent Mr. Guin and Mr. Tenore a draft of the proposed amendment to the sale documents that I drafted on behalf of James Stephenson. Again, neither of them voiced any surprise or objection to my ongoing representation of the Stephensons. A

true and correct copy of my letter and the proposed amendment enclosed therewith is attached as **Exhibit D** hereto.

76. I find it noteworthy that Plaintiffs have failed to include or even refer to these correspondence in their Disqualification Motion, and that they have failed to include any sworn statements from either Mr. Guin or Mr. Tenore to support their current claim that Plaintiffs were "shocked to learn" that THSH continued to represent the Stephensons following the sale.

**THSH's Response to Troika's Request for Privileged Billing Information**

77. On January 24, 2019, the THSH billing department received an email from an employee of the Mission Companies (attached as Exhibit Q to the Robins Affirm.) requesting certain billing information pertaining to the work THSH had performed on behalf of the Stephensons.

78. However, three weeks prior, Plaintiffs had initiated this action by filing a complaint against the Stephensons.

79. The Mission Companies were among Plaintiffs, and they were therefore directly adverse to the Stephensons in this action.

80. The billing department informed me of the email and I instructed them to direct all further correspondence to David Holahan of THSH, in his capacity as litigation counsel for the Stephensons. (Robins Affirm. Ex. Q.)

81. THSH did not comply with the Mission Companies requests' for the Stephensons' privileged and confidential billing information because the information was privileged, and because the Mission Companies were suing the Stephensons for millions of dollars in alleged damages at the time the Mission Company employee made the request.

82. I cannot imagine a scenario in which a law firm would provide confidential information of any kind to an entity that was in the process of suing one of its clients.

83. The Stephensons never authorized THSH to share the information requested by the Mission Companies, and I believe it would have been a breach of my duties to the Stephensons to disclose the requested information to their adversaries without their consent.

[Signature Page Follows]

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 3, 2019.

_____
James Rieger