UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TROIKA MEDIA GROUP, INC., TROIKA-MISSION HOLDINGS, INC., MISSIONCULTURE LLC, MISSION-MEDIA HOLDINGS LIMITED, MISSIONMEDIA LTD., and MISSION MEDIA USA INC.,

                Plaintiffs,

– against –

NICOLA STEPHENSON, JAMES STEPHENSON, and ALLMAC LLC,

                Defendants.

**OPINION AND ORDER**

19 Civ. 145 (ER)

Ramos, D.J.:

      This case concerns the fallout from marketing firm Troika Media Group's acquisition of Mission Media from spouses Nicola and James Stephenson.[1] Four months after Troika sued the Stephensons for a number of grievances related to their post-acquisition conduct and the parties agreed to enter arbitration, Troika filed a motion to disqualify the Stephensons' law firm, Tannenbaum, Helpern, Syracuse & Hirschtritt, LLP ("THSH"). Because the Court finds that THSH simultaneously represented the Stephensons in an adversarial manner while it still represented Mission Media (and thus its then-owner, Troika), it GRANTS Troika's motion to disqualify.

**I.    BACKGROUND**

      THSH represented the Stephensons in the sale of their company, Mission Media, to

---

[1] Troika Media Group, Inc. is a digital marketing firm incorporated in Nevada. Amended Compl. ¶ 13, Doc. 40. "Mission Media" includes four entities sold by the Stephensons to Troika via Troika-Mission Holdings, Inc. *Id.* ¶ 15. Those companies included Mission-Media Holdings Limited and its two subsidiaries, Mission-Media Ltd. and Mission Media USA, as well as MissionCulture LLC. *Id.* ¶ 14. AllMac LLC, an IT vendor, is not represented by the Stephensons' law firm and is unrelated to the present motion.

Troika. On May 23, 2018, THSH sent an engagement letter and agreement to the Stephensons. Affirmation in Support of Motion to Disqualify ("Robins Decl.") Ex. A, Doc. 64. The letter begins:

> Mission Media Ltd.
> . . .
> Attn: Nicola Stephenson & James Stephenson
>
> **Re:** <u>**Engagement Letter**</u>
>
> Dear Nicola and James:
>
> I am writing to set forth the arrangements for our representation of Mission Media Ltd., in connection with a sale of the business to Troika Media Group Inc., but will not include any other matters except as we may otherwise agree in writing in the future.

*Id.* On May 31, THSH sent invoices to a Brooklyn address for "Mission Media USA Inc." for a $25,000 retainer and an approximately $7300 legal fee. Robins Decl. Ex. C. The firm sent another invoice for a $50,000 fee on June 28 to the same address for Mission Media USA Inc. Robins Decl. Ex. D.

The sale of Mission Media to Troika closed on June 29, 2018, pursuant to an equity purchase agreement among Nicola Stephenson, James Stephenson, Troika Media Group, Inc. and Troika-Mission Holdings, Inc. Decl. of James Rieger in Opp. to Pls.' Mot. to Disqualify ("Rieger Decl.") Ex. A, Doc. 67. After the sale, the companies comprising Mission Media became indirect wholly owned subsidiaries of Troika Media Group and the Stephensons became Troika's employees. Amended Compl. ¶¶ 16, 18.

The parties have not provided any information concerning what THSH did or for what it billed, if anything, in July, August, and September 2018. A November 7 invoice to the Brooklyn address of Mission Media USA Inc., however, lists 4.4 hours of work conducted by THSH

partner James Rieger in October.  Robins Decl. Ex. E at 2.  The entries include several telephone conversations with "Helen" and "James" regarding "pending issues," "bank accounts," "agreements," "post-closing matters," and "open issues."  *Id.*  Specifically, the record lists telephone calls with "Helen" on October 2, 8, 9, 10, 12, 17, and 31, as well as a conference call with "James and Helen" on October 31.

