# EXHIBIT 1

JAMS ARBITRATION

No. 1425029686

IN THE MATTER OF THE ARBITRATION BETWEEN

NICOLA STEPHENSON and JAMES STEPHENSON,
individually and on behalf of TROIKA MEDIA
GROUP, INC.,

Claimants,

and

MISSION MEDIA USA, INC., TROIKA MEDIA
GROUP, INC., TROIKA MISSION HOLDINGS,
INC., ANDREW BRESSMAN, JEFFREY SCHWARTZ,
ROBERT MACHINIST, and DANIEL PAPPALARDO,

Respondents.

(Hereinafter "Proceeding One")

------------------------------------------------------------------------

TROIKA MEDIA GROUP, INC.,
TROIKA MISSION HOLDINGS, INC.,
MISSIONCULTURE LLC, MISSION-MEDIA
HOLDINGS LIMITED, MISSION-MEDIA LTD.,
and MISSION MEDIA USA INC.,

Claimants,

and

NICOLA STEPHENSON and
JAMES STEPHENSON,

Respondents.

(Hereinafter "Proceeding Two)

## PARTIAL FINAL AWARD

The parties commenced this arbitration proceeding through a Second Amended

Demand for Arbitration filed with JAMS by the Claimants in Proceeding One and the

1

Respondents in Proceeding Two, dated January 23, 2020, and an Amended Statement of Claim filed with JAMS by the Claimants in Proceeding Two and the Respondents in Proceeding One, dated November 27, 2019. The Claimants in Proceeding One and Respondents in Proceeding Two are Nicola Stephenson and James Stephenson (collectively "the Stephensons"). The Claimants in Proceeding Two are Troika Media Group, Inc. and Troika Mission Holdings, Inc. (collectively "Troika," unless specified otherwise), MissionCulture LLC, Mission-Media holdings Limited, Mission-Media Ltd., and Mission Media USA, Inc. (collectively "Mission," unless otherwise individually specified). The Respondents originally named in Proceeding One are Mission Media USA, Inc., Troika, Andrew Bressman, Jeffrey Schwartz, Robert Machinist, and Daniel Pappalardo. Prior to the Hearing in this matter, the Stephensons dismissed the claims asserted against Mr. Schwartz, Mr. Machinist, and Mr. Pappalardo in Proceeding One. *See The Stephenson Claimants' Pre-Hearing Brief* at n.1.

As reported in the Arbitrator's Report of Preliminary Conference and Procedural Order Number 1, as amended, the March 26, 2019 Stipulation between the parties to this proceeding, So Ordered by Judge Ramos on March 27, 2019, provides that "[the parties to this proceeding] agree to submit all Claims to arbitration before JAMS, pursuant to JAMS' Comprehensive Arbitration Rules." The parties agreed to consolidate their independently submitted demands into this single proceeding.

In accordance with the agreed reference to arbitration, this matter proceeded under rules and procedures described in Procedural Order Number 1, as amended, before Arbitrator Lawrence W. Pollack, Esq. The parties engaged in document discovery, conducted depositions, and participated in a virtual hearing through the Zoom platform

on September 8, 9, 10, 11, 14, 15, 16, 17, 18, and October 6, 7, and 8, 2020.  At the

hearing, very able counsel for both parties effectively offered documentary evidence, as

well as the testimony of the following fact witnesses and expert witnesses: Nicola

Stephenson, Michael Tenore, Andrew Bressman, James Rieger, James Stephenson,

Simon Bentley, Robert Machinist, Katie Rappaport, Matthew Craig, Daniel Tinkelman

(expert witness), Michael Pakter (expert witness), and Robert Paterson (expert witness).

Counsel submitted post-hearing briefs on November 23, 2020, and presented closing

arguments on December 3, 2020, following which the hearing was declared closed.

The Partial Final Award of the Arbitrator follows.

## A.  Findings of Fact

This section of the Partial Final Award contains a statement of those facts found

by the Arbitrator to be true and necessary to the Partial Final Award.  To the extent this

statement differs from any party's position or omits any matters in the record, it is the

result of determinations as to credibility, relevance, burden of proof considerations, and

the weighing of evidence, both oral and written.

### 1.  The Development of the Mission Companies

In 2003, at the age of 25, Nicola Stephenson established Mission to, as she put it,

"bring the world sort of brand experience to public relations" (115, N. Stephenson).[1]  In

the next five years, the business developed with retention by the largest jewelry and

watch retailer in the United Kingdom, followed by recruitment of Nokia globally.  *Id.* at

116-17.  A move to larger quarters ensued, with appointments by O2 for Millenium

---

[1]    Numbers and names in parentheses denote reference to the transcript page being
cited, and to the witness providing the cited testimony.  Numbers in parentheses
denote reference to the closing argument transcript page being cited.

Dome sponsorship and experiential (live events) work. *Id.* at 117. By 2008, Mission had one hundred employees. *Id.* at 123. The business expanded to the United States in 2009, to enable servicing of the LvMh Belvedere account. *Id.* at 130. Other Mission clients globally included Mont Blanc, J. Crew, Lululemon and Victoria's Secret. *Id.* at 131-32. Ms. Stephenson moved to the United States in 2015 after which followed significant work for Allergan, a pharmaceutical company. *Id.* at 133-34. In 2016, Ms. Stephenson was diagnosed with oral cancer; her husband, James Stephenson, stepped in to run the company while Ms. Stephenson received treatment and recuperated. *Id.* at 139-140.

## 2. Mission Connects with Troika

Following her return in 2017, Ms. Stephenson reconnected with Evan Vogel, who ran the Night Agency, an advertising concern. *Id.* at 150: (1134, J. Stephenson). Mr. Vogel introduced Ms. Stephenson to Andrew Bressman, a principal of Troika, to whom Mr. Vogel said he had sold the Night Agency (150-51, N. Stephenson; 936, Bressman). Mr. Bressman historically had been with a company named Wave-to-Wave Communications that acquired a company named Roomlinx, a local telephone exchange carrier, which in turn acquired Inteslspace, the first wireless internet service provider in the United States (918, Bressman). Intelspace had built out the AT&T wifi system for New York City parks. *Id.* Eventually, a group including Mr. Bressman was involved in the purchase of Roomlinx in a sale precipitated by a bankruptcy that resulted because the senior secured lender for a possible initial public offering encountered legal difficulties. *Id.* at 919-20. Roomlinx acquired Troika in 2017. *Id.* at 921.

In March, 2018, Ms. Stephenson met Mr. Bressman at the Mission offices located in Dumbo in Brooklyn, New York (152, N. Stephenson). Ms. Stephenson understood

Mr. Bressman to have confirmed at that meeting that Troika had acquired the Night Agency, and to have mentioned that Troika also owned a design firm in Los Angeles, California known as Troika Design. *Id.* at 152-53. At the meeting, Mr. Bressman, whom Ms. Stephenson described as "charming and affable," "was complimentary about Mission," and asked if Ms. Stephenson had an interest in acquisition of Mission by Troika. *Id.* at 152, 154. Ms. Stephenson declined the outreach, as she had done when another company, Kyu, a Japanese media company had approached her previously. *Id.*

Mr. Bressman persisted. *Id.* at 156. He met again with Ms. Stephenson in New Jersey toward the end of March or beginning of April, 2018. *Id.* Mr. Bressman noted at that meeting that Troika Design had been acquired as a distressed asset for branding purposes, and that he was looking for someone to "help sort it out." *Id.* at 156-57. Mr. Bressman elaborated that Troika was looking at multiple companies to aggregate, and to expand its footprint, having previously developed a tech platform known as Fandom Connect, a sports stadium utility. *Id.* at 158-59; (1469, Machinist). Ms. Stephenson recalled that Mr. Bressman talked extensively about his ability to raise money "and was at pains to point out that they had raised already in excess of I think it was $25 million," particularly through participation on its Board of the Coates family that included Denise Coates, whom Ms. Stephenson recognized as "the richest woman in the United Kingdom" (160, N. Stephenson). Ms. Stephenson added: "I don't think I had a meeting with Mr. Bressman where he didn't tell me how well funding was going," and that the company was well-capitalized. *Id.* at 436.

### 3. The Acquisition of Mission by Troika

Many communications between Ms. Stephenson and Mr. Bressman followed;

these had the effect of moving Ms. Stephenson toward serious consideration of Mr.

Bressman's invitations:

> I think we had taken the company to a certain point, but as
> an independent was really only so far you could go, so we
> were exploring raising capital ourselves and maybe
> acquiring, being acquired and joining a larger group with
> all of that opportunity it would bring, but there aren't really
> a lot of options. There is really two or three players, WPP
> led at the time by Martin Sorrell, Omnicom and Demsu and
> none of them could ever really appeal. So this was an
> intriguing opportunity, you know, very well-funded, well
> capitalized, blank sheet of paper essentially with some
> cornerstone pieces that could really be shaped and pulled
> together and, you know, launched and so there was
> something pretty compelling about that.

*Id.* at 161-62. Ms. Stephenson found particularly appealing the expansion of Mission to

the West Coast of the United States. *Id.* at 163. For his part, Mr. Bressman found Ms.

Stephenson to be "a dynamic person" (983, Bressman). He went on to say: "In my

experience, you bet on people and she was someone I wanted to bet on." *Id.* at 984.

After one more in person meeting with Mr. Bressman and multiple telephone

calls, Ms. Stephenson asked Mr. Bressman to submit an offer for Mission, on behalf of

Troika, which Mr. Bressman did, in the amount of $5 million (164, N. Stephenson; 976,

Bressman). As it had previously been suggested to Ms. Stephenson that a $40 million

valuation of Mission was appropriate, Ms. Stephenson rejected Mr. Bressman's $5

million offer, because "we were not looking for a fire sale" (165, N. Stephenson).

Mr. Bressman countered with a new offer, at a $35 million company valuation, to

be paid with $25 million in cash and $10 million in stock over an extended period. *Id.* at

166. Ultimately, the parties agreed to explore the purchase of Mission by Troika; through

counsel and other consultants, the parties engaged in formal due diligence before turning to legal documents (491-92, Tenore). To the Stephensons, such diligence revealed how Troika had been formed (493, Tenore). The due diligence also confirmed that Mr. Bressman's background included a criminal conviction, *see* JX 571,[2] a fact first disclosed by Mr. Bressman to Ms. Stephenson during one of their early meetings (972-73; Bressman; 1138-39, J. Stephenson), and that Troika had been delisted as a public company for failure to file reports with the SEC (494-96, Tenore; 744, Rieger).

To Troika, the diligence confirmed a pre-closing payment of a dividend by Mission to the Stephensons in the amount of £700,000, for the purpose of repaying director loans (431-32, N. Stephenson; 582-87, Tenore); JX 70. That confirmation took the form of a request by Troika's counsel for identification of "the accounts the directors referred to in determining whether the companies had sufficient distributable profits to pay the dividend." JX 86. This request generated the following response: "The Mission Media Limited's May Balance Sheet was used to determine there were sufficient reserves. This has been disclosed but I have attached again to this email for ease of reference." *Id.* The balance sheet attached stated that it reflected accounts "as at 31 May 2018," with total Current Assets of £3,688,560 and Current Liabilities of £4,016,083. JX 87. The dividend was declared at a Mission Board of Directors meeting held on June 27, 2018. JX 70.

The due diligence was not boundless. The Stephensons, for example, did not request documents relating to the transaction between Troika and the Night Agency,

---

[2]    "JX" denotes reference to joint exhibits introduced at the hearing. "CX" denotes reference to exhibits introduced by the Stephensons at the hearing. "RX" denotes reference to joint exhibits introduced by Troika at the hearing.

which would have revealed that Troika did not acquire the Night Agency, only that

Troika obtained a certain revenue stream from a Dr. Seuss project and some personnel

(501-504, 660, Tenore). In relation to the dividend issued to the Stephensons, Troika did

not request documents beyond the balance sheet sent to it in support of the £700,000

dividend payment, nor did its counsel or consultants raise an objection to what was

received (586-87, Tenore). Discovery in this proceeding, however, revealed an e-mail

sent by Mission's financial consultant Paul Allen to the Stephensons dated June 25, 2018,

in which Mr. Allen wrote: "There is a working capital shortfall of £460k – the buyer

would usually ask for the sellers to put the cash in to cover this shortfall." This e-mail

also states:

> From the conversation below it seems Troika are
> comfortable with the repayment of the Directors loans, with
> no adjustment for working capital. If Troika are
> additionally open to letting you declare a dividend to cover
> part of the loan balance then this will need to be declared
> this week prior to completion whilst you are still
> shareholders in Mission.
>
> I do not propose sharing our workings with Troika as this
> will point out the potential working capital shortfall, which
> will need covering either by a cash injection into the
> business, or recapitalizing using trading profits.

JX 522; *see* RX 6. In addition, Troika's due diligence did not uncover that the

Stephensons had asked to defer rent due on their UK lease until after the closing of the

transaction (429, N. Stephenson; 996, Bressman); JX 523.

On June 30, 2018, the Stephensons entered into an Equity Purchase Agreement

("EPA") with Troika Media Group, Inc. and Troika-Mission Holdings, through which the

Stephensons sold to Troika all of the issued and outstanding limited liability company

membership interests in the Mission U.S. company, MissionCulture LLC, and all

outstanding ordinary shares in the Mission U.K. company, Mission-Media Holdings

Limited. JX 83. The parties also entered into a Goodwill Purchase Agreement ("GPA")

relating to the goodwill being transferred in the transaction, JX 84, an Escrow

Agreement, JX 89, and Employment Agreements for Nicola and James Stephenson, JX

518 and 519. The EPA called for a cash payment of $11 million to be paid by Troika to

the Stephensons, plus 10 million shares of stock valued at 20 cents per share, all of which

to be delivered at the closing on June 29, 2018 (980-82, Bressman). The EPA

contemplated future payments to be calculated through an Earn Out formula, and further

stock transfers not to exceed a total of $25 million in cash and 50 million shares. JX 83

§2.02. The week before the closing, Troika's representatives contacted counsel for

Mission to advise that Troika did not have the full $11 million needed to complete the

transaction (745, 842, Rieger; 1142-43, J. Stephenson); see JX 105. Troika did not

complete the cash payment obligation until the second half of July, 2018 (844-45,

Rieger).