A series of emails involving Rieger and Helen Croft, Mission Media's then-Chief Operating Officer and General Counsel, provide more information on the services provided by THSH.  Two October 9 emails from Croft to herself titled "JR Notes" and "JR Notes part 2" include, *inter alia*, the following phrases:

- "Lawsuit for breach of contract??!!";
- "If said breach of contract, that's an expensive lawsuit to [pursue]!  No one wins on summary judgment.  Facts will be on Mission's side, but put pressure on them to settle for something.";
- "No clean way out of this – going to be messy."

Robins Decl. Ex. F at ECF p. 2.  The notes also discuss whether a party to the agreement may be in breach of section 7.14 ("Bank Account Control") or 2.05 ("Payment of Earn-out Consideration") of the equity purchase agreement.  *Id.* ECF p. 4.

In an email chain the next day, Rieger and Croft (via the address helen@thisismission.com) discussed a draft message meant to be sent from Nicola Stephenson to Andrew Bressnan, a Troika executive.  Robins Decl. Ex. G.  Croft's draft begins by detailing Nicola's concerns regarding Chris Broderick, a Troika executive placed within Mission Media as its Chief Financial Officer.  The draft indicates that Nicola is worried that the current method of integrating Troika and Mission Media would put the Stephensons' ability to "run Mission from an operational and cash flow perspective" in jeopardy.  It continues by listing five specific areas

3

of concern: (1) Broderick's poor performance as the Chief Financial Officer; (2) the Stephensons' belief that Troika was not solvent at the time; (3) whether $600,000 in Mission Media funds transferred to Troika would ever be returned; (4) Mission Media having to bear the costs of a particular freelancer; and (5) Mission Media having to bear the losses of an underperforming Troika subsidiary. It also makes specific reference to sections 7.14 and section 2.05 of the equity purchase agreement — the sections discussed in Croft's notes of her call with Rieger. The draft then suggests that Mission Media's bank accounts not be integrated with Troika's until about half of the $600,000 transferred to Troika are repaid and that the integration not take place unless any further transfers from Mission Media be conditioned on the approval of Broderick and one of the Stephensons. It closes with, "[I]f we can't come to an agreement as to how to run important parts of the organisation, then we might need to discuss what our options are."

Rieger provided revisions, and Croft forwarded the draft to the Stephensons (via nicola@thisismission.com and james@thisismission.com) the next day for their approval. Robins Decl. Ex. G. In that message, Croft wrote "James R has reviewed and provided a few additional comments/input – particularly with regards to references to taking of stock and earn-outs when you did the deal." Rieger was not copied on this final message.

The email record resumes on October 31. On that day, Rieger wrote an email to James Stephenson and Croft (via their Mission Media email accounts) advising them on how to alter James' employment agreement to limit his tax liability and how to secure stock options for Nicola Stephenson. Robins Decl. Ex. H. The day after, on November 1, Rieger emailed Troika's attorneys, informing them that James and Bressnan had agreed on alterations to James' employment agreement and that Rieger would forward along a document memorializing the deal

and its impacts on current agreements. Rieger Decl. Ex. B. The day after Rieger's email, Croft, the General Counsel of Mission, wrote James Stephenson: "James R has sent me a draft doc re your earn out etc. I will take a look and forward." Robins Decl. Ex. I.

On November 29, Rieger revised an email to Bressnan on behalf of Nicola Stephenson. Robins Decl. Ex. J. That email begins with, "It is unfortunate that the funding you are looking to raise for TMG to continue to cashflow the group has been delayed and we empathise." The email details the cash flow issues facing Troika and continues:

> I cannot emphasize enough that we believe that things have reached a critical stage. Because Mission's intra-company loan has not been timely returned to it, we are now challenged to operate Mission in the ordinary course of business. We do not want to force Mission into a Night[2] situation where potentially questionable transactions are made with the right intentions — we want things to be transparent and by the book.