The Employment Agreement for Ms. Stephenson, to which Ms. Stephenson and

Mission Media USA are the only parties, provided that Ms. Stephenson would be

employed by Troika as President of the U.S. companies, Mission Media USA, Inc.,

MissionCulture LLC, and the U.K. company, Mission-Media Holdings Limited. JX 82.

The Agreement further provided that, when Troika obtained E-2 Treaty Investor

Company Registration and Ms. Stephenson obtained her E-2 visa status, she would be

appointed President of Troika Media Group. *Id*. The Agreement stated that Ms.

Stephenson would "have duties, authority and responsibilities that are reasonable,

consistent and customary with such position." *Id*. The Agreement called for an annual

base salary of $500,000. *Id*. The Employment Agreements for Ms. Stephenson and Mr. Stephenson both limited their termination to particularly defined "for cause" actions. *Id*. Mr. Stephenson's Employment Agreement called for an annual base salary of $250,000. JX 82, 519.

When the transaction closed, the Stephensons awarded Kevin Dundas, who assumed Ms. Stephenson's position in London when she moved to the United States, a £300,000 bonus, "related to the deal happening and future success" (299, N. Stephenson). The Stephensons paid £200,000 of that bonus to Mr. Dundas from their personal funds received from the transaction (296, N. Stephenson); JX 77. The Stephensons planned for the remaining £100,000 to be paid later out of a Troika company bonus pool (300, N. Stephenson).

### 4. The Relationship Begins: June-July, 2018

Ms. Stephenson "jumped into [her new] role straight away," resolving visa issues within weeks (173, N. Stephenson). Ms. Stephenson sought to work with the other Troika companies, but nothing materialized with Troika Design in Los Angeles. *Id*. at 177. When Ms. Stephenson visited Troika Design in July, 2018, she saw "nothing more than just a concept" (1138, J. Stephenson), with neither tech business nor clients onboarded, was told that Troika Design owed over $2 million to freelancers, and learned that Apple had fired Troika Design because of the manner in which the freelancers had been treated (178-80, N. Stephenson). Mr. and Ms. Stephenson came away thinking: "this isn't what it was supposed to be" (1144, J. Stephenson).

In August, 2017, Allergan ceased a campaign on which substantial work had already been performed by Mission, but for which Mission held a retainer to cover

further work that now would not be done, as the person that hired Mission for the project

had exited from Allergan (1786-88, Rappaport). An issue thus arose as to what to do

with the funds still held by Mission, as explained at the Hearing by Katie Rappaport, the

Mission representative with day-to-day responsibility for the Allergan account:

> Well, at the time we knew for sure that we were going to
> keep 77 or something thereabouts thousand for the work we
> had to do in finishing out the year and we had estimated at
> the time on this call that there would probably be between
> 150K, surplus to that, depending on how the reconciliation
> shook out. This is my objective -- sorry, subjective point of
> view, but to Allergan that is not a great deal of cash. To me
> it's a huge amount of cash, but they were quite confident
> and also if you look at the entire agreement we have that
> year with eye care, I think the whole budget was 3 million.
> They were really just looking to end it peacefully and find a
> way for us all to stay partners and, you know, they
> recognized that it's just unfortunate how it was shaking out.

*Id.* at 1791. The bottom line was that Allergan told Mission: "We want you to be

protected. You're our partner." *Id.* at 1790. Ms. Rappaport added: "I am confident my

clients agreed to let us hold the money." *Id.* at 1795-96.

In June, 2018, Ms. Stephenson and Mez Corfield, a financial officer at Mission

UK, communicated regarding how to treat these funds being held by Mission from an

accounting perspective. *See* JX 53. Ms. Corfield was of the view that the money should

be returned to the client, but no decision was made at that time. *Id.* Ms. Corfield had e-

mailed Ms. Stephenson on May 14, 2018 that "it would be a risky strategy to recognise

this as revenue given the audit right and reconciliation obligation." JX 498. (The issue

was not part of the due diligence materials shared with Troika, and was discovered by

Mr. Bressman in January, 2019 when he met with Ms. Corfield (1004-06, Bressman).)

On July 27, 2018, Ms. Stephenson directed Ms. Corfield as follows: "Please release this

rev into July for New York. I can't remember the exact number. I understand the

potential issues but I believe we agreed second half so let's go." JX 127. Ms. Corfield

sought to discuss the issue with Ms. Stephenson before releasing the Allergan funds into

July, 2018 revenue, but Ms. Stephenson responded to this request as follows: "I don't

need to chat about it – just put it into July." *Id.*

### 5. The Onset of Conflict: August, September, 2018

Within less than thirty days of the closing of the transaction, Chris Broderick, a

Troika financial officer, sought an intercompany transfer of $300,000 from Mission

directly to Troika Design to enable Troika Design to meet its payroll needs (190, 193, N.

Stephenson). Ms. Stephenson was told "not to worry" because Mr. Bressman was in the

midst of money-raising efforts. *Id.* at 191. Ms. Stephenson began to become concerned;

what she "understood to be a pretty straightforward acquisition was seemingly not that"

*Id.* at 192. In an August 7, 2018 e-mail to Mr. Bressman, Ms. Stephenson wrote: "I get

the sense everyone is feeling a bit removed and therefore nervous and uncertain and I can

probably give some real time updates and comfort." JX 133.

After the funds transfer, Ms. Stephenson discovered that the Night Agency had

not been acquired by Troika, and that suppliers to the Night Agency which had been

ignored were seeking payment from Mission. *Id.* at 191-92; (1145-47, J. Stephenson).

Evan Vogel particularly approached Ms. Stephenson for a $250,000 payment to complete

the Dr. Seuss project Troika had acquired (191-92, N. Stephenson). Ms. Stephenson

responded that she didn't have these funds because "I had given the money to Chris

Broderick for payroll." *Id.* at 192.

Four weeks later, on August 24, 2018, Mr. Broderick requested by e-mail a

second $300,000 intercompany transfer from Mission to Troika to enable payment of the

Troika Design payroll. JX 140. In addition to the combined $600,000 now requested

from Mission, Mission was paying creditors of the Night Agency and the Night Agency

payroll (195-96, N. Stephenson). Ms. Stephenson became "quite disillusioned and very

frustrated of not being able to do my job:"

> There was no accountability about this constant, you know,
> seeming lack of funding. Where it had been represented to
> us that the company was incredibly well funded, it
> seemingly now couldn't scratch together enough money for
> its own payroll. So we were concerned and we made that
> very clear and I vocalized that quite strongly and Mr.
> Bressman's response was really that he could make me do
> whatever he wanted to do and they had bought the
> company and I was really there to do what they said. That
> was really not my understanding of my role which was to
> build a successful, profitable organization that ran properly
> and ethically and I just was not seemingly able to do that
> and was spending all of my time running around chasing
> these, you know, extraordinary situations and trying to
> close them down. So it was very concerning, not alarming
> and James, in particular, was deeply concerned about the
> 600K.

*Id.* at 199, 201. Mr. Stephenson responded to Mr. Broderick's e-mail as follows: "This is

absurd. I am not having Mission dragged down by Troika's leadership team inability to

run their business." JX 140. The next day, Ms. Stephenson wrote further to Mr.

Broderick along the same lines. JX 141. Mission nonetheless made the second $300,000

payment (206, N. Stephenson).

Mr. Bressman relayed Ms. Stephenson's sentiments to the other Troika senior

officers and directors, Jeffrey Schwartz, Robert Machinist, Mr. Broderick and Mr. Tenore

(1025, Bressman); JX 141. Mr. Schwartz commented: "She is going to be very tough to

manage. Make it clear we don't need James in these sessions. This is 2 arguments in a

month over money. You need to document all this." *Id.* Mr. Machinist responded to Mr.

Schwartz's comment: "Agreed as well. We need to do our cash planning on a group

basis and if Mission is tight we need to plan accordingly. It will take a bit of time to tame

Nic and we need to clearly get started. . . . We paid for the business and can clearly act as

we see fit." *Id.*

The funds transferred were not returned to Mission as promised in August or

September (207, N. Stephenson). Mr. Bressman told the Stephensons that "he was expert

in raising money and that he would raise the necessary cash and he understood that there

was . . . a shortfall and he was on it." *Id.* On September 18, 2018, Mr. Bressman e-

mailed the Stephensons (and Mr. Broderick): "I anticipate a chunk coming in over the

next week or so." JX 162. But the funds transferred by Mission to Troika were not

returned by October or November (208-09, N. Stephenson; 1171, J. Stephenson). Ms.

Stephenson considered the exposure for the Troika companies at this juncture

"frightening," as Troika Design "was losing day to day $1.7 million and had this

$2,000,000 freelance liability" (210, N. Stephenson). Ms. Stephenson became concerned

that the Troika financial issues could lead to Mission having to pressure its creditors. *Id.*

at 212. Mr. Stephenson summed up the Stephensons' concern at the time:

> At this point Troika had already taken out a significant
> amount of funds from Mission. It was becoming
> increasingly apparent that they were completely
> uncapitalized. They have no interest in paying creditors.
> They just thought it was okay not to pay them. We spent
> years building up relationships with other agencies and
> other third parties and that was very much a part of our
> business, those relationships. It just became increasingly
> apparent that they just didn't care and they were happy to
> commingle funds and it was making us very, very nervous
> about, you know, you have to remember a lot of the funds
> in our accounts weren't ours. They were client funds. I
> wasn't comfortable with the way that I thought that Troika
> were going to use them.

(1168-69, J. Stephenson).

### 6.  The Conflict Deepens: October, November, 2018

Section 7.14 of the EPA provides:

> Within thirty (30) days after the Closing, Sellers shall
> transfer control over all of the respective bank accounts of
> Mission US, Mission UK, MM Inc. and MM Ltd. bank
> accounts to TMG and/or Buyer and, in connection
> therewith, name any and all Representatives designated by
> TMG and/or Buyer as authorized signatories of such
> accounts.

JX 83 §7.14.

Implementation of this covenant became contentious (528, Tenore).  Ms.

Stephenson was hesitant to respond affirmatively, and would not transfer the accounts.

*Id.* at 528-29; *see* (1023, Bressman).  By October, 2018, Mr. Broderick pressed for the

covenanted bank account transfer to occur (215, N. Stephenson).  Troika considered the

failure to turn over the bank accounts as evidence of bad faith on the part of the

Stephensons (1496, Machinist).

Ms. Stephenson's hesitance and overall disenchantment provoked her to reach out

to James Rieger, the Stephensons' counsel in relation to the acquisition, with whom the

Stephensons had discussions in October and November, 2018, regarding their rights and

obligations under the various agreements with Troika, as well as potential remedies and

strategies, including the potential for repurchase of Mission (814-15, 817, 835, Rieger).

(Mr. Bressman recalled Ms. Stephenson having sent him a What's App text during this

time frame stating that she was actively looking for buyers for Mission and that she had

some interesting prospects (1018, Bressman).)  The discussions with Mr. Rieger

encompassed the bank account transfer covenant, as Mr. Rieger testified:

> I remember there being some discussions about the bank
> accounts and there was pause given in turning over the
> bank accounts because there was the thought that Troika

didn't have any of its own money and would do improper
things with the funds.

(815, Rieger).

On October 11, 2018, Ms. Stephenson sent an e-mail to Mr. Bressman that had

been prepared with the assistance of Mr. Rieger and Helen Croft, Mission's General

Counsel.  JX 195; *see generally* RX 9-13.  The e-mail summarized the events that had

transpired, as Ms. Stephenson saw them, addressed the §7.14 issues that had arisen, and

suggested a way forward:

> When you take all of the above into consideration, we
> remain really concerned that Mission's funds could be
> transferred out without visibility and in a way that puts the
> running of Mission at risk.  In addition, when I look at
> clause 2.05 of the EPA, there is a clear requirement on
> TMGs part as to how Mission should be run.  Our real
> concern is that if we give unfettered access and control to
> Mission's bank accounts, there is a risk that clause 2.05
> could be breached and we want to really try and put a
> mechanism in place so that doesn't happen.  It might not be
> his intention but the tone of Chris's email regarding the
> move and our conversations about it not being 'my
> company' which I do not completely understand, do not
> give us any comfort at this time.
>
> I don't want to enter into a long winded back and forth, but
> I do want you to understand our position.  Knowing how
> strongly you feel about the moving of the bank accounts,
> our suggestion, so as to move things forward, is to move
> Mission's US bank accounts to ConnectOne when at least
> $300k of the $644,239 owed to Mission is repaid, and with
> your agreement that when we are with ConnectOne, the
> authorisation process for moving funds from Mission's
> bank accounts is robust: transfers or payments of any
> money will require two authorisers – Chris and a Mission
> representative being James.  That way, we have some
> comfort that Mission's cashflow is going to be preserved
> and is only used for inter-group transfers as and when
> required and when we are all in agreement to that
> happening.  We appreciate, that when there is excess cash
> in the bank which we all believe there will be next year that

> this should and can be utilised as the group sees fit and in
> line with our plans.
>
> I don't want to be at an impasse with you or TMG so early
> in our relationship.  We are happy to help.  We want to
> grow the group with you.  And we want to make this work.

JX 195.  Mr. Bressman responded: "Thank you very much for sharing your thoughts.  It

is extremely comforting to read this.  There is a lot to digest and we will work though

ALL!"  *Id.*  Mr. Bressman shared Ms. Stephenson's e-mail with the other senior officers

of Troika (1025, Bressman), but there was no further response to Ms. Stephenson (216,

N. Stephenson).

In the same time frame, the Troika officers were concluding discussions

concerning "key person" insurance extending to Ms. Stephenson.  JX 199.  These

discussions had to take into account Ms. Stephenson's pre-existing oral cancer condition.