The draft then offers for the Stephensons to loan Troika a certain amount of money. It closes:

> If by the end of February, we are not in a new place and I sincerely hope we are, then we will need to enter into a sensible discussion about the future. . . . Separate to this, I will be writing to you regarding what I need visibility on moving forward if I am to remain on the board.

In response, Nicola wrote, "James – this is BRILLIANT." Finally, writing directly to the Stephensons' Mission Media email accounts, Rieger wrote, "I just want to be clear. If this loan is made, it needs to be done correctly to protect you both. Don't send any money until we have signed loan/security documents."

A week later, on December 6, the Stephensons forwarded Rieger an email from Bressnan alleging that James Stephenson had threatened his life. Robins Decl. Ex. K. Rieger sent a letter

---

[2] "Night" refers to the Night Agency, a subsidiary of Troika. Although the parties have not provided an explanation of what "Night situation" may mean, Mission Media had taken the Night Agency's profits under its own responsibility as part of Mission's acquisition by Troika. *See, e.g.*, Robins Decl. Ex. G.

to Troika and Troika's counsel that same day, identifying himself as "counsel to James and Nicola Stephenson (the 'Sellers')." Rieger Decl. Ex. C. In that letter, Rieger proposes a meeting to begin working out the conflict between Troika and the Stephensons over "Troika's solvency and funding plan." He continues:

> I am afraid that the recent acrimony and lack of progress on pressing issues is leading the parties down an inevitable path. I am writing to urge the two of you to meet with me as soon as possible, as corporate transactional attorneys in a spirit of cooperation, to find a path toward an amicable resolution.

Rieger was unsuccessful in his efforts to find a resolution. Over the next month, relations between the Stephensons and Troika rapidly deteriorated, leading to the termination of the Stephensons on January 4, 2019, and the filing of the present lawsuit. *See generally* Amended Compl. During the month of December, Rieger continued to be copied or forwarded correspondence relating to the brewing dispute between the Stephensons and Troika. *See* Robins Decl. Exs. L, M, N, O, P.

The proceedings in this case began with a request for a temporary restraining order on January 8, 2019. Troika and its subsidiaries — including the Mission Media companies — alleged that the Stephensons had seized control of Mission Media, including its computer systems and bank accounts. Compl., Doc. 1. The Court issued a restraining order that ordered the Stephensons to relinquish control of Mission, its computer systems, and its bank accounts and to stay away from the premises. Doc. 3. One month later, the Court issued a preliminary injunction enlarging the restraining order to also prohibit the Stephensons from using any Troika or Mission Media property or funds. Doc. 37. Six weeks later, the parties agreed to enter binding arbitration before the arbitration provider JAMS. Doc. 51.

In April, about four months after the entry of the restraining order, counsel for Troika requested billing records from THSH regarding the work the firm had done for Mission Media in

6

2018. Robins Decl. Ex. Q. THSH refused to provide those billing records, accusing Troika's counsel of waiting for a tactically opportune time (that is, two days after the Stephensons refused to enter mediation) to bring up concerns over conflicts of interest in light of THSH's continuous and open representation of the Stephensons in this lawsuit. Troika requested a pre-motion conference to discuss its anticipated motion to disqualify THSH on May 29, 2019. Robins Decl. Ex. R. The conference was held on June 14 and Troika filed its motion two weeks later.

## II. RELEVANT LAW

A court may disqualify an attorney if "an attorney's conduct tends to taint the underlying trial." *GSI Commerce Sols., Inc. v. BabyCenter, L.L.C.*, 618 F. 3d 204, 209 (2d Cir. 2010). "Although [the Court's] decisions on disqualification motions often benefit from guidance offered by the American Bar Association . . . and state disciplinary rules, such rules merely provide general guidance and not every violation of a disciplinary rule will necessarily lead to disqualification." *Hempstead Video, Inc. v. Incorporated Village of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005) (citations omitted). In the Second Circuit, two situations lead a court to disqualify an attorney: (1) "when an attorney places himself in a position where he could use a client's privileged information against the client," *Hempstead Video*, 409 F.3d at 133; *see also* N.Y. Rules of Prof. Conduct, Rule 1.6, 22 NYCRR § 1200.0; and (2) "when an attorney places himself in a position where he may not exercise independent judgment on behalf of a client," *First NBC Bank v. Murex, LLC*, 259 F. Supp. 3d 38, 56 (S.D.N.Y. 2017) (citing *Board of Ed. of City of New York v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979)); *see also* N.Y. Rules of Prof. Conduct, Rule 1.7, 22 NYCRR § 1200.0.