*See id.*  Mr. Schwartz responded to Mr. Machinist's comment that "[t]he woman survived

serious throat and neck cancer, I'm just happy we can insure at all" as follows: "I agree

with Bob. Nothing much to discuss. That's another reason she should be kissing your ass

for taking this enormous health risk on her."  *Id.*

The Stephensons discussed volunteering to lend $750,000 to Troika through a

bridge loan secured by company assets, but this suggestion was rebuffed (218-19, N.

Stephenson).  Mr. Bressman instead wanted to rely on financing commitments that he

believed would be preferable to the terms offered by the Stephensons (1026-27,

Bressman); as Mr. Machinist put it, "Troika had its own financial sources" (1528,

Machinist).

7. **The December 5, 2018 Meeting**

The issues between and among the Stephensons and the Troika officers needed to

be addressed, as Ms. Stephenson testified:

> There was seemingly no appetite for anyone to let me
> deliver on my job. So I suggested that we meet and really
> get to the bottom of the solvency issue, how we were going
> to manage cash, how we were going to, you know, be more
> organized and I was really looking to sign off on an org
> chart which I have been pushing on since July, which they
> seemingly couldn't get together because no one could
> seemingly agree.

(219-20, N. Stephenson). Troika's senior officers expressed a similar sentiment:

> Q. During the period of October and November did you
> notice a change in attitude on the part of either Ms.
> Stephenson or Mr. Stephenson?
>
> A. The answer is yes, I think that -- certainly from a read of
> the electronic documentation, the level of vitriol and
> dismissiveness in the document in the communications
> increased markedly.
>
> Q. Do you have any specific interactions that come to
> mind?
>
> A. No, I mean I was trying to understand and get answers
> to things which I asked as the CEO and I wasn't getting
> answers. I was aggravated with Chris Broderick. I spent
> an enormous amount of time working with Andrew trying
> to figure out why this was happening and we were trying to
> deal at the same time with keeping people excited and
> incentivizing people to build their businesses. The last
> thing in the world you want to do is kill the business after
> you buy. It just makes no sense whatsoever.

(1521-22, Machinist).

But while the parties agreed on the need to meet, and that they would do so on

December 5, 2018, they diverged on what the meeting would address. Ms. Stephenson

proposed an agenda for the meeting, and sought attendance of Helen Croft and Kevin

Dundas by telephone. JX 274. Mr. Schwartz reacted adversely to this suggestion: "She really thinks we are stupid, Asking her lawyer from the U.K." *Id.* Mr. Machinist described Ms. Stephenson's proposed agenda as containing "a number of glaring misreads, mistakes, leaps of control etc.," to which Mr. Schwartz added:

> Bob I agree 100%. It is the most self serving, posturing, email imaginable. I truly can't tolerate her bs. She has to be put in her place. This bitch actually wants to close Troika now. We have to address the org chart Wednesday. She has to be put in her lane period. I'm good at 11.

JX 272. The Troika officers did not tell Ms. Stephenson before the meeting that they did not want Mr. Dundas or Ms. Croft to participate: "[i]t was up to us to define who was going to be at the meeting," Mr. Machinist testified (1709, Machinist). Nor was there a response to Ms. Stephenson's e-mail before the meeting. *Id.* at 1709-10.

The Troika officers sought to discuss Mission cash flow at the meeting, particularly as it appeared to the Troika officers that while Mission's profits had risen its cash had decreased (1030, Bressman). This caused apprehension, because "if the performance had been anywhere near that which was represented [as] forecast, then there should not be cash shortfalls" (1537, Machinist). Particularly there was a concern about "why cash was not reconciling between EBITDA and cash and how does it reconcile back to the beginning of the transaction" (1711, Machinist). Troika's officers commissioned Mr. Broderick the night before the meeting to perform a "back of the envelope" preliminary analysis to address this concern (1542, Machinist; 1031, Bressman). This analysis concluded that if Mission was earning as much as represented, there should be $1.5 million in the bank (1542, Machinist). As Mr. Bressman testified: "[w]e didn't understand where the cash was . . . There was a difference of about a million and a half dollars that we could not account for" (1035, Bressman).

The Troika officers did not share the Broderick analysis with Ms. Stephenson before the meeting (1543, 1712, Machinist; 1038, Bressman). When asked why, Mr. Bressman stated: "We strategically chose not to. We were very concerned there was a million and a half dollars missing from the company." *Id.*

At the December 5, 2018 meeting, Mr. Machinist took control (1033, Bressman). Mr. Machinist denied Ms. Stephenson's request that Ms. Croft and Mr. Dundas attend by telephone, and told Ms. Stephenson there was no need for an agenda (1032, Bressman; 222, N. Stephenson). Mr. Machinist asked Ms. Stephenson where the $1.5 million reflected in the Broderick analysis was. *Id.* at 222-23. Mr. Machinist described his approach as follows:

> So we really had a pretty good understanding of the accounting. I felt that we had done a preliminary analysis that showed a shortfall. I didn't want to confront her with that. What I wanted to say –
>
> ARBITRATOR POLLACK: Isn't that what you did?
>
> THE WITNESS: No, what we did is we sat in a room we said we can't understand this and I went through exactly what I have been saying here. If you're making X amount of money and you start off with Y amount of money then X plus Y during the intervening period should equal the new pot less any extraordinary things or timing differences. When that -- I said that's our problem here. So tell us where we are wrong. Tell us why this doesn't work.

(1544, Machinist). Mr. Bressman echoed Mr. Machinist's testimony: "We came to the meeting in a non-accusatory way" (1039, Bressman).

Ms. Stephenson did not share this view (222-25, N. Stephenson). She was angry, but did not walk out. *Id.* at 224. She was "completely floored" at being accused of stealing based on a document prepared without her input. *Id.* at 223. She was "really appalled by the approach, the sandbagging, the dishonesty." *Id.* at 230.

After the meeting concluded, Ms. Stephenson called Mr. Stephenson from a taxi, and told him she had just been accused of stealing $1.7 million and was very upset. *Id.* at 226. She then met in the Mission office with Mr. Stephenson and Juratele Baubliene, from the Mission Accounts Department, to discuss the Broderick analysis. *Id.* at 227. When Juratele left the meeting, Ms. Stephenson burst into tears. *Id.* at 230; (1174, J. Stephenson). Mr. Stephenson, in turn, became upset and attempted to reach Mr. Bressman by telephone (231, N. Stephenson). When Mr. Bressman returned the call, Mr. Stephenson shouted, cursed at him, and threatened to kill him. *Id.* at 232; (1040, Bressman). Mr. Stephenson followed up with this text message: "You're a bunch of cunts. I have Nic in tears. We are done." JX 492. Mr. Bressman proceeded to the local Police Department where he filed a Police Report regarding the incident. JX 310. Mr. Bressman testified: "I was genuinely concerned for my life" (1042, Bressman).

## 8. Meeting Aftermath

Following the December 5, 2018 meeting, the Broderick analysis was shared with Ms. Stephenson (1547, Machinist), and Ms. Stephenson shared her attempt at minuting the meeting with the other participants. JX 290. Ms. Stephenson provided the Broderick analysis to Juratele, who reviewed it and, according to Ms. Stephenson, "went through each of Chris Broderick's mistakes," and showed that "there was, in fact, no missing $1.7 million" (229, N. Stephenson); JX 294. Mr. Machinist testified that, within eighteen hours, Juratele prepared "a reconciliation of the differential down to $5,000 . . . which made absolutely no sense whatsoever" (1545, 1721, Machinist). Mr. Schwartz had a similar view: "This is total gobbly gook. This is more nonsense. We need a third party to opine on the ridiculous memo." JX 294.

Ms. Stephenson attempted to calm things down (234, N. Stephenson).  She met

over lunch on December 10, 2018 with Mr. Bressman and prepared an e-mail

memorializing proposed next steps.  *Id.* at 236; JX 318.  Mr. Bressman insisted that Mr.

Stephenson apologize to him; Ms. Stephenson responded that Mr. Stephenson would not

do so (236, N. Stephenson; 1044, Bressman).  Mr. Bressman was adamant that Mr.

Stephenson be terminated for cause, and banned from the Mission offices (1044, 1047-

48, 1109-10, Bressman).  Ms. Stephenson said she would not do so (242, N. Stephenson).

On December 19, 2018, Mr. Broderick sent the following e-mail to Juratele and

Nicole Brown, two Mission finance officers:

> Hi Jurate & Nicole,
>
> Attached please find wire transfer confirmation for $500K,
> to the Mission Culture ConnectOne Bank account.
>
> Nicole already has access and when Jurate gets back from
> vacation we can get her setup as well.
>
> In the meantime if anything needs to be done, please let me
> know.
>
> Thanks and have a great holiday!
> Chris

JX 507; *see generally* (1883, Machinist).  Ms. Stephenson believed that these funds were

sent in connection with money owed to the Mission companies, and was confused as to

why the money was not paid directly into the Mission bank account (317-19, N.

Stephenson).  She responded to Mr. Broderick as follows: "We don't bank with Connect

One."  JX 507.  Ms. Stephenson did not discuss Mr. Broderick's e-mail with anyone in

the office, as it arrived on the last day before the holiday break.  *Id.* at 318.  She did send

it to Mr. Rieger; when asked why, she testified:

> I probably felt it was another illusion, setup, game playing.
> If Mr. Bressman or Mr. Broderick had really meant to give
> 500,000 back to the Mission U.S. bank account they could
> have just sent it to the Mission bank account. I was still
> waiting for a reply to my October e-mail of banking
> protocol from Mr. Bressman that he just refused to
> acknowledge, and so it just felt like a really cheap shot.

(322-23, N. Stephenson).  Ms. Stephenson did not make any further inquiry relating to

the $500,000 in the ConnectOne account (1029, Bressman).

In late December, 2018, Ms. Stephenson provided Mr. Bressman with a 2019

performance projection for the Mission U.K. companies that forecasted an operating

profit for the year.  JX 463.  By this point, however, Ms. Stephenson felt the relationship

with Troika was damaged (242, N. Stephenson).   She took advice from Mr. Rieger.  *Id.*

But before year-end, Ms. Stephenson arranged for a £100,000 bonus payment to be made

to Kevin Dundas, reflecting the final installment of the £300,000 bonus awarded at the

closing of the Mission-Troika transaction (304, N. Stephenson; 1376, J. Stephenson); JX

501.  Ms. Stephenson did not tell anyone at Troika that this payment had been made (312,

N. Stephenson; 1050, Bressman; 1499, Machinist).  The Stephensons also made

arrangements at this time to move $150,000 from Mission UK to Mission US, JX 512,

due to the "cash flow crisis" created by the loans to Troika and pressures to support the

Night Agency (1372-73, J. Stephenson); *see generally* (1881, Machinist).

### 9.  U.K. Insolvency Proceedings

Section 7.01 of the EPA provides:

> **Resignations.** Sellers shall deliver to Buyer written
> resignations, effective as of the Closing Date, of the
> respective directors, officers and managers of the Mission
> Companies and MM Ltd, as set forth on Section 7.01 of the
> Disclosure Schedules.

EPS §7.01. The EPA does not contain Disclosure Schedules for Section 7.01 (596-606,

Tenore; 850-51, Rieger; 1683-84, Machinist); *see* JX 93, 608, 609.

Although Ms. Stephenson understood EPA §7.01 to impose an obligation upon

the Stephensons to resign as directors and that they would no longer be directors

following the closing of the transaction, the resignations did not occur (329-332, N.

Stephenson; 530, Tenore). Mr. Tenore did not recall following up with Mr. Rieger at or

following the closing concerning director resignation, as the issue was "just down the

list" (531-32, Tenore). Ms. Stephenson testified that Mr. Tenore "confirmed that [the

resignations] would not be required" (329-30, N. Stephenson). Mr. Rieger testified that

the buyer never informed the seller as to whom they would appoint as UK directors in

place of the Stephensons, that §7.01 predicated resignation on a name being set forth on

the Disclosure Schedules, and that he considered the issue either waived as a result of no

such name being provided, or that, because the language of §7.01 permitted the

resignation issue to be resolved following the closing, resignation was to be treated as a

mutual obligation of the parties to be worked on with Mr. Tenore when Troika was ready

to replace the Stephensons as directors of the UK company (775-77, 780, 782, 859,

Rieger; 877-78, Tenore).

On December 29, 2018, Ms. Stephenson reached out by text message to Simon

Bentley, who had been Deputy Chair of the Mishcon law firm in England. JX 510; (244,

N. Stephenson). The Stephensons and Mr. Bentley met in London on January 2, 2019

(244, N. Stephenson; 1219, Bentley). According to Ms. Stephenson, Mr. Bentley

"arrived at the meeting having done his homework," that he asked if the Stephensons

were aware that they were still directors of the Mission UK company, and that Ms.

Stephenson was surprised to learn that they were (245, 334, 337-38, 462-63, N. Stephenson,). For his part, Mr. Bentley testified: "I remember her telling me that they were directors," and that he may have confirmed that fact before the meeting through a Google search of Companies House records (1223, 1227, Bentley); *see* (341, N. Stephenson).

Mr. Bentley discussed with the Stephensons the responsibilities of directors under UK law, particularly to creditors if Mission was found to have solvency issues (1223-26, Bentley). While describing the circumstances surrounding Troika, Ms. Stephenson raised solvency concerns (245-46, N. Stephenson;). These included tight cash flow, Troika taking money from the Mission companies, and a perceived lack of governance and corporate irresponsibility (1315, J. Stephenson). Mr. Bentley recalled being left with the impression that Ms. Stephenson's communications with Troika officers had become "strained and stressful" (1250, Bentley). If the Mission companies were found to be insolvent, responsibilities to creditors would fall on the Stephensons, Mr. Bentley cautioned, as he believed that Ms. Stephenson would not have understood all such intricacies (1226, Bentley). Mr. Bentley testified that Ms. Stephenson took what he said very seriously. *Id.* at 1228.