In deciding these motions, courts must "balance a client's right freely to choose his counsel against the need to maintain the highest standards of the profession." *Hempstead Video*,

409 F.3d at 132 (internal quotations and citation omitted). Although "[m]otions to disqualify are disfavored and subject to a high standard of proof," the Second Circuit has held that "any doubt should be resolved in favor of disqualification." *First NBC Bank*, 259 F. Supp. 3d at 56 (citing *Evans v. Artek Systems Corp.*, 715 F.2d 788, 791–92 (2d Cir. 1983) and *Hull v. Celanese Corp.*, 513 F.2d 568, 571 (2d Cir. 1975)).

"The authority of federal courts to disqualify attorneys derives from their inherent power to preserve the integrity of the adversary process." *Hempstead Video, Inc.*, 409 F.3d at 132. "Attorney discipline has historically been a matter for judges and not arbitrators because it requires an application of substantive state law regarding the legal profession and results in an enforceable judicial order." *Munich Reinsurance Am., Inc. v. ACE Prop. & Cas. Ins. Co.*, 500 F. Supp. 2d 272, 275 (S.D.N.Y. 2007). "Issues of a lawyer's professional responsibilities are not within the customary expertise of industry arbitrators and are appropriately decided by the Court." *Nw. Nat. Ins. Co. v. Insco, Ltd.*, No. 11 Civ. 1124 (SAS), 2011 WL 4552997, at *4 (S.D.N.Y. Oct. 3, 2011) (internal quotations and alterations removed); *accord Employers Ins. Co. of Wausau v. Munich Reinsurance Am., Inc.*, No. 10 Civ. 3558 (PKC), 2011 WL 1873123, at *1–2 (S.D.N.Y. May 16, 2011).

### III. DISQUALIFICATION DUE TO CONFLICT OF INTEREST

Courts employ a two-part process when determining whether disqualification for dual representation of adverse clients is warranted. First, they determine whether the dual representation was concurrent or successive; next they determine whether the facts of the representation merit the firm's disqualification. *Hempstead Video*, 409 F.3d at 133. If the representation was concurrent, then the behavior is considered to be "prima facie improper" and the burden falls on the conflicted law firm to "show at the very least, that there will be no actual

8

or apparent conflict in loyalties or diminution in the vigor of [its] representation." *Id.* (emphasis removed). "This is a burden so heavy that it will be rarely met." *GSI Commerce*, 618 F.3d at 209.

After a review of the submissions and briefings by the parties, the Court concludes that the representation here was concurrent. Mission Media remained THSH's client after it became a wholly owned subsidiary of Troika in June 2018, and Mission was certainly THSH's client when the law firm billed Mission for work performed by the firm in October. The Court finds that, at the same time, THSH was counseling the Stephensons in connection with the conflict that would ripen into this lawsuit. Because THSH has not met its heavy burden of showing why its behavior should not result in disqualification, the Court grants Troika's motion to disqualify.

### A. Concurrent Representation

When determining whether a law firm's conflict due to concurrent representation merits disqualification, courts look to the point in time at which the conflict arose, not when the litigation is filed. *First Bank*, 259 F. Supp. 3d. at 68. In the absence of this "hot potato" rule, "an attorney could always convert a present client into a 'former client' by choosing when to cease to represent the disfavored client." *Ehrich v. Binghamton City Sch. Dist.*, 210 F.R.D. 17, 25 (N.D.N.Y. 2002) (quoting *Unified Sewerage Agency of Washington Co., Ore. v. Jelco*, 646 F.2d 1339, 1345 n.4 (9th Cir. 1981)).