Mr. Bentley recalled discussion of the possibility of Ms. Stephenson taking back the company, but did not remember it as her objective:

> No. I don't remember her saying that was her objective.
> Her objective was she was worried. She was in a state of
> huge concern about the whole situation and worried about
> her responsibilities and, yes, of the -- you know, the
> continuance of the group she founded. So in that sense,
> that form of concern, but no, there was no -- there was no
> sort of sinister prepack, right, let's get an administrator in,
> let's do a prepack with Nic, of course not, definitely not.

(1234, Bentley). Mr. Bentley did not recall being advised of the availability of $500,000 in the ConnectOne account; if he had been so advised that would have made a difference to him. *Id.* at 1280-83.

Mr. Bentley arranged a meeting to be held with Michael Stubbs, a solicitor at the Mishcon law firm (1228, Bentley). Mr. and Ms. Stephenson attended that meeting (247, N. Stephenson; 1190, J. Stephenson). The Stephensons testified that they "provided Mishcon with all of the financial information and context [they] had at the time" (291, 354, N. Stephenson), including information pertaining to what Ms. Stephenson described as the "rogue [$500,000] bank account." *Id.* at 324; *see* (1329, J. Stephenson). The Stephensons referenced the $500,000, even as they did not feel these funds were available to Mission, that neither Nicola nor James had control over the funds, and that they were "just an illusion[ ] basically" (1331-32, J. Stephenson). The Stephensons further testified that they supplied Mishcon with all information maintained by Mission's UK financial director Helen Gregson, particularly through an eight-week financial forecast (248, 294, 354, 362, N. Stephenson; 1310, J. Stephenson); JX 445.

Troika questioned the thrust of the Stephensons' testimony that: "[w]hatever they requested we gave them" (1323, J. Stephenson). Troika pointed out that the Stephensons and/or Ms. Gregson did not advise the Mishcon firm that their landlord had previously agreed to defer rent payment obligations, only that the rent was overdue, JX 572, that reports provided by Ms. Stephenson in December, 2018 projected a profit for 2019, *see* JX 463, and that the eight-week forecast itself showed positive cash flow through January 28, 2019. JX 445.

Based on the information given to it, which Mishcon identified as: "(1) the information provided to us by the directors during separate meetings on 2 and 3 January 2018: (2) the management account balance sheet as at November 2018; (3) management account profit and loss account as at November 2018; (3) current aged creditor and debtor schedules; and (4) short term cashflow forecasts for the period through to the end of February 2019," Mishcon advised that Mission UK was "unable to pay its debts as they fell due [including their rent obligation], and thus was insolvent according to the cash flow test if not the balance sheet test" under U.K. law.  JX 358; (352, N. Stephenson; 1231, Bentley).  The Stephensons took the advice given and relied upon it (359-60, 459, N. Stephenson).

The Mishcon firm referred the Stephensons for particularized advice to Geoff Rowley, a licensed insolvency practitioner at FRP Advisory (253, N. Stephenson).  The Stephensons met with Mr. Rowley on January 3, 2019, to provide information (254, N. Stephenson).  FRP corroborated the Mishcon view, issuing a report substantiating a finding of insolvency relating to Mission Media Limited ("MML"), for the following reasons:

> From the information provided it is clear that MML is unable to pay its debts as and when they fall due which is evidenced by:
>
> MML's inability to pay the amounts due to HMRC of some £303k in relation to corporation tax for the period ended 31.12.2017 which was due for payment no later than 30.09.2018.  You have advised that this debt is now with HMRC's debt management unit.
>
> The failure to pay the rent of some £157k which fell due on the December quarter date.
>
> The short-term cash flow forecast which details a funding deficit in excess of £500k by the end of February.

> I also note that the November management accounts
> detailed net assets of £95k but within the Company's
> debtors there is an amount due from Mission Culture LLC
> of some £640k which you consider it is unable to pay. To
> the extent that the true level of recoverability of this debt is
> less than £545k, MML would also be balance sheet
> insolvent.
>
> Where a company is insolvent or facing insolvency there is
> an obligation on the directors to focus on the interests of
> creditors as opposed to shareholders. I understand that you
> have been seeking clarity from the shareholder as to their
> ability to provide additional funding into MML (and other
> group companies) without a satisfactory outcome.

JX 573; (255, N. Stephenson, 1232, Bentley). Based on this advice, the Stephensons

placed the Mission UK companies into insolvency administration at 9 am GMT on

January 4, 2019 (249, 254, N. Stephenson); JX 649, 366.

At no time before the insolvency filing did the Stephensons advise any Troika

officer or director that insolvency proceedings were being considered or about to be filed

(249-50, N. Stephenson; 533, Tenore; 1564-65, Machinist).

Troika representatives described the insolvency as "devastating" (1053,

Bressman). They moved swiftly to "regain control" of the situation, using available

funds to exit insolvency as soon as possible (1564-66, Machinist). Troika's largest

shareholder (Coates) committed the necessary capital, and creditors never had to be

informed of the insolvency filing. *Id* at 1568-69, 1739. The companies exited insolvency

on January 23 or 24, 2019. *Id.* at 1580; JX 403.

Ms. Stephenson so notified Mr. Bentley as follows: "Mission failed. The money

came in albeit after the 3rd missed deadline. Hope you are back safe. Will update you

fully tomorrow. Thank you for helping us try." JX 510; (1290-92, Bentley).

At midday GMT, after the filing of the insolvency (361, N. Stephenson), Kevin Dundas telephoned Ms. Stephenson to report that Mr. Bressman had told Mr. Dundas that Mr. and Ms. Stephenson had been fired (256, N. Stephenson; *see* 1559-60, Machinist). Mr. and Ms. Stephenson then received formal notices of termination, for cause (257, N. Stephenson). JX 516, 517.

### 10. Litigation and Arbitration

On January 7, 2019, Troika obtained an Order from Judge Ramos in the United States District Court for the Southern District of New York temporarily restraining the Stephensons from entering Troika or Mission premises, from utilizing Troika electronic systems, and from communicating with Troika or Mission employees. JX 493. Troika obtained the Order following an oral presentation to the Court that did not include any witness testimony. *Troika Pre-Hearing Brief*, Exhibit B.

On January 10 (or 11), 2019, Ms. Stephenson met with Mr. Bressman (260, N. Stephenson). According to Ms. Stephenson, Mr. Bressman said at the meeting that there had been a terrible misunderstanding and asked if Ms. Stephenson would consider coming back to Troika. *Id.* Ms. Stephenson replied that much had been said that would be difficult to retrieve and that she did not want to give more time to Troika. *Id.* at 261. Mr. Bressman and Ms. Stephenson had one other meeting, but the situation did not change. *Id.* at 262.

Troika moved to broaden the temporary restraining order and for contempt of the previously entered order on February 8, 2019. The Court issued the requested Order on February 13, 2019, again following an oral presentation from counsel not including witness testimony. JX 494. The renewed proceeding followed Mr. Stephenson's attempt

to access Troika's accounts to cover company expenses that had been charged on an American Express account for which Mr. Stephenson had personal responsibility (265, N. Stephenson; 1450, J. Stephenson).  Mr. Stephenson eventually paid the bill, after repeatedly asking Troika to do so, without a positive response (1200, 1450-51, J. Stephenson).

The unraveling of the Troika-Mission relationship had other consequences; as a result of the employment termination, Ms. Stephenson lost her visa status, but eventually regained it (263-64, N. Stephenson).  Ms. Stephenson also had her health care coverage through Troika cancelled (1720, Machinist).  The Sunday Times of London published an article chronicling the Mission-Troika relationship (1058-59, Bressman); JX 520.  On October 29, 2019, Judge Ramos disqualified the Tannenbaum firm from further representation of the Stephensons in these proceedings, finding that the firm had a conflict of interest due to its concurrent representation of the Stephensons and Mission-Media, to which the law firm had sent its original engagement letter.  JX 495.  This arbitration proceeding followed.

## B.  The Claims Presented

The following description of the claims presented has been assembled based on submissions from counsel dated December 4, 2020.  The Arbitrator requested these submissions during the December 3, 2020 post-Hearing closing argument session, in order to ensure consideration and disposition of all claims interposed by all parties.  *See* (3183).

The Stephensons seek declaratory relief, as well as monetary damages, for: (1) alleged breach of sections 1(a) and 3(e) of their Employment Agreements, and for alleged

termination of the agreements without cause; (2) alleged breach of sections 2.04(c-e), 2.05(c), 2.06, 6.18(a) and 6.23 of the Equity Purchase Agreement; (3) alleged fraud in the inducement of the Equity Purchase Agreement; and (4) relief from the restrictive covenant within section 7.05(a) of the Equity Purchase Agreement and section 5.02 of the Goodwill Purchase Agreement, and from enforcement of certain "back-end" payments.

Troika seeks declaratory relief, as well as monetary damages, for: (1) alleged improper payment of the June, 2018 dividend; (2) alleged breach of sections 7.14, 7.16, 7.01, 5.06(a), (e) and (j), and 5.07 of the Equity Purchase Agreement; (3) various alleged breaches of fiduciary duty, including aiding and abetting such alleged breaches; (4) alleged conversion, corporate waste and repayment of funds allegedly not repaid; (5) alleged malicious prosecution; (6) recognition, enforcement and extension of the restrictive covenant; and (7) punitive damages.  Both parties seek reimbursement of fees, costs and expenses.

## C. Discussion

### 1. The Fraudulent Inducement and Breach of Contract Claims Addressing the Formation and Implementation of the EPA and GPA

The parties have accused one another of breaching the EPA, either in its formative stages or in its implementation.  The Stephensons assert that the Troika parties fraudulently induced them into the agreements, by misrepresenting the nature of the Night Agency acquisition and the status of Troika's solvency, and by then breaching the representations and warranties within the EPA that Troika was solvent immediately after giving effect to the transactions contemplated by the EPA, as the EPA defined that term, JX 83 §6.23, and that all compensation payable to Troika employees, independent

contractors or consultants had been paid.  JX 83 §6.18; *see The Stephenson Claimants' Post-Hearing Brief ("St. Br.")* at 9.

Troika asserts that the dividend paid by Mission prior to Closing was improper, and in any event breached sections 5.06 (a), (e) and (j) of the EPA.  *Troika Post-Hearing Memorandum (Tr. Br.")* at 2-9.  Troika further alleges that the Stephensons' failure to surrender control of Mission's bank accounts breached §7.14 of the EPA, that failure to provide a closing balance sheet breached §7.16 of the EPA, that the Stephensons' failure to resign as directors breached §7.01 of the EPA, and that the Stephensons breached the solvency representation and warranty within §5.07 of the EPA.  *Id.* at 9-16, 37-39, 65.

### a. The Stephensons' Fraudulent Inducement and Breach of Contract Claims

### i. The Fraudulent Inducement Claims

Under New York law, a claim for fraudulent inducement requires "a knowing misrepresentation of material present fact, which is intended to deceive another party and induce that party to act on it, resulting in injury[.]" *Genger v. Genger*, 144 A.D.3d 581, 582 (1st Dep't 2016) (citing *GoSmile, Inc. v. Levine*, 81 A.D.3d 77, 81 (1st Dept.2010)).

The Stephensons attempt to meet this standard with the contentions that: (1) Mr. Bressman orally misrepresented to them that Troika was well-capitalized and possessed adequate resources to enable the Stephensons to continue running and expanding Mission; and (2) Troika's representatives misrepresented the nature of the transactions into which Troika had entered with the Night Agency.  *St. Br.* at 9.  Troika responds that the oral statements by Mr. Bressman concerning the capitalization of Troika were true, but in any event are not actionable under the "entire agreement" provision in the EPA and GPA, which states that the agreements within them contain the only representations upon

which the Stephensons could have any reliance entitlement. *Tr. Br.* at 62-73. Troika

adds that both the financial capitalization and Night Agency alleged fraudulent

inducement predicates reflect seller's remorse, in that the sellers had a full opportunity to

address these issues through due diligence prior to closing. *Id.* at 73.

The evidence shows a deep interest by Ms. Stephenson in combining Mission

with Troika. Ms. Stephenson saw great upside in the opportunity presented by the

combination. It was incumbent on the Mission parties to balance this optimism with

appropriate due diligence, particularly where, as here, both of the alleged fraudulent

inducement bases were subject to interpretation. The Stephensons had the opportunity to

test the veracity of what they were being told before they agreed to the deal, to examine

Mr. Bressman's financial characterizations and the Night Agency particulars. That

hindsight suggests that they may not have done so with the rigor they should have does

not translate into an intent to deceive and an inducement to act on the part of Troika. The

Stephensons therefore have not sustained their burden of proof on the fraudulent

inducement claims.

The entire agreement term within the EPA also defeats the Stephensons'

fraudulent inducement claims. That term provides that the EPA "supersede[d] all prior

and contemporaneous understandings and agreements, both written and oral, with respect

to such subject matter." JX 83 §10.06. Discussions concerning Troika's financial

wherewithal and Night Agency ownership fall within the reach of this clause.

The Stephensons' fraudulent inducement claims are denied.

### ii. The Solvency Breach Claim

Through Section 6.23 of the EPA, Troika represented and warranted that Troika

"is and immediately after giving effect to the transactions contemplated by this

Agreement upon Closing, will be solvent." The EPA defines "Solvent" as follows:

> **"Solvent"** means, with respect to a particular date and
> Person, that on such date (i) the present fair market value
> (or present fair saleable value) of the assets of such Person
> is not less than the total amount required to pay the
> liabilities of such Person on its total existing debts and
> liabilities (including contingent liabilities) as they become
> absolute and matured; (ii) such Person is able to realize
> upon its assets and pay its debts and other liabilities,
> contingent obligations, and commitments as they mature
> and become due in the normal course of business; (iii)
> assuming consummation of the issuance of the TMG
> Shares as contemplated by this Agreement, such Person is
> not incurring debts or liabilities beyond its ability to pay as
> such debts and liabilities mature; (iv) such Person is not
> engaged in any business or transaction, and does not
> propose to engage in any business or transaction, for which
> its property would constitute unreasonably small capital
> after giving due consideration to the prevailing practice in
> the industry in which such Person is engaged; and (v) such
> Person is not a defendant in any civil action that would
> result in a judgment that such Person is or would become
> unable to satisfy.