#### 1. The Beginning of THSH's Relationship with Mission Media

In May 2018, Mission Media engaged THSH as its legal representative. This is supported by the fact that the May engagement letter was addressed to Mission Media, that the letter was regarding "the arrangements for our representation of Mission Media Ltd.," and that the invoices for the $25,000 retainer and approximately $57,000 in legal fees for THSH's work in May and

June were addressed to Mission Media USA. *See* NYCRR 1215.1 (requiring that attorneys provide their client with written letters of engagement).

The Stephensons maintain that Mission Media was never THSH's client — the two of them were the only entities that formed an attorney–client relationship with the firm. They aver that it was their belief — and that of the firm — that the Stephensons were the client. *See* Decl. of Nicola Stephenson ¶ 7, Doc. 69; Rieger Decl. ¶¶ 13. They argue that they owned the entirety of Mission Media, and so the engagement letter was the same as forming a relationship with the Stephensons alone. And they allege the fees for THSH were paid from their own pockets. Rieger Decl. ¶¶ 35–39.

None of these points can overcome the plain language of the engagement letter and the invoices. The relationship a firm has with its attorney and the relationship the firm's shareholders and officers have with the firm's attorneys are separate, even in a closely held corporation like Mission Media. *See* N.Y. Rules of Prof. Conduct, Rule 1.13(a), 22 NYCRR § 1200.0; *MacKenzie-Childs LLC v. MacKenzie-Childs*, 262 F.R.D. 241, 253 (W.D.N.Y. 2009) (citing *Cohen v. Acorn Int'l Ltd.*, 921 F. Supp. 1062, 1064 (S.D.N.Y. 1995)); *see also* Stewart D. Aaron & Manvin S. Mayell, *Representing an Entity: Who is the Client?, in* 4B N.Y. Practice Series - Commercial Litigation in New York State Courts § 70:6 (Robert L. Haig ed., 4th ed. 2019). Although nothing prevents the Stephensons from having their own attorney–client relationship with THSH (and the Court assumes they did based on the positions they have taken in briefing), the engagement letter and invoices firmly establish that a relationship, and thus a duty of loyalty, was formed in May between Mission Media and THSH, regardless of the Stephensons' belief otherwise. *Cf. United States v. Int'l Broth. of Teamsters*, 119 F.3d 210, 217 (2d Cir. 2010) (declining to adopt a "reasonable belief standard" in determining whether a corporate employee

has formed an attorney–client relationship with corporate counsel). The fact that the Stephensons may have indemnified Mission Media for THSH's attorney fees does not preclude THSH from owing a duty of loyalty to Mission, either. *See* N.Y. Rules of Prof. Conduct, Rule 5.4(c), 22 NYCRR § 1200.0 ("[A] lawyer shall not permit a person who . . . pays the lawyer to render legal service for another to direct or regulate the lawyer's professional judgment in rendering such legal services.")

2. *When the Relationship with Mission Media Concluded*

THSH's representation of Mission Media, however, did conclude at some point. "When an attorney-client relationship ends depends largely on the purpose for which it was created." *Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc.*, 687 F. Supp. 2d 381, 389 (S.D.N.Y. 2010). In this case, the May engagement letter limited the scope of the relationship between THSH and Mission Media to "a sale of the business to Troika Media Group Inc." That business had certainly concluded by Rieger's December 6 letter in the wake of James Stephenson's alleged death threats directed to Troika executive Bressnan (or at least Troika has waived any conflict from THSH's behavior afterwards given THSH's open representation of the Stephensons in the lead-up to this lawsuit).[3]

But in October, at least, THSH continued to perform work related to the sale to Troika. THSH billed 4.4 hours to Mission Media for work in October that included conversations with Croft, then a Mission executive, regarding "post-closing matters." And the email communication in November was similarly related to the transaction: Rieger specifically

---

[3] The Stephensons argue that Troika has waived all objection to THSH's conduct given the length and intensity of these proceedings over the past month. But the Court finds that Troika did not have notice of the conversations between Croft and Rieger — the most troubling — until it conducted a search of their emails after the entry of the temporary restraining order and preliminary injunction. The Court further finds that any delay between the emails' discovery and the bringing of this motion was not improper.