The Stephensons rely on the expert testimony of Dr. Daniel Tinkelman to support their

claim that Troika breached §6.23, by failing to be sufficiently capitalized upon Closing.

*St. Br.* at 3-5. Dr. Tinkelman opined that Troika did not meet the above definition

following the Closing, particularly subsections ii, iii, and iv (2176-77, Tinkelman). Dr.

Tinkelman reasoned that continuing losses incurred by Troika violated subsection iii,

because the result would be debts and liabilities beyond Troika's ability to pay, that

Troika violated subsection ii, because the assets available as of the date of acquisition

were insufficient to pay debts needed to be paid at that time, and that Troika violated

subsection iv, because its overall capital was insufficient to support its business.

Troika counters that the factual record rebuts Dr. Tinkelman's opinion.  That record shows that upon Closing and immediately thereafter the combined Troika entity had $9,924,000 of positive shareholder equity after recognizing prior year's losses and $2,096,000 in cash and cash equivalents on hand.  *See* JX 479 at 3.  Nor, as Troika's expert, Michael Pakter, pointed out, did Dr. Tinkelman perform a capital adequacy test. *Id.* at 2.

Mr. Pakter also noted that Dr. Tinkelman did not afford due weight to Troika's ability to raise capital not only to fund acquisitions but also to cover ongoing operational expenses. JX 479 at 10; (1512, Machinist).  On this point, the evidence shows that, at Closing, the Stephensons and their counsel knew enough about the nature of Troika's business operation to consider that Troika's financial picture had to take into account the importance of capital raising for all aspects of the venture.  Due diligence thus should have assessed this reality.  The fact that it did not cannot translate into a finding that Troika breached §6,23.

Troika financial issues clearly contributed to the discord among the Stephensons and the Troika directors and officers.  But a breach of the solvency warranty did not cause this discord.  Nor should it be a foundation for financial damages.  The record demonstrates instead that the failure of both parties to communicate rationally and with due respect for each other in respect of financial issues precipitated the rift between them, not the fact that the finances did not live up to representations and warranties within the EPA.

The Stephensons' claim for breach of 6.23 of the EPA is denied.[3]

### iii. The Claim for Breach of §6.18(a) of the EPA

In Section 6.18(a) of the EPA, Troika represented and warranted that

> Except as set forth in **Section 6.18(a)** of the TMG
> Disclosure Schedules, as of the date hereof, all
> compensation, including wages, commissions, bonuses,
> fees and other compensation, payable to all employees,
> independent contractors or consultants of TMG Group for
> services performed on or prior to the date hereof have been
> paid in full and there are no outstanding agreements,
> understandings or commitments of TMG Group with
> respect to any compensation, commissions, bonuses or fees,
> other than any payments to be made thereto in the ordinary
> course of business (e.g., payroll).

The Stephensons claim that Troika breached this representation and warranty because at

least Mr. Bressman was owed hundreds of thousands of dollars in back pay before

Closing that was paid to him after Closing. *St. Br.* at 5-6. Troika responds that the

Stephensons and their counsel should have uncovered in their due diligence effort that

Troika owed Mr. Bressman payment for back pay (3047). In any event, Troika observes

that the representation and warranty exempts "any payments to be made in the ordinary

course of business (e.g., payroll)," and that the payment to Mr. Bressman so qualifies

(3047-48). The due diligence and payroll points mentioned by Troika must be

determinative in respect of the §6.18(a) breach claim.

The claim for breach of §6.18(a) of the EPA is denied.

---

[3]   Troika urges that the Stephensons breached the representations and warranties within
§5.07 of the EPA, which relates to the solvency of Mission UK, adding that if there
is any issue with Troika's solvency it is due to the financial frailty of Mission UK.
*Tr. Br.* at 71-72. Troika introduced this claim to buttress a contention that the
Stephensons lack standing to contest Troika's solvency. *Id.* Troika has not made an
independent claim for damages based on the alleged violation of §5.07. The denial
of the Stephenson's breach of contract claim under §6.23 of the EPA renders
Troika's position on §5.07 moot.

### b. Troika's Breach of Contract Claims

### i. The Pre-Closing Dividend

Troika asserts that the payment of the £700,000 dividend prior to the Closing on June 27, 2018 reflects dishonesty and a breach of §§5.06(a), (e), and (j) of the EPA. *Tr. Br.* at 2-9. The Stephensons counter that they supplied a balance sheet reflecting reserves sufficient to support the dividend notwithstanding negative working capital when asked to do so by six of Troika's counsel, and that this balance sheet was relied upon, and never questioned by Troika or its counsel. *St. Br.* at 19-20.

Troika's contention flows from discovery of the Paul Allen memo dated June 25, 2018, JX 522, which blackboarded a working capital shortfall of £460,000, and added: "the buyer would usually ask for the sellers to put the cash in to cover this shortfall," and "I do not propose sharing our workings with Troika as this will point out the potential working capital shortfall, which will need covering either by a cash injection into the business, or recapitalizing using trading profits." Mr. Bressman testified that if he had seen the Allen e-mail "he never would have permitted $1 million to leave the company" (990, Bressman). The dividend payment was used for the retirement of director's loans that had been made to the Stephensons; it did not result in the payment of additional cash to the Stephensons (432, N. Stephenson; 708, Bressman).

Troika argues that the dividend payment "stripped" funds from the entity to be created, and was unlawful. *Tr. Br.* at 2-9. Troika urges that the Stephensons have the burden of proving that the dividend payment was proper under the entire fairness doctrine, as embodied in *Pepper v. Litton*, 308 U.S. 296 (1939). *Id.* at 3. *Pepper*, however, laid out rules of equity to govern corporate dealings in the context of a

bankruptcy, and thus is off center from the corporate acquisition context of this matter. Here, Troika and its counsel had a responsibility to exercise appropriate due diligence to confirm to their satisfaction the particulars of a dividend payment that had been approved by the two directors and shareholders of the corporation being acquired (3054-55).

An e-mail copied to the six lawyers acting for Troika accomplished this task. JX 86. This e-mail attached a balance sheet showing negative working capital (JX 87), just as the Paul Allen memo did. None of the Troika lawyers objected to the negative working capital conclusion derivable from the balance sheet provided. None of the Troika lawyers objected to the payment of the dividend. The issue surrounding the disclosure relating to the dividend payment thus reduces to one of degree in relation to the negative working capital finding contained within each of the documents. Troika's counsel had the opportunity prior to the Closing to raise and test this issue, and whether conclusions of the nature drawn by Mr. Allen would have changed anything concerning a deal Troika sought and encouraged. Troika, for example, could have asked if Mission had requested any studies relating to the dividend payment from any of their advisors beyond the May 31, 2018 balance sheet that was supplied to Troika's counsel. They did not. Moreover, Troika and its counsel possessed the core information on the basis of which Mr. Allen had conducted his analysis (1627, Machinist); see CX 1. It would appear as a result that Troika could have performed a review similar to that in which Mr. Allen engaged (426, N. Stephenson).

Troika's claim for breach of §§5.06 (a), (e) and (j) of the EPA by reason of the £700,000 dividend payment made on June 27, 2018 is denied.

### ii.  The Claim of Breach of § 7.14 of the EPA

Troika contends that the Stephensons breached §7.14 of the EPA when they did not cede control of all Mission bank accounts to Troika within thirty days after Closing. *Tr. Br.* at 9-12.  The Stephensons assert in response that Mission provided Troika access to its bank accounts (*see* 1166, J. Stephenson), and that no information from Mission's bank accounts, or Paprika, its internal accounting system, was kept from Troika.  *St. Br.* at 16-17.

The record is clear that the Stephensons never transferred the Mission bank accounts to Troika.  The closer question is whether in the circumstances that failure should provide a basis for contract breach and damages.  The evidence shows that bank account transfer became a surrogate for the overarching disconnect between the parties. The hesitance of Ms. Stephenson to bank account transfer derived from concerns generated by requests for funds to cover the Troika Design payroll, and from the failure of Mr. Bressman to deliver on his commitment that capital would be raised to cover shortfalls.  These factors are not justifications for the Stephensons' failure to honor §7.14 of the EPA, but they are mitigating circumstances sufficient to support denial of the claim that the failure to conform to §7.14 constitutes a breach compensable by monetary damages.

The Allergan revenue recognition in July, 2018 does not alter this conclusion. Troika asserts that transfer of the Mission bank accounts would have revealed the Allergan issue and a potential favorable knock-on effect for the Stephensons for the calculation of EBITDA and the resultant Earn Out calculation, either for 2018 or 2019, or would have displayed to Troika at the earliest point that the Mission revenues were not as

represented. *Tr. Br.* at 15-16. The record demonstrates however, that the Allergan issue depicted merely an accounting question as to which there existed substantial discord, but little consequence. Mr. Craig allowed that, whether the Allergan funds were represented as revenue or as a cost, the effect on EBITDA would have been the same (2106, Craig).

Troika's claim for breach of §7.14 is denied.

### iii. Troika's Claim of Breach of §7.16 of the EPA

Troika claims that the Stephensons breached §7.16 of the EPA by failing to deliver a closing balance sheet for the period ending June 30, 2018 within ninety days of Closing. *Tr. Br.* at 12-13. Mr. Machinist, however, testified that the Stephensons eventually complied with this covenant (1498, Machinist). As no particularized damages appear to have resulted from this delayed compliance, the claim for breach should be denied.

Troika's claim for breach of §7.16 of the EPA is denied.

### iv. Troika's Claim for Breach of §7.01 of the EPA

Troika alleges that the Stephensons breached §7.01 of the EPA, which Troika reads to have placed a contractual obligation on the Stephensons to resign as directors. *Tr. Br.* at 37-39. The Stephensons reject this foundation. They contend that §7.01 did not require them actually to resign, but merely to deliver resignations for the individuals identified in disclosure schedules annexed to the EPA. *St. Br.* at 27-31.

The Stephensons' reading of the provisions appears the accurate one. Section 7.01 called for the "Sellers [to] deliver to Buyer written resignations, effective as of the Closing Date, of the respective directors, officers and managers of the Mission Companies and MM Ltd, as set forth on **Section 7.01** of the Disclosure Schedules." The

plain language of this provision does not require the Stephensons to resign as directors. Rather, the provision commands a procedure under which the Stephensons were to deliver written resignations "as set forth on Section 7.01 of the Disclosure Schedules." This command never activated. The parties did not include a Section 7.01 Disclosure Schedule. Thus, there was nothing with which to comply or breach. It therefore matters not whether this circumstance is denominated as a waiver of the resignation requirement or not, a point debated by the parties at the Hearing and in their briefing and argument. The determinative fact is that the Stephensons validly remained directors of the UK companies, under §7.01 of the EPA.

The claim that their doing so constitutes a breach of §7.01 must be denied.

### c.  Coda

The denial of all of the fraudulent inducement and breach of contract claims asserted by the parties underscores that these various alleged misrepresentations and breaches of the EPA did not cause the collapse of the relationship between the parties, or precipitate financial damage to either party. Instead, the record reflects, almost from the outset, parties talking past each other, not displaying the respect and mutuality they sought when they entered into the EPA and the GPA. As Mr. Machinist testified, to make this venture work, "meant embracing the entrepeneurs and giving them comfort" (1475, Machinist), because "[t]he last thing in the world you want to do is kill the business after you buy. It just makes no sense whatsoever" (1522, Machinist). But "the last thing in the world you would want to do" is exactly what happened. Troika, for its part, sought funds from Mission to repay commitments of another subsidiary without regard for how their new partner would take the request, it did not credit suggestions

advanced by Ms. Stephenson, it ridiculed her behind her back, and it accused her of theft based on an analysis of figures it did not permit her to vet.

Ms. Stephenson did not accept that the acquisition meant that Troika could call the shots. Affronted by how she perceived she was being treated, Ms. Stephenson fought back, which only made matters worse. She sought legal advice and considered the options available to her, pushed to be heard, questioned the multiple entreaties for funds after being told Troika could have ready access to additional capital, and following the December 5, 2018 meeting, questioned why she was being treated as she was.

Read against this backdrop, the claims the parties have asserted under and involving their acquisition contract are easily unmasked as unwarranted attempts to cast what became fundamental differences between them -- with blame placeable on both sides -- into legal jargon and alleged bases for monetary recovery. That is why they all are proper subjects for denial.

### 2. Troika's Breach of Fiduciary Duty Claim Based on the U.K. Insolvency

Troika attacks the Stephensons on a number of grounds in relation to the U.K. insolvency, all under the broad rubric of breach of fiduciary duty. These principally include the failure to notify Troika that insolvency proceedings were being considered or about to be filed, and that the Stephensons failed to provide all pertinent financial information to counsel and the Administrator. *Tr. Br.* at 29-36. The Stephensons respond that they exercised good faith in the judgments they made in placing the Mission U.K. companies into insolvency, relying upon the advice of counsel in so doing. *St. Br.* at 31-35.

The record reflects that the Stephensons visited with Simon Bentley in London on January 2, 2019, when they either learned or confirmed that they were directors of the U.K. companies, and that they possessed the responsibilities concordant with that status, including the potential for personal liability to the company's creditors. The record further reflects that the Stephensons advised Mr. Bentley of concerns they had over the financial condition of the U.K. companies. This consultation led Mr. Bentley to recommend that the Stephensons meet with counsel, which they did, with Mr. Stubbs of the Mishcon law firm, and in turn with Mr. Rowley. The Stephensons expressed the belief that they supplied all counsel with the financial information that had been requested, which took the form, in part, of an eight-week cash forecast, an open invitation to confer with Ms. Gregson, the Mission U.K. financial officer, and notification of information concerning the availability of the $500,000 in the ConnectOne account, as advised by Mr. Broderick. On the basis of the information provided, the Mishcon firm recommended that the U.K. firms be placed into insolvency, a result eventuated through Mr. Rowley, who endorsed the Mishcon views based on the totality of circumstances. *See* (2927).