11

mentioned potential changes to the equity purchase agreement in his November 1 email. Thus, THSH's representation of Mission Media continued into November 2018 and was concurrent with its representation of the Stephensons.

It was during this period — in October and November — that THSH's conflict-of-interest began vis-à-vis Mission Media and the Stephensons. In October, Rieger spoke with Croft and, based on her notes of the conversations, discussed ways in which Troika (then the sole owner of Mission Media) might be in breach of the contract with the Stephensons. Rieger further discussed with Croft and the Stephensons ways in which the Stephensons — no longer Mission Media's owners — could maintain better control over Mission's bank accounts.

### B. THSH's Burden

Having found that the THSH's representation of Mission Media and the Stephensons were simultaneous at the time the conflict arose — and thus prima facia improper — the Court now looks to THSH and the Stephensons to prove that the conflict does not taint the underlying proceedings. *See Hempstead Video, Inc. v. Incorporated Village of Valley Stream*, 409 F.3d 127, 133 (2d Cir. 2005).

The Stephensons have failed to rebut this prima facie case because they have not even tried. The declaration of James Rieger does not address the conversations with Helen Croft at all. Instead it only addresses the time around the closing of the sale and the late November discussions with the Stephensons concerning their employment agreements. The Stephensons' opposition papers likewise fail to engage at all with their burden to show this Court why THSH's improper behavior should not result in disqualification, relegating discussion of concurrent representation to two paragraphs and a footnote. *See* Doc. 66 at 11–12.

Furthermore, their one citation to case law is unavailing. The Stephensons cite *Maiden*

*Lane Hospitality Group LLC v. Beck by David Companies, Inc.* in support of the proposition that a finding of concurrent representation does not automatically lead to disqualification. *See* No. 18 Civ. 7476, 2019 WL 2417253, at *3 (S.D.N.Y. June 10, 2019). But in that case, Judge Engelmeyer found that the parties in supposed conflict were not "irreconcilably adverse." *Id.* The situation here is much different: THSH actively counseled the Stephensons as the conflict with Troika (that is, the employer of Nicola Stephenson and the owner of James Stephenson's employer, Mission Media) came to a head. The Stephensons and Mission Media were clearly adverse.

It very may well be that there is an innocent explanation for THSH's conduct in October 2018 while it represented both Mission Media and the Stephensons, but the Stephensons have not provided it to this Court. "Because 'an attorney must avoid not only the fact, but even the appearance, of representing conflicting interests,'" *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1387 (2d Cir. 1976), and because "any doubt should be resolved in favor of disqualification," *First NBC Bank*, 259 F. Supp. 3d at 56, this Court finds that THSH must be disqualified.

## IV. DISQUALIFICATION DUE TO THE ADVOCATE-WITNESS RULE

Troika separately moves to disqualify THSH under the advocate-witness rule because it claims that it would elicit the testimony of THSH attorneys at any resulting trial. The Court finds that on this basis, as well, it must disqualify THSH.

"The advocate-witness rule prohibits an attorney from representing a party where the attorney will be called as a witness." *Giuffre v. Dershowitz*, — F. Supp. 3d —, 2019 WL 5212368, at *11 (S.D.N.Y. Oct. 16, 2019) (citing N.Y. Rules of Prof. Conduct, Rule 3.7, 22 NYCRR § 1200.0). "In order to disqualify an attorney based on the advocate-witness rule, 'a