Under U.S. law and U.K. law, a director owes a fiduciary duty to a corporation "to act independently and a duty to exercise reasonable care and skill in carrying out those duties and a duty to act in the best interest of the company" (2775, Paterson); *Melcher v. Apollo Med. Fund Mgmt. L.L.C.*, 84 A.D.3d 547 (1st Dep't 2011), *rev'd on procedural grounds*, 18 N.Y.3d 915 (2012) (manager of an LLC owes a fiduciary duty of due care, good faith and loyalty to the members of the LLC). In the performance of its

fiduciary duties, a director can seek professional advice and rely on that advice, as appropriate (2775, Paterson).

In this instance, the Stephensons sought and relied upon the advice provided to them, in the exercise of their view that Mr. Stubbs and Mr. Rowley predicated such advice on pertinent information being supplied to them. The fact that the information provided may have been incomplete or even misleading, as urged by Troika, or that the commentary concerning it was subjective in nature, does not affect the underlying premise that the approach for advice was undertaken in the Stephensons' good faith belief that the financial issues they presented were real. The insolvency filing in reliance on consistent advice received from three advisors in three consecutive days thus did not violate the fiduciary duties possessed by the Stephensons. Nor did the evidence presented at the hearing support Troika's innuendo that the Stephensons engineered the insolvency to regain control of Mission. Ms. Stephenson denied any such motivation, or that her report to Mr. Bentley that the "Mission failed" should be so interpreted (411, N. Stephenson). No other evidence contradicted that denial.

But the fiduciary duty owed by the Stephensons to Troika must be viewed to enable the conclusion that acts, even if undertaken in good faith by a director, not be so undertaken without also being notified to the Company's Board, or other directors and/or officers. This must particularly be the case in relation to consideration of insolvency proceedings which, by their very nature, could have extraordinary negative consequences for a company, as spelled out by Mr. Paterson:

> In my view, placing a company into administration or any
> formal insolvency is a very serious matter and the directors
> should take every reasonable step to explore the possibility
> of keeping the company solvent and out of administration.

And even if the personal relations had deteriorated, even if
there was evidence that Troika hadn't paid some creditors,
which companies can delay creditors for all sorts of
commercial reasons, it remains my view that this was
business.

Mission should have asked its shareholder if it would have
been prepared to fund it, specifically to avoid it taking the
drastic step of appointing administrators.  So I still think
that the very easy step of asking the shareholder if it would
fund the companies to avoid having to go into formal
insolvency was a step worth taking. I can't see any reason
not to take that step because the balance of taking that step
and asking for funding against the draconian measure of
placing the company into administration I think the balance
is in favor of taking that step and asking Troika again for
funding.

Q. But that would be a judgment call, wouldn't it?

A. I can't – I mean I'm asked to give my opinion as an
expert. It is my opinion. I can't say any reason why the
directors wouldn't do it. What I ask myself rhetorically
what did they have to lose other than speaking to people
they had fallen out with which happens in business, what
did they have to lose?

Q. Well, what about if their concern was based on past
conduct that they were being left out to hold the bag for
creditors, that they had been set up?

A.  Wouldn't that be a further reason to ask the shareholder
if they were worried they had been left exposed to
creditors? They, in my view, would want to be seen to
discharge their duties as fully as possible to negate the
personal risks themselves.

(2857-59, Paterson).  These views must be credited.

    What cannot be credited is Ms. Stephenson's rationalization that notifying Troika

in advance of an insolvency filing would "delay things:" "If I had spoken to

Mr. Bressman about my intentions on the administration, he would have continued to lie

about funds imminently coming into the company in order to persuade me to allow the

Mission companies to get into deeper troubles with their creditors" (393, N. Stephenson). The fiduciary duty a director owes to his or her company outweighs the type of suspicion harbored by Ms. Stephenson.

What occurred following the filing exemplifies that the violation of fiduciary duty in the failure to notify Troika's directors and officers of the placement of the U.K. companies into insolvency had a dire consequence, because the evidence shows that the placement of the Mission U.K. companies into an insolvency proceeding could have been avoided. Troika stepped in swiftly and swept the company out of insolvency in three weeks, the fastest exit from bankruptcy recalled by Mr. Paterson (2760, 2762, Paterson). It follows that the shortfalls on which the insolvency was predicated could well have been filled in the first instance through capital Troika clearly, at least eventually, had the ability to access. This result seriously calls into question the need for the filing in the first place, and whether, if the intention to file and the advice of counsel and the Administrator had been notified to Troika, the filing would have been avoided.

Troika's claim for breach of fiduciary duty by reason of the Stephensons' failure to notify Troika's Board, directors and/or officers of the consideration or intent to file insolvency proceedings is granted.

### 3. Troika's Breach of Fiduciary Duty Claims Based on Conduct of Counsel

Troika asserts that the Stephensons' consultation with Helen Croft, Mission UK Companies General Counsel, and with Mr. Rieger of the Tannenbaum firm, concerning their legal rights and obligations as well as potential remedies and strategies available to them commencing in October, 2018, constituted a breach of their fiduciary duty to Troika. *Tr. Br.* at 16-20. According to Troika, the Stephensons "fatally corrupted" Ms.

Croft's duty of loyalty owed to Troika, *Tr. Br.* at 16, as exemplified by Ms. Croft's active involvement in the drafting of the e-mail Ms. Stephenson sent to Mr. Bressman on October 11, 2018 that criticized Troika's approach towards Mission. JX 195. Mr. Rieger contributed to the drafting of that e-mail, a fact referenced by Judge Ramos in his ruling disqualifying the Tannenbaum firm from representing the Stephensons in this proceeding. JX 495. Troika adds that the Stephensons committed the intentional tort of aiding and abetting a breach of fiduciary duty by inducing others to work behind Troika's back in an adversarial manner. *Tr. Br.* at 19-20. Troika seeks as damages recovery of the compensation it paid to Ms. Croft, and the fees it paid to the Tannenbaum firm when they allegedly acted contrary to Troika's interests. *Id.* at 20.

With the elevation of animosity in the October, 2018 time frame prompted by mistrust due to financial stress, the Stephensons became concerned that the deal they made may not have been what they thought it would be. The Stephensons had every right to seek legal guidance as to their options in these circumstances. But they needed to do so with due respect for the fact that the acquisition of Mission by Troika delivered with it the imposition of fiduciary duties upon them and correlative loyalty from those serving the combined entity.

The Stephensons did not respect these boundaries by involving Ms. Croft in their consultations, because following the acquisition Ms. Croft worked for and owed a duty of loyalty to Troika. The evidence renders the situation with the Tannenbaum firm on this point a bit more opaque. Mr. Rieger expressed the belief that, from the outset of his firm's engagement as counsel, the Stephensons, then the sole proprietors of Mission, were his clients, and his only clients (731, Rieger). Judge Ramos in his disqualification

opinion allowed: "It very may well be that there is an innocent explanation for [the Tannenbaum firm's] conduct while it represented both Mission Media and the Stephensons." JX 495 at 13.

Mr. Rieger's testimony credibly provided that "innocent explanation" in the form of administrative error in the denomination of the client when the firm created its initial engagement letter (726-27, Rieger ) ("I did not know the structure of the transaction at the time the engagement letter was issued. So yes, the engagement letter, more appropriately, should have been addressed to Nicola and James Stephenson."). The substantive thrust of Troika's position, manifested in its claims for recovery of what it paid to Ms. Croft in compensation and to the Tannenbaum firm in fees, nonetheless remains vital. In their conduct from October, 2018 onward, Ms. Croft and the Tannenbaum firm represented the Stephensons' interests, not Troika's interests. Compensation for that representation should be the Stephensons' responsibility.

Troika's claims for breach of fiduciary duty based on conduct of counsel and the concordant claims for tortious interference by aiding and abetting such a breach are granted.

### 4. The Stephenson's Claims for Breach of the Employment Agreements

#### a. Section 1(a) of Ms. Stephenson's Employment Agreement

Section 1 (a) of Ms. Stephenson's Employment Agreement provides:

> **Positions; Duties.** During the Employment Term (as defined in Section **J**), the Company shall employ Executive as: (i) the President of each of the Company, MissionCulture LLC, and Mission-Media Holdings Limited (collectively, **"Mission Media"**), and (ii) at such time as Parent has successfully obtained its E-2 Treaty Investor Company Registration on behalf of itself and its subsidiaries (the **"E-2 Registration"**) and Executive has

> obtained her E-2 visa status under the E-2 Registration, the
> Executive shall be appointed President of the Parent.
> Executive shall have duties, authority, and responsibilities
> that are reasonable, consistent, and customary with such
> position.  Executive shall report to the Chief Executive
> Officer and the Board of Directors of Parent (the **"Board"**)
> at its New York office.

Despite pushback on the point from Troika, *see* (519, 520, Tenore), Ms. Stephenson

contends that all the particulars regarding her E-2 status were accomplished, but that she

was not accorded recognition by Troika as its President, and never was allowed to report

to Mr. Machinist as the Agreement required. *St. Br.* at 6-8.  Troika describes this claim

as "much ado about nothing," because, in its view, Ms. Stephenson had a clear reporting

line to the Executive (3045).  More fundamentally, as it appears that no financial damage

sought by the Stephensons derives directly from the alleged breaches of §1(a), the only

claimed damages by reason of impropriety in relation to the Employment Agreements

flows from the forfeiture of back-end Earn Out and salary compensation discussed

elsewhere in this Partial Final Award.

The claim for breach of Section 1(a) of Ms. Stephenson's Employment

Agreement is denied.

### b. The Stephensons' Claim for Breach of Section 3(e) of their Employment Agreements

Section 3(e) of the Stephensons' Employment Agreements provide:

> **Business and Entertainment Expenses.** Upon submission
> of appropriate documentation by Executive in accordance
> with the Company's policies in effect from time to time, the
> Company shall pay or reimburse Executive for all business
> expenses that Executive incurs in performing Executive's
> duties under this Agreement, including, but not limited to,
> business class travel (excluding gas mileage),
> entertainment, and professional dues and subscriptions, in
> accordance with the Company's and Parent's policies in
> effect from time to time.

49

Mr. Stephenson personally guaranteed the corporate expenses fitting this description.
After termination of the Stephensons' employment, an American Express bill of
$148,612.16 remained outstanding. Mr. Stephenson's attempt to pay this bill through
Troika's computer system was one of the factors that precipitated Troika's rush into court
to seek a temporary restraining order. Mr. Stephenson paid the bill personally. He
should be reimbursed.

The pushback from Troika that the bill may include personal expenses misses the
point. *See* (3000-3001); *St. Br.* at 42. Mr. Stephenson served as personal guarantor of
the account on the understanding that the company would stand behind him, and not
harm his personal credit status. The time for challenging the nature of individual items
on a bill predominated by company charges according to the record evidence has long
passed. Troika should reimburse Mr. Stephenson for his payment of company expenses,
as required by Section 3(e) of his Employment Agreement.

The Stephensons' claim for Breach of Section 3(e) of their Employment
Agreements is granted.

### c.  The Stephenson's Claim that Troika Breached the Employment Agreements by Terminating them Without Cause

#### i.  James Stephenson

Section 4(b)(i)(C) of the Nicola and James Stephenson Employment Agreements
defines Termination for Cause as:

> an act of gross misconduct by Executive with regard to the
> Company that is materially injurious to the Company and is
> committed without good faith and without a reasonable
> belief by the Executive that the act or omission was in the
> best interest of the Company.

JX 82 §4 (b)(i)(C).

By letter dated January 4, 2019, Troika invoked the above provision to terminate

the employment of James Stephenson "for cause." The letter stated, in part:

> You have engaged in many acts of gross misconduct that
> are materially injurious to the Company. Examples of such
> gross misconduct include but are not limited to: on
> December 5, 2018, you threatened to kill senior company
> executive Andrew Bressman, an act that was witnessed by
> several individuals and for which Mr. Bressman necessarily
> filed a police report out of concern for his personal safety;
> you subsequently made profane insults and threats in your
> communications with senior company executives and
> Board members, including calling them "a bunch of c**ts";
> you intentionally precluded and prevented management
> from having full and complete access to and control of the
> affiliated companies' bank accounts, expressly and
> specifically rejecting numerous demands that you provide
> such access; you refused to provide basic financial and
> operational books and records of MissionCulture LLC and
> Mission Media USA, Inc. in blatant rejection of the many
> requests by management. You have been on notice of this
> misconduct for weeks, yet you have defiantly and expressly
> refused to comply with these basic obligations you have to
> Troika, the Company and all of their affiliated companies
> worldwide (the "Companies"). Your acts of gross
> misconduct have been in direct violation of your
> obligations to the Companies. Your acts of gross
> misconduct have been materially injurious to the
> Companies, and have placed the entire future of the
> Companies at risk while putting your interests, and the
> interests of Nicola Stephenson, above the Companies'
> interests. Your actions, and your placing your personal
> interests ahead of the interests of the Companies, have
> materially jeopardized the business reputation and financial
> well-being of the Companies and will not be tolerated.

JX 516. Mr. Stephenson argues that the facts listed in his termination letter do not satisfy

the "for cause" provision, because they do not describe conduct "materially injurious to

the Company," but rather reflect a zero tolerance for such conduct, a policy, it is further

argued, that Troika did not honor in its own criticisms of Ms. Stephenson. *St. Br.* at 14.

One wrong, however, does not justify another.  Mr. Stephenson's virile attack on

Mr. Bressman and his subsequent text message containing what even Mr. Stephenson

described as "the ultimate profanity" undoubtedly qualifies as "gross misconduct" (1177,

J. Stephenson).  That it also was "materially injurious to the Company" is reflected in the

jarring reaction it evoked from the Company's senior management: "His wife was crying

and he basically he threatened and he was yelling and screaming.  He threatened

Andrew's life.  He said he was going to kill him and it rattled all of us."  JX 491 at 164

(C. Broderick deposition).  Mr. Bressman filed a police report and feared for his safety.