13

party must demonstrate that the testimony is both necessary and substantially likely to be prejudicial.'" *Prout v. Vladeck*, 316 F. Supp. 3d 784, 809 (S.D.N.Y. 2018) (quoting *Decker v. Nagel Rice LLC*, 716 F. Supp. 2d 228, 232 (S.D.N.Y. 2010)). "The movant 'bears the burden of demonstrating specifically how and as to what issues in the case the prejudice may occur and that the likelihood of prejudice occurring [to the witness-advocate's client] is substantial.'" *Giuffre*, 2019 WL 5212368, at *11 (quoting *Murray v. Metropolitan Life Ins. Co.*, 583 F.3d 173, 178 (2d Cir. 2009)). "Because courts must guard against the tactical use of motions to disqualify counsel, they are subject to fairly strict scrutiny, particularly motions under the witness-advocate rule." *Murray v. Metro. Life Ins. Co.*, 583 F.3d 173, 178 (2d Cir. 2009) (quotations and citation removed).

The gravamen of Troika's complaint directly implicates the behavior of THSH in October. Troika alleged in its complaint that the Stephensons took control of Mission Media's bank accounts after they signed an agreement transferring their control to Troika. Amended Compl. ¶ 27. Additionally, several of Troika's causes of action relate to the Stephensons' failure to abide by the purchase agreement and for the breaches of the duties of loyalty and fair dealing. *Id.* ¶¶ 129–57. And Troika states in its briefing papers that the testimony of THSH lawyers "will be required to show the Stephensons' wrongful conduct during the period of [THSH's] simultaneous representation of the Company and the Stephensons." Doc. 65 at 10.

At the very least, the conversations between Croft and Rieger are probative on the events that led to the Stephensons' actions, especially since Croft was under the employ of Mission Media in October. They are substantially prejudicial to the Stephensons because they tend to show the motive and planning behind the alleged breaches of the equity purchase agreement and any duties owed to Troika.

14

The Stephensons' only response in opposition to the application of the advocate-witness rule is that any conversations involving Rieger would be privileged. But the most troubling and relevant conversations are not privileged; they were between Croft and Rieger and sent via Mission Media's email systems in October.[4] To the extent Rieger was acting as attorney for the Stephensons, the Stephensons have not provided any reason why a conversation between their attorney and an unaffiliated third-party — one who was under the employ of Troika-subsidiary Mission Media — should be protected. To the extent that Rieger was acting on behalf of Mission Media, the privilege is for Mission (and therefore Troika) to exercise, not the Stephensons. *See also Giuffre*, 2019 WL 5212368, at *13 (holding that the admissibility of statements by advocate-witnesses will be determine *in limine* or at trial).

Accordingly, the Court finds that THSH should be disqualified on this basis, as well.

## V. PRODUCTION OF DOCUMENTS

In addition to disqualification of counsel, Troika moves for the production of documents related to THSH's representation of Mission Media. A dispute between Troika and THSH is not currently before this Court, and the Court will not order any relief to Troika based on disagreements over THSH's services to it and its subsidiaries. The Court will resolve any conflicts regarding production only should the parties return from arbitration, seek to remove this Court's stay of these proceedings, and begin discovery.

## VI. CONCLUSION

For the foregoing reasons, this Court GRANTS Troika's motion to disqualify THSH as counsel for the Stephensons. THSH is ordered to withdraw from this case by November 8, 2019.

---

[4] Importantly, this Court does *not* rule on whether any communications other than those including Croft and THSH attorneys in October 2018 are privileged. Their suppression is not currently before this Court.

The Stephensons shall promptly inform the Court when they have retained new counsel. This case remains stayed and the parties are ordered to abide by the Stipulation and Order directing the parties to proceed to arbitration. Doc. 51. The Clerk of Court is respectfully directed to terminate the motions, Doc. 63, 82.[5]

It is SO ORDERED.

Dated: October 29, 2019
        New York, New York

                                                        Edgardo Ramos, U.S.D.J.

---

[5] The Stephensons' motion for a teleconference to obtain the Court's guidance on how to proceed with arbitration pending the resolution of this motion is DENIED as moot.