There exists no place in any company for such conduct that unquestionably was

"committed without good faith and without a reasonable belief by [Mr. Stephenson] that

the act or omission was in the best interest of the Company."  The Company properly

invoked the "for cause" provision to support the termination of Mr. Stephenson's

employment.

The claim for breach of Mr. Stephenson's Employment Agreement by reason of

his termination for cause is denied.

### ii.  Nicola Stephenson

By letter dated January 4, 2019, Troika invoked the "for cause" provision to

terminate the employment of Nicola Stephenson.  The letter stated, in part:

> You have engaged in many acts of gross misconduct that
> are materially injurious to the Company.  Examples of such
> gross misconduct include but are not limited to: you
> intentionally precluded and prevented management from
> having full and complete access to and control of the
> affiliated companies' bank accounts expressly rejecting
> numerous demands that you provide such access; you
> intentionally and expressly refused to provide basic
> financial and operational books and records of
> MissionCulture LLC and Mission Media USA, Inc in

blatant rejection of the many requests by management; you
undertook to engage in efforts, inquiries, and
communications to offer to sell and search for buyers of the
Company and affiliated Mission companies without
approval, ratification or direction from senior management
or the Board of Directors; you have failed to appropriately
and adequately supervise the accounting and financial
books/records of the Company, such that there is more than
$1.5 million currently unaccounted for; you failed to
terminate James Stephenson after he engaged in gross
misconduct known to you, including but not limited to
threatening to kill Senior Executive Andrew Bressman and
making profane insults to senior management and Board
members, including calling them "a bunch of c**ts." You
have been on notice of this misconduct for weeks, yet you
have defiantly and expressly refused to comply with these
basic obligations you have to Troika, the Company and all
of their affiliated companies worldwide (the "Companies").
Your acts of gross misconduct have been in direct violation
of your obligations to the Companies.

JX 517. Ms. Stephenson urges that the litany of points raised in the letter to her do not

qualify as "for cause" under what she describes as a provision narrowly drafted to take

into account that a termination allegedly for cause could result in the Stephensons

potentially forfeiting up to $22 million in deferred compensation deriving from the sale

of Mission. *St. Br.* at 12.

Ms. Stephenson is correct. Standing alone, the points set out in the letter to her

depict acts infused with business judgment and discretion, such as the approach to

turnover of Mission's bank accounts and the alleged "theft" of $1.5 million, acts already

characterized in this Award as improper support for breach of contract claims. To the

extent the letter castigated Ms. Stephenson for the conduct of her husband, that criticism

must be cast aside. Troika's directors and officers had the ability and the power to punish

Mr. Stephenson. The attempt to thrust that task upon Ms. Stephenson should not be a

ground for Ms. Stephenson's termination, allegedly for cause.

If the story had ended with the January 4, 2019 letter to Ms. Stephenson, Ms. Stephenson's claim for breach of her employment agreement could have had viability. But on the day Troika attempted to terminate Ms. Stephenson's employment, Ms. Stephenson (and Mr. Stephenson) placed Mission-Media Limited and Mission-Media Holdings Limited into insolvency proceedings in London, without providing prior notice to Troika's Board, directors and officers. Having found such conduct to constitute a breach of fiduciary duty by company directors, it follows that such a breach should fulfill the "for cause" definition in Ms. Stephenson's Employment Agreement. Ms. Stephenson's breach of her fiduciary duty to the Company prompted material injury to the Company, particularly as the facts demonstrated subsequently that the insolvency placement appeared unwarranted. With the benefit of hindsight, it can be concluded that this conduct qualifies as gross misconduct materially injurious to the Company, committed without good faith and without a reasonable belief that the act or omission was in the best interest of the Company.

The claim for breach of Ms. Stephenson's Employment Agreement by reason of her termination for cause is denied.[4]

## 5. The Restrictive Covenant Claims

Section 7.05 (a) of the EPA (incorporated by reference in section 5.02 of the GPA) provides:

---

[4]    Troika contends in its post-hearing brief that information within the Sunday Times article also supports the claim that Ms. Stephenson breached her Employment Agreement, because "she was the obvious source of the confidential information reported" in the article. *Tr. Br.* at 43. No testimonial or documentary evidence controverts either Ms. Stephenson's rebuttal of this contention, or her statement that the author of the story obtained any such allegedly confidential information from his own reporting. *See* (419-23, N. Stephenson).

> For a period of four (4) years (five (5) years if, and only if,
> the Earn-out Period is extended to include the Calculation
> Period ending on December 31, 2023 in accordance with
> the terms and conditions of this Agreement) commencing
> on the Closing Date (the **"Restricted Period"**), each Seller
> shall not, and shall not permit any of such Seller's Affiliates
> to, directly or indirectly, (i) engage in or assist others in
> engaging in the Business anywhere throughout the world
> (including the United States and the United Kingdom); (ii)
> have an interest in any Person that engages directly or
> indirectly in the Business anywhere throughout the world
> (including the United States and the United Kingdom) in
> any capacity, including as a partner, shareholder, member,
> employee, principal, agent, trustee or consultant; or (iii)
> intentionally interfere in any material respect with the
> business relationships (whether formed prior to or after the
> date of this Agreement) between Mission US, Mission UK
> or MM Ltd, on the one hand, and customers or suppliers of
> Mission US, Mission UK or MM Ltd, on the other hand.
> Notwithstanding the foregoing, each Seller may own,
> directly or indirectly, solely as an investment, securities of
> any Person traded on any national securities exchange if
> such Seller is not a controlling Person of, or a member of a
> group which controls, such Person and does not, directly or
> indirectly, own two percent (2%) or more of any class of
> securities of such Person.

"Business" as that term is utilized within Section 7.05 (a) is defined as "the advertising

business of Mission US, Mission UK, MM Inc. and MM Ltd."

The Stephensons assert that the restrictive covenant within §7.05 (a) is

unenforceable. *St. Br.* at 21. They seek a declaratory judgment excusing them from the

restrictive covenant, because Troika breached the EPA and GPA, because the covenant

should not apply as it relates only to "advertising," not the experiential events business of

Mission, and because the covenant is unduly broad in duration and scope. *Id.* at 23-24.

Troika defends enforcement of the covenant, arguing that it should also be extended as a

damages remedy for the Stephensons' breach of the EPA and GPA. *Tr. Br.* at 74-77.

The denial of all breach of contract claims under the EPA and GPA eliminates the foundation for the Stephensons' claim that the covenant should not be enforced, and for Troika's assertion that the covenant should be extended. The restrictive covenant issue thus narrows to whether the covenant should continue to apply, with the initial focus on the definition of "Business" and its use of the term "advertising."

Hearing testimony raised skepticism as to whether the Mission companies referenced in the definition of "Business" engaged in "advertising," even acknowledging the breadth of that term (929, Bressman, 1829, Rappaport). Ms. Rappaport, for example, described Mission not as a traditional advertising agency but as an "event agency," somewhere between public relations and advertising (1758-59, Rappaport), with specialization in experiential marketing. *Id.* at 1824. Mr. Bressman similarly described Mission as an "experiential event company" (929, Bressman). Brochures prepared by Mission, however, referenced that it engaged in advertising, *see* RX 12, 23, 24, 25, and Mr. Machinist espoused a definition of advertising that included any communication delivering promotional messages through a specific audience (1587, Machinist). Although characterization of the experiential Mission business as "advertising" seems like placement of a square peg into a round hole, in the end the evidence was not absolutely conclusive on the point, leaving application of the covenant to the business of Mission in some doubt, at least by its explicit terms.

That doubt must hover when assessing whether the restrictive covenant should be enforced. While the New York courts view restrictive covenants in employment agreements warily, describing them as subject to specific enforcement only to the extent reasonable in time and area, necessary to protect the employer's legitimate interests, not

harmful to the general public and not unreasonably burdensome to the employee, *BDO*

*Seidman v. Hirshberg*, 93 N.Y.2d 382 (1999), the New York courts have treated such

covenants in merger and acquisition agreements differently, particularly when they

implicate acquisition of the good will of a business. *See Mohawk Maint. Co. v. Kessler*,

52 N.Y.2d 276, 284 (1981) ("A purchaser who acquires the 'good will' of a business pays

good and valuable consideration for the sellers implied promise to do everything within

his power to transfer the loyalties of his customers to the new proprietor. At the very

least the purchaser obtains the exclusive right, as between himself and the seller, to

exploit the established loyalties of the firm's customers for the benefit of his newly

acquired business.").

 Courts applying New York law, however, access equitable considerations even

when considering commercial contracts with restrictive covenants "under a simple rule of

reason, balancing the competing public policies in favor of robust competition and

freedom to contract." *Mathias v. Jacobs*, 167 F. Supp.2d 606, 611 (S.D.N.Y. 2001)

(*quoting DAR & Assocs., Inc. v. Uniforce Servs., Inc.*, 37 F. Supp.2d 192, 197 (E.D.N.Y.

1999)). Judge Marrero observed in the *Mathias* case that "the 'simple rule of reason' still

embraces consideration of the factors entailed in the employment contract test, including

protection of legitimate business interests and the hardship imposed upon the former

employee." 167 F. Supp.2d at 612-13.

 Here, the legitimate business interests are defined by a restrictive covenant with,

at best, tangential application to the experiential event core business in which the

Stephensons participated. That restrictive covenant has imposed hardship upon the

Stephensons by sidelining them since January 4, 2019, when Troika chose to terminate

their employment.  As things stand, Troika has paid $13 million for a business valued

initially at $35 million, and most recently at between $24.4 and $26.3 million, JX 639,

and has maintained that business for thirty months without any further payment to Ms.

Stephenson, the principal architect of the business.  That economic equation renders it

difficult for Troika to argue successfully now, as it attempts to do, that the balance of

hardships tips in Troika's favor, because releasing Ms. Stephenson from the restrictive

covenant would be "signing the death warrant" for the company (3113).  To the contrary,

the appropriate economic balance, taking into account the protection of legitimate

business interests and the hardship continued application of the restrictive covenant

would impose upon Ms. Stephenson, supports the conclusion that the covenant is now

"overbroad" in the circumstances and no longer should be enforced (3115).

The Stephensons' claim for a declaratory judgment releasing them from the

restrictive covenant within section 7.05 (a) of the EPA and section 5.02 of the GPA is

granted.  Troika's claim to extend that covenant is denied.

### 6. Troika's Claims for Corporate Waste and Repayment

Troika raises a variety of claims relating to payments allegedly made wrongfully

by the Stephensons, denominated as corporate waste or as bases for repayment.

#### a. Kevin Dundas Payment in December, 2018

The payment to Kevin Dundas in December, 2018 derived from the £300,000

bonus awarded to Mr. Dundas after the acquisition closed.  The Stephensons paid

£200,000 of that bonus from funds they received personally as a result of the acquisition.

The Mission UK companies paid the final £100,000 on December 20, 2018, but that

payment was not disclosed to anyone at Troika.  Troika contends that the Stephensons

should have made the payment personally, as they did with the original £200,000 payment. *Tr. Br.* at 22-29. Having the Mission companies make the £100,000 payment, Troika urges, violated various provisions of the EPA, and constituted corporate waste. *Id.* The Stephensons respond that it was always understood that the final £100,000 payment to Mr. Dundas would be made by the company, from a fully disclosed and agreed bonus pool. *St. Br.* at 17-18.

The evidence reveals, at the very least, that the communication between the Stephensons and the Troika representatives regarding the Dundas £100,000 payment was either poor or nonexistent. The only concrete fact to be gleaned from the record concerning the Dundas bonus is its genesis, that the Stephensons paid the original installment of the Dundas payment from their personal funds. Given the apparent communication void thereafter, symmetry, if nothing else, suggests that responsibility for the final payment should be similarly vested. Troika's claim to this effect is granted.

### b. Louise Galbreath and Juliette Timms

Troika accuses the Stephensons of "payroll padding" and corporate waste in the payments to Louise Galbreath and Juliette Timms. *Tr. Br.* at 39-40. The record does not support this charge. Ms. Galbreath served as a housekeeper for the Stephensons in London (1429, J. Stephenson). She coordinated matters for clients who stayed at the Stephensons' home, and provided meals and other amenities for clients, continuing those services when the Stephensons stayed in London after they moved to the United States (137, N. Stephenson). Mr. Bressman knew the role played by Ms. Galbreath, and that she was on the payroll before and after the closing of the acquisition (1430-31, J.

Stephenson).  Ms. Timms served as non-executive chairman of Mission, assisting in

recruitment in that capacity (125, N. Stephenson).

Troika's claims that the payments to Louise Galbreath and Juliette Timms

constituted corporate waste are denied.

### c.  Troika's claims for repayment of loans/expenses due January 5, 2019

Before the Closing, the Stephensons agreed to repay to Troika $115,000 in

directors' loans, plus $27,000 in personal expenses, on January 5, 2019.  RX 3.  The

Stephensons do not dispute this obligation (471-75, N. Stephenson).  The loans and

expenses have not been repaid.  They should be.  Troika's claim for repayment of

$142,000 is granted.

### 7.  Troika's Claim for Malicious Prosecution

Troika characterizes the Stephensons' fraudulent inducement claim against Mr.

Bressman personally as "an act of pure retaliation and vindictiveness," and a foundation

for a claim of malicious prosecution.  *Tr. Br.* at 46-47.  Troika also attaches a malicious

prosecution label to the insolvency proceedings instituted by the Stephensons.  *Id.*

Under New York law, a claim of malicious prosecution requires: (1) the

institution of an action or proceeding by the defendant; (2) begun with malice; (3) the

absence of probable cause to support the proceeding; and (4) termination of the

proceeding in favor of the plaintiff.  *Scheiner v. New York City Health and Hospitals*, 152

F. Supp.2d 487, 503 (S.D.N.Y. 2001).  Neither of the malicious prosecution claims here

meet this standard.  While the fraudulent inducement claim denied in this Award did not

succeed, the record still demonstrates that the assertions on which the claim was based

were made.  The insolvency proceedings have been found to have been instituted in good

faith in reliance upon counsel.

Troika's claim for malicious prosecution is denied.

8. **Damages**

a. **The Stephensons' Claims for Payment Under Sections 2.04 (c-e), 2.05 (c) and 2.06 of the EPA**

The Stephensons' claims under sections 2.04 (c-e), 2.05 (c) and 2.06 of the EPA

implicate Earn Out consideration and the issuance of Troika shares beyond those received

at the Closing.  Each of these provisions condition such payment or issuance on neither

seller having been terminated for cause by Troika.  Having found in this Partial Final

Award that Troika did not breach the Employment Agreement of either of the

Stephensons when it terminated their Employment Agreements for cause on January 4,

2019, the condition for payment of Earn Out consideration or issuance of additional

shares has not been met.

The Stephensons' claim for breach of sections 2.04 (c-e), 2.05 (c) and 2.06 of the

EPA and the corresponding claim for damages is denied.

b. **Troika's Breach of Fiduciary Claim Based on the U.K. Insolvency**

Troika attributes two damage elements to the Stephensons' breach of fiduciary

duty based on the U.K. insolvency found to constitute a valid claim in this Award.  The

first comprises so-called out-of-pocket costs incurred in addressing the insolvency

proceedings once filed.  *Tr. Br.* at 85.  Mr. Pakter calculated these damages as $571,514

(in JX 476 at 33).

The Stephensons criticize only Mr. Pakter's inclusion within his calculation of

£100,000 for new director compensation, on the theory that this compensation provision

merely carried out what Troika has urged that EPA §7.01 required throughout this proceeding, the appointment of new directors. *St. Br.* at 46-47; (2929). Troika has claimed (in error) that the Stephensons breached §7.01 by not seeing to the appointment of new directors. It strains logic to penalize the Stephensons now for an appointment Troika has sponsored. The criticism directed at the inclusion of the £100,000 for new directors' compensation is valid, requiring a downward adjustment in the recoverable amount of Troika's out-of-pocket damages.

The second element of damages attributable by Troika to breach of fiduciary duty in relation to the U.K. insolvency is lost profits principally resulting from the loss of Ms. Stephenson as the rainmaker she was hired to be. *Tr. Br.* at 85-90. Claims for lost profits are speculative by their very nature. As a result, New York law requires lost profits damage claims to be established with precision, both as to causation and quantum:

> First, it must be demonstrated with certainty that such damages have been caused by the breach and, second, the alleged loss must be capable of proof with reasonable certainty. In other words, the damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes *(Wakeman v Wheeler & Wilson Mfg. Co.,*101 NY 205).

*Kenford Co. v. Erie Cty.*, 67 N.Y.2d 257, 261(1986).

The lost profit claim here does not meet these requirements. Troika chose to terminate the employment of Ms. Stephenson <u>before</u> it learned of the institution of the insolvency proceedings, thus on its own creating an independent cause for profits that may have been lost by reason of Ms. Stephensons' absence having nothing to do with any fiduciary duty breach. This disconnection renders impossible any attempt to allocate the lost profits calculated by Mr. Pakter to Troika's choice to terminate Ms. Stephenson's

employment, as opposed to the breach of fiduciary duty occasioned by the failure to notify Troika of the insolvency. In so doing, it eliminates the "reasonable certainty" needed to predicate a valid lost profits claim under New York law.

The record here also does not justify a lost profits award for an independent reason already referenced in this Partial Final Award. Troika paid $13 million for a transaction valued at $35 million, and it has no obligation to make any further payments because it terminated the employment of Ms. Stephenson and Mr. Stephenson. Even at the end of fiscal year 2019, Empire Valuation Services valued Mission at between $24.4 million and $26.3 million. JX 639; (2059-60, 290, Craig). Troika thus maintains an asset valued at between $11 million and $13 million more than it had to pay for it, neither a "loss," nor derivatively a basis for an award of lost profit damages.

The claim for lost profits by reason of the Stephensons' breach of fiduciary duty in relation to the U.K. insolvency is denied.

### c.  Troika's Breach of Fiduciary Duty Claim Based on Conduct of Counsel

This Partial Final Award has concluded that compensation for Ms. Croft and the Tannenbaum firm from October, 2018 onward should be assessed as damages in this proceeding. Troika has proven $42,213 relating to Ms. Croft, and $149,185 in Tannenbaum firm fees. Troika is entitled to recover these amounts, plus interest.

### d.  The Stephensons' Claim for Breach of Section 3(e) of their Employment Agreements

This Partial Final Award has concluded that Troika should reimburse Mr. Stephenson for his personal payment of company expenses in the amount of $148,612.16. The Stephensons are entitled to recover this amount, plus interest.

### e.  Troika's Clams for Corporate Waste and Repayment

This Partial Final Award has concluded that the Stephensons should be responsible personally for the £100,000 final bonus installment paid by Troika to Mr. Dundas. Troika is entitled to recover that amount, plus interest.

### f. Troika's Claims for Repayment of Loans/Expenses due January 5, 2019

This Partial Final Award has concluded that the Stephensons should pay $142,000 in directors' loans and expenses due on January 5, 2019, but never repaid by the Stephensons. Troika is entitled to recover this amount, plus interest.

### g. Troika's Claim for Punitive Damages

An Arbitrator has the power to award punitive damages, when appropriate. *Flintlock Const. Services, LLC v, Weiss*, 122 A.D.3d 51 (1st Dep't 2014). "To sustain a claim for punitive damages in tort, one of the following must be shown: intentional or deliberate wrongdoing, aggravating or outrageous circumstances, a fraudulent or evil motive, or a conscious act that willfully and wantonly disregards the rights of another." *Don Buchwald & Assoc., Inc. v. Rich*, 281 A.D.2d 329, 330 (1st Dep't 2001). For the reasons described in this Award, the facts here do not include any of these predicates required for a punitive damage claim.

Troika's claim for punitive damages is denied.

### h. Interest and Currency Considerations

Inherent in the issuance of monetary awards generally, and in international matters particularly, are considerations of interest rate, calculation dates for such interest, and currency differences. After giving due consideration to these factors under the governing New York law in the EPA, the parties are requested to collaborate to adjust all damage rulings in this Partial Final Award. The parties shall provide to the Arbitrator an

agreed accounting on or before January 20, 2021. The Arbitrator will incorporate the agreed accounting into a Final Award. Any disputes concerning this process should be raised with the Arbitrator.

**D. Conclusion**

For the foregoing reasons, this Partial Final Award shall issue as follows:

1. The Stephensons' fraudulent inducement claims are denied.

2. The Stephensons' claim for breach of §6.23 of the EPA is denied

3. The Stephensons' claim for breach of §6.18(a) of the EPA is denied.

4. Troika's claim for breach of §§5.06(a), (e) and (j) of the EPA by reason of the £700,000 dividend payment made on June 27, 2018 is denied.

5. Troika's claim for breach of §7.14 of the EPA is denied.

6. Troika's claim for breach of §7.16 of the EPA is denied.

7. Troika's claim for breach of §7.01 of the EPA is denied.

8. Troika's claim for breach of §5.07 of the EPA is denied as moot.

9. Troika's claim for breach of fiduciary duty by reason of the Stephensons' failure to notify Troika's Board, directors and/or officers of the consideration or intent to file the insolvency proceedings in the U.K. is granted.

10. Troika's claim for breach of fiduciary duty based on conduct of counsel and the concordant claim for tortious interference by aiding and abetting such a breach are granted.

11. Ms. Stephenson's claim for breach of Section 1(a) of her Employment Agreement is denied.

12. The Stephensons' claim for Breach of Section 3(e) of their Employment Agreements is granted.

13. The claim for breach of Mr. Stephenson's Employment Agreement by reason of his termination for cause is denied.

14. The claim for breach of Ms. Stephenson's Employment Agreement by reason of her termination for cause is denied.

15. The Stephensons' claim for a declaratory judgment releasing them from the restrictive covenant within section 7.05(a) of the EPA and section 5.02 of the GPA is granted. Troika's claim to extend that covenant is denied.

16. Troika's claim that the Stephensons should be responsible personally for payment of the £100,000 bonus payment made by Troika to Kevin Dundas is granted.

17. Troika's claim for repayment of $142,000 in directors' loans and expenses is granted.

18. Troika's claim for malicious prosecution is denied.

19. The Stephensons' claim for breach of sections 2.04 (c-e), 2.05 (c) and 2.06 of the EPA and the corresponding claim for damages is denied.

20. Troika's claim for out-of-pocket losses by reason of the Stephensons' breach of fiduciary duty in relation to the U.K. insolvency is granted.

21. Troika's claim for lost profits by reason of the Stephensons' breach of fiduciary duty in relation to the U.K. insolvency is denied.

22. Troika shall recover:

- $571,514, less £100,000, for its out-of-pocket expenses by reason of its breach of fiduciary claim based on the U.K. insolvency, plus interest

- $142,000 for repayment of directors' loans and expenses, plus interest

- $42,213 relating to Ms. Croft, and $149,185 in Tannenbaum firm fees by reason of the breach of fiduciary duty claim due to conduct of counsel, plus interest

- £100,000 reimbursement for the Dundas bonus claim, plus interest

23.    The Stephensons shall recover:

- $148,612.16 on their claim for breach of section 3(e) of Mr. Stephenson's Employment Agreement, plus interest

24.    Troika's claim for punitive damages is denied.

25.    All claims by all parties for reimbursement of fees, costs and expenses not otherwise mentioned in this Partial Final Award are denied.

26.    To the extent any claim is not specifically mentioned herein, it is denied.

Dated: New York, New York
         January 4, 2021

_Lawrence W. Pollack_
Lawrence W. Pollack
Arbitrator

State of New York
                    :ss:
County of New York

I, Lawrence W. Pollack, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my PARTIAL FINAL AWARD.

Dated:  January 4, 2021

_Lawrence W. Pollack_
Lawrence W. Pollack
Arbitrator

## SERVICE LIST

| | |
|---|---|
| **Case Name:** Stephenson, Nicola, et al. vs. Mission Media USA, Inc., et al. | **Hear Type:** Arbitration |
| **Reference #:** 1425029686 | **Case Type:** Business/Commercial |
| **Panelist:** Pollack, Lawrence W., | |

### David A. Berger
Allegaert, Berger & Vogel

David A. Berger
111 Broadway
20th
New York, NY 10006
dberger@abv.com

Claimant
Phone: 212-571-0550
Fax: 212-571-0555

**Party Represented:**
James Stephenson
Nicola Stephenson

### Rachel Briant
Allegaert, Berger & Vogel

Rachel Briant
111 Broadway
20th
New York, NY 10006
rbriant@abv.com

Claimant
Phone: 212-571-0550
Fax: 212-571-0555

**Party Represented:**
James Stephenson
Nicola Stephenson

### Richard L. Crisona
Allegaert, Berger & Vogel

Richard L. Crisona
111 Broadway
20th
New York, NY 10006
rcrisona@abv.com

Claimant
Phone: 212-571-0550
Fax: 212-571-0555

**Party Represented:**
James Stephenson
Nicola Stephenson

### Bruce Robins
Feder Kaszovitz LLP

Bruce Robins
845 Third Avenue
New York, NY 10022-6601

brobins@fedkas.com

Respondent
Phone: 212-888-8200
x5412
Fax: 347-226-5472

**Party Represented:**
Andrew Bressman
Daniel Pappalardo
Jeffrey Schwartz
Mission Media USA, Inc.
Robert Machinist
Troika Media Group, Inc.
Troika Mission Holdings, Inc.

### David Sack
Feder Kaszovitz LLP

David Sack
845 Third Avenue
New York, NY 10022-6601
dsack@fedkas.com

Respondent
Phone: 212-888-8200
Fax: 212-888-7776

**Party Represented:**
Andrew Bressman
Daniel Pappalardo
Jeffrey Schwartz
Mission Media USA, Inc.
Robert Machinist
Troika Media Group, Inc.
Troika Mission Holdings, Inc.

**Murray L. Skala**

Feder Kaszovitz LLP

| | |
|---|---|
| Murray L. Skala | Respondent |
| 845 Third Avenue, | Phone: 212-888-8200 |
| 11th Fl. | Fax: (347) 226-5461 |
| New York,  NY   10022-6601 | |
| mskala@fedkas.com | |

**Party Represented:**
  Andrew Bressman
  Daniel Pappalardo
  Jeffrey Schwartz
  Mission Media USA, Inc.
  Robert Machinist
  Troika Media Group, Inc.
  Troika Mission Holdings, Inc.

## PROOF OF SERVICE BY E-MAIL

Re: Stephenson, Nicola, et al. vs. Mission Media USA, Inc., et al.
Reference No. 1425029686

I, Christine Persaud, not a party to the within action, hereby declare that on  January 4, 2021, I

served the attached PARTIAL FINAL AWARD on the parties in the within action by electronic mail at New

York, NEW YORK, addressed as follows:

Murray L. Skala Esq.
Bruce Robins Esq.
David Sack Esq.
Feder Kaszovitz LLP
845 Third Avenue,
11th Fl.
New York, NY   10022-6601
Phone: 212-888-8200
mskala@fedkas.com
brobins@fedkas.com
dsack@fedkas.com
   Parties Represented:
   Andrew Bressman
   Daniel Pappalardo
   Jeffrey Schwartz
   Mission Media USA, Inc.
   Robert Machinist
   Troika Media Group, Inc.
   Troika Mission Holdings, Inc.

David A. Berger Esq.
Richard L. Crisona Esq.
Ms. Rachel Briant
Allegaert, Berger & Vogel
111 Broadway
20th
New York, NY   10006
Phone: 212-571-0550
dberger@abv.com
rcrisona@abv.com
rbriant@abv.com
   Parties Represented:
   James Stephenson
   Nicola Stephenson

I declare under penalty of perjury the foregoing to be true and correct. Executed at New York, NEW

YORK on  January 4, 2021.

/s/Christine Persaud

Christine Persaud
JAMS
CPersaud@jamsadr.com